**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| CONTENTGUARD HOLDINGS, INC., | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CASE NO. 2:13-CV-1112-JRG |
| | § | |
| AMAZON.COM, INC., et al., | § | |
| *Defendants*. | § | |
| ──────────────────────── | § | |
| | § | |
| CONTENTGUARD HOLDINGS, INC., | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CASE NO. 2:14-CV-61-JRG |
| | § | |
| GOOGLE, INC., | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiff ContentGuard Holdings, Inc.'s Opening Claim Construction Brief (Dkt. No. 304),[1] the response of Defendants Amazon.com, Inc. ("Amazon"), Apple Inc., DirecTV, LLC, HTC Corporation, HTC America, Inc., Huawei Technologies Co., Ltd., Huawei Device USA, Inc., Motorola Mobility LLC, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Defendants") (Dkt. No. 331), Defendant Amazon.com, Inc.'s Separate Responsive Claim Construction Brief (Dkt. No. 336), Plaintiff's replies (Dkt. Nos. 344 & 345), and Defendants' sur-reply (Dkt. No. 353).

The Court held a claim construction hearing on February 6, 2015.

---

[1] References to docket numbers herein are to Civil Action No. 2:13-CV-1112 unless otherwise indicated.

# Table of Contents

I. BACKGROUND .................................................................................................. 4

II. LEGAL PRINCIPLES ........................................................................................ 4

III. CONSTRUCTION OF AGREED TERMS ........................................................ 9

IV. CONSTRUCTION OF DISPUTED TERMS IN THE STEFIK PATENTS ......... 10

   A.  "repository" and "trusted" ........................................................................... 10

   B.  "physical integrity" ....................................................................................... 16

   C.  "communications integrity" ........................................................................... 18

   D.  "behavioral integrity" .................................................................................... 19

   E.  "content" and "digital content" ..................................................................... 21

   F.  "rights," "usage rights," and "usage rights information" ................................ 23

   G.  "usage rights" ('160 Patent) ........................................................................... 33

   H.  "digital work" ............................................................................................... 35

   I.  "digital document" and "document" ............................................................. 37

   J.  "requester mode of operation" and "server mode of operation" .................... 40

   K.  "manner of use" ........................................................................................... 43

   L.  "render" and "rendering" ............................................................................... 45

   M.  "authorization object" ................................................................................... 48

   N.  "identification certificate" and "digital certificate" ....................................... 51

   O.  "nonce" and "random registration identifier" ............................................... 53

   P.  "distributed repository" ................................................................................. 56

   Q.  "document platform" ..................................................................................... 61

   R.  "validating" .................................................................................................. 65

   S.  "determining, by the document platform" ..................................................... 68

   T.  "grammar" ..................................................................................................... 72

   U.  "description structure" .................................................................................. 75

   V.  "means for communicating with a master repository for obtaining an identification certificate for the repository" ................................................... 76

   W.  "means for processing a request from the means for requesting" ................... 80

   X.  "means for checking whether the request is for a permitted rendering of the digital content in accordance with rights specified in the apparatus" ........................................... 85

Y. "means for receiving the authorization ob[j]ect when it is determined that the request should be granted" .................................................................................. 88

Z. "means for requesting a transfer of the digital content from an external memory to the storage" ........................................................................................................... 91

AA. "means for processing the request to make the digital content available to the rendering engine for rendering when the request is for a permitted rendering of the digital [content]," "means for authorizing the repository for making the digital content available for rendering, wherein the digital content can be made available for rendering only by an authorized repository," and "means for making a request for an authorization object required to be included within the repository for the apparatus to render the digital content" ................................................................................... 95

**V. CONSTRUCTION OF DISPUTED TERMS IN THE NGUYEN PATENTS ................ 98**

A. "repository" ................................................................................................................ 99

B. "license" ..................................................................................................................... 99

C. "meta-right" ............................................................................................................. 102

D. "usage rights" .......................................................................................................... 106

E. "manner of use" ....................................................................................................... 108

F. "state variable" ........................................................................................................ 109

G. "the at least one state variable identifies a location where a state of rights is tracked" .... 114

H. "specifying, in a first license, . . . at least one usage right and at least one meta-right for the item, wherein the usage right and the meta-right include at least one right that is shared among one or more users or devices" .................................................. 116

I. "means for obtaining a set of rights associated with an item" ........................................... 119

J. "means for determining whether the rights consumer is entitled to the right specified by the meta-right" .................................................................................................. 122

K. "means for exercising the meta-right to create the right specified by the meta-right" ..... 125

L. "means for generating a license including the created right, if the rights consumer is entitled to the right specified by the meta-right" .......................................................... 128

**VI. CONSTRUCTION OF DISPUTED TERMS IN THE DUNKELD PATENT ............ 130**

A. "detect[ing] a transfer" ........................................................................................... 131

B. "instance" ................................................................................................................ 133

C. "other portion" ........................................................................................................ 136

D. "over said network between user devices" ................................................................... 140

**VII. CONCLUSION ................................................................................................. 143**

3

# I.  BACKGROUND

Plaintiff brings suit alleging infringement of United States Patents No. 6,963,859 ("the '859 Patent"), 7,523,072 ("the '072 Patent"), 7,225,160 ("the '160 Patent"), 7,269,576 ("the '576 Patent"), 8,370,956 ("the '956 Patent"), 8,393,007 ("the '007 Patent") (collectively, the "Trusted Repository Patents" or "Stefik Patents"), 7,774,280 ("the '280 Patent"), 8,001,053 ("the '053 Patent") (collectively, the "Meta Rights Patents," "Nguyen/Chen Patents," or "Nguyen Patents"), and 8,583,556 ("the '556 Patent," also referred to as the "Transaction Tracking Patent" or the "Dunkeld Patent") (all, collectively, "the patents-in-suit").  (Dkt. No. 304, Exs. A-I.)

The parties have presented the patents-in-suit as three distinct groups, as set forth above, and the Court addresses those three groups in turn, below.

The Court heard oral arguments on February 6, 2015.  The parties did not present oral argument as to all disputed terms.  Instead, "[g]iven the large number of disputed claim terms," the parties chose to present oral arguments on terms identified in the parties' January 23, 2015 Joint Notice Regarding *Markman* Hearing.  (Dkt. No. 365.)  The parties also presented oral argument regarding one additional group of terms identified by the Court, namely "nonce" and "random registration identifier" in the Stefik Patents.  The parties did not present oral arguments regarding any other disputed terms and instead submitted those disputes on the briefing.

# II.  LEGAL PRINCIPLES

It is understood that "[a] claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention."  *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).  Claim construction is clearly an issue of law for the court to decide.  *Markman v.*

*Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction analysis is substantially guided by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the claims of a patent define the invention to which the

patentee is entitled the right to exclude." 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id.* The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to, and intended to be read by, others skilled in the particular art. *Id.*

Despite the importance of claim terms, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id.* at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim

> language and most naturally aligns with the patent's description of the invention
> will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the United States Patent and Trademark Office ("PTO") understood the patent. *Id.* at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*; *see Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation").

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319-24. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321.

*Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.*

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

In general, prior claim construction proceedings involving the same patents-in-suit are "entitled to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in *Markman*, even though *stare decisis* may not be applicable *per se*." *Maurice Mitchell Innovations, LP v. Intel Corp.*, No. 2:04-CV-450, 2006 WL 1751779, at *4 (E.D. Tex. June 21, 2006) (Davis, J.); *see TQP Development, LLC v. Inuit Inc.*, No. 2:12-CV-180, 2014 WL 2810016, at *6 (E.D. Tex. June 20, 2014) (Bryson, J.) ("[P]revious claim constructions in cases involving the same patent are entitled to substantial weight, and the Court has determined that it will not depart from those constructions absent a strong reason for doing so."); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 839-40 (2015) ("prior cases will sometimes be binding because of issue preclusion and sometimes will serve as persuasive authority") (citation omitted).

The Court nonetheless conducts an independent evaluation during claim construction proceedings. *See, e.g., Texas Instruments, Inc. v. Linear Techs. Corp.*, 182 F. Supp. 2d 580, 589-90 (E.D. Tex. 2002); *Burns, Morris & Stewart Ltd. P'ship v. Masonite Int'l Corp.*, 401 F.

Supp. 2d 692, 697 (E.D. Tex. 2005); *Negotiated Data Solutions, Inc. v. Apple, Inc.*, No. 2:11-CV-390, 2012 WL 6494240, at *5 (E.D. Tex. Dec. 13, 2012).

## III.  CONSTRUCTION OF AGREED TERMS

The Court hereby notes the Parties' agreed constructions:

| Stefik Patents | |
|---|---|
| <u>Term</u> | <u>Agreed Construction</u> |
| "rendering engine" | "a processor and associated software that renders" |
| "master device" | "A special type of device which issues identification certificates and distributes lists of repositories whose integrity has been compromised and which should be denied access to digital works (referred to as repository 'hotlists')." |
| "master repository" | "A special type of repository which issues identification certificates and distributes lists of repositories whose integrity have been compromised and which should be denied access to digital works (referred to as repository 'hotlists'.)" |
| "session key" | "a cryptographic key for encryption of messages during a single session" |
| "means for requesting use of the digital content stored in the storage" | "a user interface which is the mechanism by which a user interacts with a repository in order to invoke transactions to gain access to digital content, or exercise usage rights" |
| Nguyen/Chen Patents | |
| <u>Term</u> | <u>Agreed Construction</u> |
| "rights" | "The term 'right' in the claims of the '280 and '053 patents means a 'meta-right' or a 'usage right,' depending on context" |

(Dkt. No. 292, 11/17/2014 Joint Claim Construction and Prehearing Statement, at 2; *see* Dkt.

No. 366, Ex. B, 1/23/2015 Joint Claim Construction Chart.)

## IV. CONSTRUCTION OF DISPUTED TERMS IN THE STEFIK PATENTS

The earliest issued of the Stefik Patents is the '859 Patent. The '859 Patent is titled

"Content Rendering Repository" and issued on November 8, 2005. The Abstract states:

> A rendering system adapted for use in a system for managing use of content and
> operative to rendering [*sic*] content in accordance with usage rights associated
> with the content. The system includes a rendering device configured to render the
> content and a repository coupled to the rendering device and operative to enforce
> usage rights associated with the content and permit the rendering device to render
> the content in accordance with a manner of use specified by the usage rights.

Four of the six Stefik Patents have been the subject of *Inter Partes* Review ("IPR")

proceedings at the PTO's Patent Trial and Appeal Board ("PTAB"). (*See* Dkt. No. 331,

Exs. 1-4).

The Stefik Patents all claim priority to an application filed on November 23, 1994.

Defendants submit that the specifications of the Stefik Patents are "largely identical" except that,

Defendants argue, "the '160 patent specification is critically different from the other Stefik

specifications," as discussed further below. (Dkt. No. 331, at 1 n.1.)

The present Memorandum Opinion and Order cites only the specification of the '859

Patent unless otherwise indicated.

## A. "repository" and "trusted"

| "repository" | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "a trusted system in that it maintains physical, communications, and behavioral integrity in the support of usage rights" | "a trusted system, which maintains physical, communications and behavioral integrity, and supports usage rights" |

| **"trusted"** | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "maintains physical, communications, and behavioral integrity in the support of usage rights" | "maintains physical, communications and behavioral integrity" |

(Dkt. No. 304, at 1; Dkt. No. 331, at 2.)  The parties submit that "repository" appears in Claims 1, 15, 21, 24, 58, 71, and 81 of the '859 Patent, Claims 1 and 18 of the '576 Patent, and Claims 1 and 10 of the '072 Patent.  (Dkt. No. 292-1, at 7; Dkt. No. 331, at 2.)  The parties submit that "trusted" appears in Claims 1, 7, and 13 of the '956 Patent and Claims 1, 6, and 11 of the '007 Patent.  (Dkt. No. 292-1, at 8; Dkt. No. 331, at 2.)

    <u>(1)  The Parties' Positions</u>

    Plaintiff argues that its proposed construction for "repository" "adopts th[e] language from the [specification's] glossary verbatim while Defendants' proposed construction introduces ambiguities by replacing 'in that it' with 'which'" and "by replacing 'in the support of usage rights' with 'and supports usage rights.'"  (Dkt. No. 304, at 2.)  Plaintiff submits that although Defendants rely on the construction by the PTAB during an IPR, "[t]he PTAB based its construction on the same glossary definition [Plaintiff] relies on, but provided no reason to depart from the language from the glossary."  (*Id.*)

    Defendants respond that "Defendants' proposed construction of 'repository' follows the PTAB's construction verbatim; and Defendants' construction of the related term 'trusted,' which the PTAB did not construe, mirrors this construction."  (Dkt. No. 331, at 2 (citing, *id.*, Ex. 2, at 8).)  Defendants submit that Plaintiff "actually rearranged pieces of the [specification glossary's] definition to alter the meaning of 'repository.'"  (Dkt. No. 331, at 3.)  Defendants

explain that "[u]nder [Plaintiff's] construction, instead of the three integrities being required at all times, as taught by the Stefik patents and required by the PTAB's construction, the three integrities only need to be present when supporting usage rights." (*Id.*)

In an additional, separate responsive brief, Defendant Amazon argues that because the specification defines "repository" and "trusted" in "purely functional language," those terms are indefinite. (Dkt. No. 336, at 3.) Defendant Amazon cites *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244 (Fed. Cir. 2008), which found indefinite the term "fragile gel." (*See id.*, at 3-5.)

Plaintiff replies that Defendants' argument that a repository must "maintain the three integrities at all times" "is not found in the PTAB construction and directly contradicts the Stefik patents' specification . . . ." (Dkt. No. 345, at 1.) Plaintiff concludes that "[t]here is simply no basis for defining 'repository' as something that maintains the three integrities *at all times*, even while conducting transactions that do not support usage rights." (*Id.*)

Plaintiff also replies, as to Amazon's separate brief, that "Amazon's arguments should be rejected because they reflect an elementary misunderstanding of the applicable law and are not supported by any evidence." (Dkt. No. 344, at 1.) Plaintiff notes that Amazon submits no expert opinions on this issue, and Plaintiff submits that "there is ample support in the specification that describes the boundaries of the three integrities that define [Mr.] Stefik's concept of 'trust.'" (*Id.*, at 3-5 (citing 11:62-12:50).)

In sur-reply, Defendants argue that, "[l]ogically, [Mr.] Stefik must have intended for repositories and trusted systems to require the three integrities at all times, otherwise his inventions would not solve the digital piracy problem." (Dkt. No. 353, at 1.) Defendants also note that a "restoration file," which is used to restore a back-up file, "would be held in [a]

repository," and "[i]f a repository cannot verify that it is communicating with another trusted repository, then 'the registration transaction terminates in an error.'"  (*Id.*, at 3 (citing '859 Patent at 27:3-5 & 36:57-58).)

At the February 6, 2015 hearing, Defendants reiterated that "in support of" is broader than how the PTAB construed the term and injects ambiguity into the claims.

<u>(2)  Analysis</u>

The parties disagree as to whether the disputed terms refer to *supporting* usage rights or merely being "*in the support of* usage rights," as well as whether the three "integrities" must be present at all times.

On one hand, the PTAB construed "repository" to mean "a trusted system which maintains physical, communications and behavioral integrity, and supports usage rights."  (Dkt. No. 304, Ex. J, 6/26/2014 Final Written Decision, at 10-11.).  This prior construction is entitled to some deference.  *See Maurice Mitchell*, 2006 WL 1751779, at *4; s*ee also TQP*, 2014 WL 2810016, at *6; *Teva*, 135 S. Ct. at 839-40.

On the other hand, the "Glossary" section of the specification explicitly states:

Repository:

Conceptually a set of functional specifications defining core functionality in the support of usage rights.  A repository is a trusted system in that it maintains physical, communications and behavioral integrity.

'859 Patent at 50:47-51.

On balance, the Court finds that by setting forth an explicit definition in a "Glossary," the patentee acted as lexicographer and expressly defined the term "repository."  *See Intellicall*, 952 F.2d at 1388; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004) ("[T]he inventor's written description of the invention . . . is relevant and controlling insofar as it

provides clear lexicography . . . ."); *Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1354 (Fed. Cir. 2003) ("patentee's lexicography must, of course, appear with reasonable clarity, deliberateness, and precision") (citation and internal quotation marks omitted).

This lexicography finding is supported by other disclosures in the specification, such as the discussion of "Repositories":

Repositories

Many of the powerful functions of repositories—such as their ability to "loan" digital works or automatically handle the commercial reuse of digital works—are possible because they are trusted systems. The systems are trusted because they are able to take responsibility for fairly and reliably carrying out the commercial transactions. That the systems can be responsible ("able to respond") is fundamentally an issue of integrity. The integrity of repositories has three parts: physical integrity, communications integrity, and behavioral integrity.

'859 Patent at 11:51-61; *see also* 6:29-31 ("the digital work genie only moves from one trusted bottle (repository) to another"). The specification also discloses that a repository may communicate with a non-repository and that not all communications between repositories are secure. *See id.* at 25:37-52, 26:30-67 ("registration transaction") & 37:12-21 ("non-repository archive storage").

To whatever extent Defendant Amazon maintains that Plaintiff's construction is improperly functional rather than structural, that argument is rejected. *See, e.g., Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374-75 (Fed. Cir. 2014) ("defining a particular claim term by its function is not improper"); *Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1366 (Fed. Cir. 2010) ("The use of comparative and functional language to construe and explain a claim term is not improper. A description of what a component does may add clarity and understanding to the meaning and scope of the claim."); *Microprocessor Enhancement Corp. v.*

*Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) ("claims are not necessarily indefinite for using functional language").

As to extrinsic evidence, Defendants have also cited an article in which named inventor Mark Stefik stated that a "trusted system" "could always be counted on to follow the rules of the trust," and "[i]n the case of digital works on repositories, the requirement for trust is that the repositories follow—at all times and in every instance—the rules about how digital works are used." (Dkt. No. 331, Ex. 5, Mark Stefik, *Letting Loose the Light: Igniting Commerce in Electronic Publication* 12, 24 (1996).) This extrinsic evidence is of insufficient weight, however, to override the explicit lexicography in the specification, as set forth above. *See Phillips*, 415 F.3d at 1317 ("[W]hile extrinsic evidence can shed useful light on the relevant art, we have explained that it is less significant than the intrinsic record in determining the legally operative meaning of claim language.") (citations and internal quotation marks omitted).

That lexicography, on its face, requires only that the integrities be maintained "in support of" usage rights. Defendants have failed to adequately support their proposed "at all times" interpretation. (*See* Dkt. No. 353, at 1.)

The Court accordingly hereby construes these disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| **"repository"** | **"a trusted system in that it maintains physical, communications, and behavioral integrity in the support of usage rights"** |
| **"trusted"** | **"maintains physical, communications, and behavioral integrity in the support of usage rights"** |

**B. "physical integrity"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "prevents access to content by a non-trusted system" | "preventing access to information by a non-trusted system" |

(Dkt. No. 304, at 1; Dkt. No. 331, at 4.)  Defendants submit that this disputed term appears in

Claims 1, 15, 21, 24, 58, 71, and 81 of the '859 Patent, Claims 1 and 18 of the '576 Patent,

Claims 1 and 10 of the '072 Patent, Claims 1, 7, and 13 of the '956 Patent, and Claims 1, 6,

and 11 of the '007 Patent.  (Dkt. No. 331, at 4.)

(1)  The Parties' Positions

Plaintiff argues that whereas its proposal is supported by the specification and "clarifies

for the jury that the relevant 'information' is the 'content,' as described by the specification,"

"Defendants' proposed construction does not identify what 'information' the physical integrity

applies to."  (Dkt. No. 304, at 3.)

Defendants argue that "[Plaintiff] attempts to broaden the PTAB's construction, so that

repositories and trusted systems need only prevent non-trusted systems from accessing 'content'"

rather than "information."  (Dkt. No. 331, at 4.)  Defendants explain that the PTAB used the

word "information" to encompass "data," "content," and "digital works."  (*Id.* (citing *id.*, Ex. 2,

at 10; citing '859 Patent at 11:62-12:20).)

Plaintiff replies that Defendants' proposal is contrary to the PTAB decision, and "a

repository cannot determine whether it is communicating with another trusted repository without

first exchanging at least some preliminary, unprotected information . . . ."  (Dkt. No. 345, at 1.)

At the February 6, 2015 hearing, Plaintiff emphasized that the PTAB found that the terms

"content," "data," "digital work," and "information" were used interchangeably.  (*See* Dkt.

No. 304, Ex. J, 6/26/2014 Final Written Decision ('576 Patent), at 12; Dkt. No. 331, Ex. 2, 7/1/2014 Final Written Decision ('859 Patent), at 10.)

(2)  Analysis

On one hand, the specification refers to protecting "works."  '859 Patent at 12:1-5 ("[T]he repository design protects access to the content of digital works. . . . [R]epositories never allow non-trusted systems to access the works directly.") & 11:63-64 ("Physical integrity applies both to the repositories and to the protected digital works.").  Further, the specification discloses that unsecured communications may be used as part of a "registration process."  *See id.* at 26:30-67 ("registration transaction").

Also, the PTAB noted that the specification "appears to use" the terms "information" and "content" "interchangeably."  (Dkt. No. 304, Ex. J, 6/26/2014 Final Written Decision ('576 Patent),[2] at 12 (emphasis added); *see* Dkt. No. 331, Ex. 2, 7/1/2014 Final Written Decision ('859 Patent), at 10 (same).)

On the other hand, the PTAB construed "physical integrity" to mean "preventing access to *information* by a non-trusted system."  (Dkt. No. 304, Ex. J, 6/26/2014 Final Written Decision ('576 Patent), at 12 (emphasis added); *see* Dkt. No. 331, Ex. 2, 7/1/2014 Final Written Decision ('859 Patent), at 10 (same).)

The specification supports such a reading of "physical integrity" by disclosing the importance of protecting the repository itself:

> *Physical integrity refers to the integrity of the physical devices themselves. Physical integrity applies both to the repositories and to the protected digital works.*  Thus, the higher security classes of repositories themselves may have sensors that detect when tampering is attempted on their secure cases.  *In addition*

---

[2] For convenience, the present Memorandum Opinion and Order in some instances uses parentheticals to identify the patent that is related to a particular exhibit.

*to protection of the repository itself*, the repository design protects access to the content of digital works. In contrast with the design of conventional magnetic and optical devices—such as floppy disks, CD-ROMs, and videotapes—repositories never allow non-trusted systems to access the works directly. A maker of generic computer systems cannot guarantee that their platform will not be used to make unauthorized copies. The manufacturer provides generic capabilities for reading and writing information, and the general nature of the functionality of the general computing device depends on it. Thus, a copy program can copy arbitrary data. This copying issue is not limited to general purpose computers. It also arises for the unauthorized duplication of entertainment "software" such as video and audio recordings by magnetic recorders. Again, the functionality of the recorders depends on their ability to copy and they have no means to check whether a copy is authorized. In contrast, repositories prevent access to the raw data by general devices and can test explicit rights and conditions before copying or otherwise granting access. *Information is only accessed by protocol between trusted repositories.*

'859 Patent at 11:62-12:20 (emphasis added).

The Court accordingly hereby construes **"physical integrity"** to mean **"preventing access to information in a repository by a non-trusted system."**

**C. "communications integrity"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "only communicates with other devices that are able to present proof that they are trusted systems, for example, by using security measures such as encryption, exchange of digital certificates, and nonces" | "only communicates with other devices that are able to present proof that they are trusted systems, e.g., by using security measures such as encryption, exchange of digital certificates, and nonces" |

(Dkt. No. 304, at 1; Dkt. No. 292-2, at 1.)

Defendants submit that "[t]he parties do not differ substantively about the definition of communications integrity, so the Defendants have not addressed that term in [their response] brief." (Dkt. No. 331, at 2 n.2.) At the February 6, 2015 hearing, the parties did not address this term.

The Court accordingly hereby construes **"communications integrity"** to mean **"only communicates with other devices that are able to present proof that they are trusted**

**systems, for example, by using security measures such as encryption, exchange of digital certificates, and nonces."**

**D. "behavioral integrity"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "requires software that is to be installed in the repository to include a digital certificate, in other words, an assurance that the software comes from a source known to the repository" | "requiring software to include a digital certificate in order to be installed in the repository" |

(Dkt. No. 304, at 1; Dkt. No. 331, at 4-5.)  Defendants submit that this disputed term appears in Claims 1, 15, 21, 24, 58, 71, and 81 of the '859 Patent, Claims 1 and 18 of the '576 Patent, Claims 1 and 10 of the '072 Patent, Claims 1, 7, and 13 of the '956 Patent, and Claims 1, 6, and 11 of the '007 Patent.  (Dkt. No. 331, at 4-5.)

(1)  The Parties' Positions

Plaintiff argues that its proposed construction is supported by the specification as well as by the PTAB's construction and understanding.  (Dkt. No. 304, at 3.)

Defendants respond that "[t]he PTAB rejected essentially the same argument" that Plaintiff has presented here, namely "to redefine the term 'digital certificate' to encompass any 'assurance that the software comes from a source known to the repository.'"  (Dkt. No. 331, at 5.)  Defendants argue that "[h]aving survived the IPRs based on [the PTAB's] construction [(requiring the use of a digital certificate)], [Plaintiff] now makes a second attempt at eliminating the digital certificate requirement."  (*Id.*)

Plaintiff replies that Defendants' attempt to "limit 'digital certificate' . . . to an exemplary form" "is contrary to the PTAB's decisions."  (Dkt. No. 345, at 2.)

(2)  Analysis

On one hand, the specification discloses:

> *The integrity of the software is generally assured only by knowledge of its source.*
> Restated, a user will trust software purchased at a reputable computer store but
> not trust software obtained off a random (insecure) server on a network.
> Behavioral integrity is maintained by requiring that repository software be
> certified and be distributed with proof of such certification, i.e. a *digital
> certificate*. The purpose of the certificate is to authenticate that the software has
> been tested by an authorized organization, which attests that the software does
> what it is supposed to do and that it does not compromise the behavioral integrity
> of a repository. If the digital certificate cannot be found in the digital work or the
> master repository which generated the certificate is not known to the repository
> receiving the software, then the software cannot be installed.

'859 Patent at 12:36-50 (emphasis added). The PTAB also "credit[ed] the testimony of [Plaintiff's] expert, Dr. Goodrich, that 'a person of ordinary skill in the art [in 1994] would [have understood] a digital certificate to be an assurance that downloaded software comes from a reputable source, including a measure of tamper resistance.'" (Dkt. No. 331, Ex. 2, 7/1/2014 Final Written Decision ('859 Patent), at 26 (square brackets PTAB's).)

On the other hand, the PTAB construed "behavioral integrity" as "requiring software to include a digital certificate in order to be installed in the repository." (Dkt. No. 304, Ex. J, 6/26/2014 Final Written Decision ('576 Patent), at 13; *see* Dkt. No. 331, Ex. 2, 7/1/2014 Final Written Decision ('859 Patent), at 11 (same).) The PTAB also found:

> We do not credit the testimony of the expert witness of [Plaintiff], Dr. Goodrich,
> that "a person of ordinary skill in the art of 1994 would [have understood] that the
> '859 patent specification refers to the use of digital certificates as only an
> exemplary method of preserving the behavioral integrity of a repository." The
> testimony is unexplained and conclusory; it does not account for the various
> factors we have considered and discussed above.

(Dkt. No. 331, Ex. 2, 7/1/2014 Final Written Decision ('859 Patent), at 20 (citation omitted).) Defendants also object to Plaintiff's citation of Dr. Goodrich's statement made in the IPR as hearsay. (Dkt. No. 331, at 6 n.6 (citing Fed. R. Evid. 801(c)).)

On balance, Plaintiff has failed to justify departing from the PTAB's construction, which is entitled to "reasoned deference." *Maurice Mitchell*, 2006 WL 1751779, at *4; *see TQP*, 2014

WL 2810016, at *6; *see also Teva*, 135 S. Ct. at 839-40.  Plaintiff's proposed construction, which includes additional language that would tend to broaden the scope of the disputed term, is therefore rejected.

The Court accordingly hereby construes **"behavioral integrity"** to mean **"requiring software to include a digital certificate in order to be installed in the repository."**

## E.  "content" and "digital content"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "any work that has been reduced to a digital representation" | "the digital information (i.e., raw bits) representing a digital work" |

(Dkt. No. 304, at 4; Dkt. No. 331, at 13-14.)  The parties submit that these disputed terms appear in Claims 1 and 58 of the '859 Patent, Claims 1, 4, 5, 7, 10, 11, 13, 16, and 17 of the '956 Patent, Claims 1, 3, 4, 6, 8, 9, 11, and 13 of the '007 Patent, Claims 1, 4, 7, 18, 21, 24, and 34 of the '576 Patent, and Claims 1, 9, and 10 of the '160 Patent.  (Dkt. No. 292-1, at 2; Dkt. No. 331, at 13.)

(1)  The Parties' Positions

Plaintiff argues that Defendants are attempting to "bootstrap 'digital work' and their corresponding interpretation into claims that do not contain the term."  (Dkt. No. 304, at 4.) Plaintiff urges that "[t]he final sentence of the 'digital work' glossary definition injects an optional feature of the preferred embodiment, and represents a departure from the plain and ordinary meaning of 'content.'"  (Dkt. No. 304, at 5.)  "[T]he patentee chose to use 'content' rather than 'digital work' in the claims," Plaintiff emphasizes.  (*Id.*, at 6.)  Finally, Plaintiff submits that "in distinguishing over prior art in a related application, the patentee cited only the first two sentences from the glossary entry as the definition for 'digital work.'"  (*Id.*)

Defendants respond that their proposals for "content" and "digital work" are consistent with one another because, as defined in the specification, "'digital work' and 'content' are closely related, interdependent terms, with content referring to the 'digital information (i.e. raw bits)' that make up a digital work, and digital work referring to encapsulating that 'digital information.'"  (Dkt. No. 331, at 14.)

Plaintiff replies that "[t]here is no basis to rewrite the claims as Defendants propose." (Dkt. No. 345, at 6.)

(2)  Analysis

The parties have not submitted any previous construction, by the PTAB or otherwise, for these disputed terms.

The specification sets forth two definitions for "content."  First, the specification states: "Herein the terms 'digital work,' 'work' and 'content' refer to any work that has been reduced to a digital representation."  '859 Patent at 5:64-66.  Second, the "Glossary" section of the specification states:

Content:

The digital information (i.e. raw bits) representing a digital work.

*Id.* at 49:52-54.

The term "digital work," in turn, is defined in the "Glossary" as follows:

Digital Work (Work):

Any encapsulated digital information.  Such digital information may represent music, a magazine or book, or a multimedia composition.  Usage rights and fees are attached to the digital work.

*Id.* at 50:8-12.  Fees, however, are optional.  *Id.* at 18:19-29 ("In the currently preferred embodiment . . . no fee is required.").

The definition of "digital work" is probative, particularly given that the first of the above-quoted definitions for "content" purports to define not only "content" but also "digital work." In light of this, the "Glossary" definition proposed by Defendants is more appropriate.

The Court accordingly hereby construes **"content"** and **"digital content"** to mean **"the digital information (i.e., raw bits) representing a digital work."**

## F. "rights," "usage rights," and "usage rights information"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "an indication of the manner in which a [digital work / digital content / content / a digital document] may be used or distributed as well as any conditions on which use or distribution is premised" | "statements in a language for defining the manner in which a digital work may be used or distributed, as well as any conditions on which use or distribution is premised. Usage rights must be permanently attached to the digital work"[3] |

(Dkt. No. 304, at 4 (square brackets Plaintiff's); Dkt. No. 331, at 7.) The parties submit that these disputed terms appear in Claims 1 and 58 of the '859 Patent, Claims 1, 15, 18, and 32 of the '576 Patent, Claims 1, 7, and 13 of the '956 Patent, Claims 1, 6, and 11 of the '007 Patent, and Claims 1, 8, 10, and 16 of the '072 Patent. (Dkt. No. 292-1, at 8; Dkt. No. 331, at 7.)

(1) "language"

(a) The Parties' Positions

Plaintiff submits:

In the preferred embodiment, the usage rights are *expressed* in a usage rights language, but are not themselves a language. Incongruously, the glossary entry for "usage rights" recites "a language for defining the manner in which a digital work may be used or distributed, as well as any conditions on which use or distribution is premised." The glossary incorrectly purports to define "usage

---

[3] Defendants previously proposed: "A language for defining the manner in which a digital work may be used or distributed, as well as any conditions on which use or distribution is premised. Rights must be attached to the digital work." (Dkt. No. 292-2, at 9.)

rights" while actually defining "usage rights language." . . . This error in the glossary definition was corrected in the '160 patent.

(Dkt. No. 304, at 8-9 (citing '859 Patent at 16:63-66 & 51:7-10; citing '160 Patent at 48:24-26).)

Defendants respond that "[i]n the twenty years of multiple of [*sic*] patent applications prosecuted since it filed the parent application, [Plaintiff] has *never* suggested that the 'usage rights' definition appearing across [the] Stefik patent family contains an error or ambiguity." (Dkt. No. 331, at 8.)

Plaintiff replies: "[i]f interpretable code expresses a usage right and thus qualifies as a 'statement in a language,' then Defendants' proposal adds nothing. The claims already require computer implementation, and all data recorded, read, or communicated by a computer is encoded. On the other hand, if a code or number interpreted to express a usage right does not meet Defendants' 'statement in a language' limitation, then Defendants' construction excludes a preferred embodiment." (Dkt. No. 345, at 6.)

In sur-reply, Defendants reply that the disclosure of a "right code" (quoted below) "merely explains that each right will have a designated right code 'assigned to' correspond to it in a descriptor block, not that this code itself constitutes the right." (Dkt. No. 353, at 3.)

(b) Analysis

The "Glossary" section of the specification of the Stefik Patents (except for the '160 Patent) states:

Usage Rights:

A language for defining the manner in which a digital work may be used or distributed, as well as any conditions on which use or distribution is premised.

'859 Patent at 51:7-10. The specification of one of the Stefik Patents, the '160 Patent, includes a "Glossary" section that defines "usage rights" as an "indication" rather than as a language:

Usage Rights—An indication of the manner of use by which a digital work may be used or distributed, as well as any conditions on which manner of use is premised.

'160 Patent at 48:24-26. As to this disclosure of "indication," the specification also discloses that "[a] right 1450 [in Fig. 14] has a label (e.g. COPY or PRINT) which *indicate[s]* the use or distribution privileges that are embodied by the right." '859 Patent at 17:25-28 (emphasis added).

The specification includes disclosures of usage rights as being in "a language." *See id.* at 16:63-25:35 & 51:4-6; *see also id.* at Fig. 15. In particular, the specification discloses:

The present invention uses statements in a high level *"usage rights language"* to define rights associated with digital works and their parts. Usage rights statements are interpreted by repositories and are used to determine what transactions can be successfully carried out for a digital work and also to determine parameters for those transactions. For example, *sentences in the language* determine whether a given digital work can be copied, when and how it can be used, and what fees (if any) are to be charged for that use. Once the usage rights statements are generated, they are encoded in a suitable form for accessing during the processing of transactions.

*Defining usage rights in terms of a language* in combination with the hierarchical representation of a digital work enables the support of a wide variety of distribution and fee schemes.

*Id.* at 16:63-17:12 (emphasis added).

The specification also discloses that a usage right can be specified by merely a "right code." '859 Patent at 9:47-57 ("The right code field 1001 will contain a unique code assigned to a right. . . . The rights as stored in the rights portion 304 may typically be in numerical order based on the right code.").

These disclosures are consistent with reading the definition in the "Glossary" section of the specification as indicating that a "usage right" can be either expressed in a language or with a code. Further, the specification of one of the Stefik Patents, the '160 Patent, includes a

"Glossary" section that defines "usage rights" as an "indication" rather than in terms of a language, as set forth above. '160 Patent at 48:24-26; *see Aventis Pharm. Inc. v. Amino Chemicals Ltd.*, 715 F.3d 1363, 1380 (Fed. Cir. 2013) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.") (quoting *Omega Eng'g v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003)).

Defendants' proposal of requiring a "language" is therefore hereby expressly rejected.

(2) "permanently attached"

(a) The Parties' Positions

Plaintiff argues that Defendants import a "permanently attached" limitation from a preferred embodiment. (Dkt. No. 304, at 4.) Plaintiff submits that "the agreed portion of the parties' constructions for the rights terms already encompasses the 'attachment' contemplated by the patent." (*Id.*, at 7.) Plaintiff also argues, for example, that "the content associated with the right may exist both before and after the term or life of the right." (*Id.*, at 8.)

Defendants respond by citing "the unequivocal statement in the specification that, 'A key feature of the present invention is that usage rights are permanently 'attached' to the digital work.' ['859 Patent at] 6:11-12." (Dkt. No. 331, at 8 (emphasis omitted).) Defendants also submit: "the 'description tree' is different and distinct from the actual 'usage rights' for a digital work (which are merely 'described' by the description tree), and the fact that the 'description tree' file can be stored separately from the 'contents' file of a work does not, and cannot, negate the patents' explicit requirement that 'usage rights are permanently 'attached' to the digital work.'" (*Id.*, at 10.) Finally, Defendants argue that "[Plaintiff's] efforts to eliminate the 'attachment' of usage rights teachings, and, instead, to inject 'associated with' teachings into the

'160 patent specification, demonstrate that [Plaintiff], itself, recognizes the difference between 'attachment' and mere 'association' of usage rights and content, and that [Plaintiff] did not view the '859, '576, '072, '956 and '007 patents as teaching mere 'association.'" (*Id.*, at 11.)

Plaintiff replies that Defendants' proposal "modifies the glossary definition of 'usage rights' and misinterprets the specification's teachings concerning how usage rights are permanently 'attached.'" (Dkt. No. 345, at 2.) Plaintiff submits that "'attachment' is a metaphor to explain that rights should be associated with content, while 'permanent' attachment means that that association persists for the term or life of the right." (*Id.*, at 2-3.) Plaintiff concludes that "Defendants' attempt to import the undefined requirement of permanent 'attachment' into the claims could only mislead a jury into believing that usage rights must physically be a part of the content file(s) that comprise a digital work." (*Id.*, at 3.) Finally, Plaintiff argues that the "description tree" disclosure cited by Defendants does *not* establish that "the description tree structure describes a single location of content and usage rights (akin to a table of contents)." (*Id.*, at 5.)

In sur-reply, Defendants argue that "[g]iven that 'attachment' is a specific type of association, it comes as no surprise that the Stefik patents occasionally use the phrase 'associated with." (Dkt. No. 353, at 4.) Defendants also argue that "[d]escription trees are not the same as usage rights, which [Plaintiff] itself recognized by claiming the two as separate and distinct elements in the '160 patent." (*Id.*, at 5 (citing '160 Patent at 48:31-51 [Claim 1]).)

At the February 6, 2015 hearing, Plaintiff urged that Defendants' proposal of "permanent" attachment must be rejected because a usage right is associated with a work only for the life of the usage right. In other words, Plaintiff argued, the life of the usage right may be

shorter than the life of the work.  Defendants responded that the specification consistently

discloses that works are inseparable from usage rights.

(b)  Analysis

Claim 1 of the '859 Patent, for example, recites "usage rights associated with the

content."

The specification discloses, however, that "[a] key feature of the present invention is that

usage rights are permanently 'attached' to the digital work."  '859 Patent at 6:11-12; *see id.*

at 3:50-52 ("It would be desirable to have a distribution system where the means for billing is

always transported with the work") & 6:25-32 ("the present invention never separates the fee

descriptions from the work").  Similarly, the specification also discloses:

Attaching Usage Rights to a Digital Work

*It is fundamental to the present invention that the usage rights are treated as part of the digital work.*  As the digital work is distributed, the scope of the granted usage rights will remain the same or may be narrowed.  For example, when a digital work is transferred from a document server to a repository, the usage rights may include the right to loan a copy for a predetermined period of time (called the original rights).  When the repository loans out a copy of the digital work, the usage rights in the loaner copy (called the next set of rights) could be set to prohibit any further rights to loan out the copy.  The basic idea is that one cannot grant more rights than they have.

The *attachment of usage rights into a digital work* may occur in a variety of ways. If the usage rights will be the same for an entire digital work, they could be attached when the digital work is processed for deposit in the digital work server. In the case of a digital work having different usage rights for the various components, this can be done as the digital work is being created.  An authoring tool or digital work assembling tool could be utilized which provides for an automated process of attaching the usage rights.

*Id.* at 10:44-65 (emphasis added); *see id.* at 6:14-16 ("[T]he usage rights and any associated fees

assigned by a creator and subsequent distributor will always remain with a digital work."); *see*

*also id.* at 6:22-23 ("[t]he combination of attached usage rights and repositories enable distinct

advantages over prior systems") & 18:13-17 ("The set of rights attached to a digital work define how that digital work may be transferred, used, performed or played. A set of rights will attach to the entire digital work and in the case of compound digital works, each of the components of the digital work.").

Further, the "Glossary" section of the specification defines "digital work" and "composite digital work" as requiring that usage rights are "attached":

> Digital Work (Work):
>
> Any encapsulated digital information. Such digital information may represent music, a magazine or book, or a multimedia composition. *Usage rights and fees are attached to the digital work.*

*Id.* at 50:8-12 (emphasis added).

> Composite Digital Work:
>
> A digital work comprised of distinguishable parts. Each of the distinguishable parts is itself a digital work *which have usage rights attached*.

*Id.* at 49:48-51 (emphasis added).

The specification also appears to suggest that usage rights and their associated content can be stored in separate "descriptor" and "contents" files, respectively. '859 Patent at 8:46-54 ("The description tree file makes it possible to examine the rights and fees for a work without reference to the content of the digital work."); *see id.* at Fig. 12 (illustrating "Descriptor Storage 1203" distinct from "Content Storage 1204"). The storage can even be on separate devices:

> The description tree storage 1203 and content storage 1204 need not be of the same type of storage medium, nor are they necessarily on the same physical device. So for example, the descriptor storage 1203 may be stored on a solid state storage (for rapid retrieval of the description tree information), while the content storage 1204 may be on a high capacity storage such as an optical disk.

*Id.* at 13:41-47; *see also id.* at 9:10-25 (regarding "rights portion 704" of description tree, illustrated in Figure 7). Further, the specification discloses that "usage rights" can be "associated with" content. *See* '859 Patent at 3:53-60, 6:52-53, 16:64-66, 18:39-41, 30:8-9 & 30:13-16.

On the whole, however, the specification refers to a "description tree" as containing descriptions of usage rights rather than usage rights themselves:

> Description Tree:
>
> A structure which *describes* the location of content and the usage rights and usage fees for a digital work. A description tree is comprised of description blocks. Each description block corresponds to a digital work or to an interest (typically a revenue bearing interest) in a digital work.

*See* '859 Patent at 50:1-7 (appearing in "Glossary" section of the specification; emphasis added).

Defendants' proposal of "attached" is thus adequately supported by the explicit glossary definitions as well as the above-quoted discussions of "the present invention." *See Intellicall*, 952 F.2d at 1388; *see also Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013) ("When a patent . . . describes the features of the 'present invention' as a whole, this description limits the scope of the invention.") (quoting *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007)); *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (construing term in light of description of "the present invention").

As for the prosecution history, during prosecution of the '072 Patent the patentee distinguished a prior art reference in part on the basis that the prior art reference at issue required the alleged usage rights to be stored in the same file, and necessarily the same device, as the alleged content:

> Independent claim 26, recites, in relevant part, . . . the at least one of the at least one usage rights is stored *separately* from the digital document.

> In contrast, as is shown in the diagram below, Perritt is directed to a digital library system, wherein permissions header (PH) is *attached* to a work (W) . . . .

(Dkt. No. 304, Ex. M, 5/23/2008 Amendment After Final ('072 Patent) at 8 (emphasis modified).)

> [C]ontrary to present independent claims 1, 14 and 26, since the permissions header and the work of Perritt are attached to one another, the permissions header must be stored in the same file as the work.

(*Id.*, Ex. N, 10/15/2008 Response to Office Action ('072 Patent) at 11-12.)

As to extrinsic evidence, Plaintiff submits the opinion of its expert, Dr. Goodrich, that the Stefik Patents teach that "usage rights" and their associated "digital works" exist independently. (*See* Dkt. No. 304, 11/25/2014 Goodrich Decl. at ¶¶ 46-51).

Defendants submit an article authored by one of the named inventors, Mark Stefik, stating as follows under the heading "Attached Usage Rights":

> We start with an analogy. When we go to a store to buy a shirt, there are various tags attached to it. One kind of tag is a price tag. If we want to buy the shirt, we must pay the amount on the tag. Another tag gives cleaning instructions: for example, wash by hand in cold water or dry clean only. Still another tag might say something about the style of the shirt or the history of the shirt company.

> This is roughly the idea of usage rights on digital works. Digital works come with tags on them. * * * [*T*]*he tags are not removable*.

(Dkt. No. 331, Ex. 5, Mark Stefik, *Letting Loose the Light: Igniting Commerce in Electronic Publication* 14 (1996) (emphasis added).)

Defendants also cite prosecution history of a European Patent Office application that names Mark Stefik as inventor:

> A skilled person readily knows several ways of how to associate two digital objects (such as a rights object and a content object), for instance by physically attaching both, inserting a unique identifier for one object in the header of the other object, specifying in the header of the first object address or access information for the second object, providing a look-up table linking both objects

together, or storing both objects in different files that have the same unique file name.

(Dkt. No. 353, Ex. 2, 10/25/2004 Response, at 3.)

Further, Plaintiff submits that in *Smartflash LLC v. Apple Inc., et al.*, No. 6:13-cv-447 (E.D. Tex.), Defendant Apple Inc. has described another patent (which also names Mark Stefik as an inventor) as teaching separately stored content and rights information. (Dkt. No. 345, Ex. AB, at 3.)

Finally, Plaintiff has noted that the prosecuting attorney for the '160 Patent has testified that the changes made to the specification of the '160 Patent were intended to remove all possible doubt that "attached" and "associated" mean the same thing. (Dkt. No. 345, Ex. AC, Kaufman Dep. at 171:25-172:14 ("The Stefik application used the terms 'attached' and 'associated' interchangeably. And as I've stated earlier, we think the correct construction was that neither of those terms requires a direct physical coupling. But to a layman that caused some confusion, and we decided to make that consistent. . . . That was our intent.").

Such prosecutor testimony, however, is of minimal if any weight during claim construction proceedings. *See Markman*, 52 F.3d at 983 ("[T]he testimony of Markman and his patent attorney on the proper construction of the claims is entitled to no deference."), *aff'd*, 517 U.S. 370 (1996); *see also Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1346 (Fed. Cir. 2008) (finding that a letter from prosecuting attorney to inventor, reporting the results of an examiner interview, was "of no value" because the letter was not part of the prosecution history and did not "help educate the court regarding the field of the invention . . . [or] help the court determine what a person of ordinary skill in the art would understand claim terms to mean") (quoting *Phillips*, 415 F.3d at 1319).

On balance, nothing in the prosecution history or the extrinsic evidence cited by the parties warrants departing from the lexicography and descriptions of the invention in the specification, set forth above, which support Defendants' proposal of requiring that usage rights are "attached" to digital works.

Defendants' proposal of *permanent* attachment, however, lacks sufficient support in the intrinsic evidence. Instead, for example, the specification contemplates "mak[ing] a copy of the digital work in a place outside of the protection of usage rights." '859 Patent at 35:64-36:3.

(3) Construction

Based on the foregoing analysis of Defendants' proposals of "language" and of "permanently attached," the Court hereby construes **"rights," "usage rights,"** and **"usage rights information"** to mean **"indications that are attached, or treated as attached, to [a digital work / digital content / content / a digital document] and that indicate the manner in which the [digital work / digital content / content / digital document] may be used or distributed as well as any conditions on which use or distribution is premised."**

**G. "usage rights" ('160 Patent)**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "an indication of the manner in which a [digital work / digital content / content / a digital document] may be used or distributed as well as any conditions on which use or distribution is premised"[4] | "an indication of the manner of use by which a digital work may be used or distributed, as well as any conditions on which manner of use is premised" |

(Dkt. No. 304, at 9; Dkt. No. 331, at 11; Dkt. No. 366, Ex. B, at 15.) Defendants submit that this disputed term appears in Claims 1, 2, 3, 9, and 10 of the '160 Patent. (Dkt. No. 331, at 11.)

---

[4] Plaintiff previously proposed: "Same as in Stefik Patents, i.e., 'an indication of the manner in which a [digital work / digital content / content / a digital document] may be used or distributed as well as any conditions on which use or distribution is premised.'" (Dkt. No. 292-1, at 12.)

<u>(1) The Parties' Positions</u>

Plaintiff argues that "[i]n their proposal, Defendants repeat features already in the claims as well as optional features (e.g., conditions) in a way that differs in form but not in substance from their proposal for the other patents. Defendants' form over substance approach would only confuse the jury." (Dkt. No. 304, at 10.)

Defendants respond that the '160 Patent is different than the other Stefik Patents because "the '160 patent undeniably changed the glossary definition and corresponding teachings of the specification." (Dkt. No. 331, at 12.) In particular, Defendants urge that "[b]ecause the '160 specification eliminated all references to, and requirement of, 'attachment,' Defendants propose that the Court adopt a construction of 'usage rights' for the '160 patent (and only that patent) that does not contain the 'permanently attached' requirement."

Plaintiff replies that having a separate construction for the '160 patent "would result in unnecessary jury confusion." (Dkt. No. 345, at 17.)

Generally, "we presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning." *See Aventis*, 715 F.3d at 1380 (quoting *Omega Eng'g*, 334 F.3d at 1334).

<u>(2) Analysis</u>

Here, however, the '160 Patent does not contain the same definitive statements cited above as to the other Stefik Patents. The Court therefore does not include an "attached" requirement in the construction of "usage rights" in the '160 Patent.

The Court accordingly hereby construes **"usage rights"** in the '160 Patent to mean **"an indication of the manner of use by which a digital work may be used or distributed, as well as any conditions on which manner of use is premised."**

**H. "digital work"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| '859 Patent, '576 Patent, '072 Patent, '956 Patent, and '007 Patent:<br>    No construction<br><br>'160 Patent:<br>    No construction necessary.  Alternatively:<br>    "any work that has been reduced to a digital representation" | '859 Patent, '576 Patent, '072 Patent, '956 Patent, and '007 Patent:<br>    "Any encapsulated digital information. Such digital information may represent music, a magazine or book, or a multimedia composition.  Usage rights and fees are attached to the digital work."<br><br>'160 Patent:<br>    "Digital content with any associated usage rights.  Such digital content may represent music, a magazine or book, or a multimedia composition." |

(Dkt. No. 304, at 9; Dkt. No. 331, at 12-13; Dkt. No. 366, Ex. B, at 15.)  The parties submit that this disputed term appears in Claims 1, 2, 3, 6, 9, and 10 of the '160 Patent.  (Dkt. No. 292-1, at 2; Dkt. No. 331, at 13.)

(1)  The Parties' Positions

Plaintiff argues "[t]he claims already recite the contents and structure of the claimed digital work, so no separate construction of that term is necessary."  (Dkt. No. 304, at 9.)

Defendants argue: "Although the claims of the '859, '576, '956, '007, and '072 patents do not explicitly recite the term 'digital work,' the glossary defines other terms recited in the claims, such as 'content,' 'description structure,' 'requester mode,' 'server mode,' and 'usage rights,' in terms of their relationship to a 'digital work.'  So the jury will need to understand this term."  (Dkt. No. 331, at 12-13.)

As to the '160 Patent, Defendants argue: "[Plaintiff] asks the Court to ignore the glossary definition and offers an alternative construction cherry-picked from the specification.  Again, the Court should adopt the express definitions provided in the glossary."  (Dkt. No. 331, at 13.)

Plaintiff replies that the term "digital work" appears in the claims of only the '160 Patent. (Dkt. No. 345, at 6.)

<u>(2) Analysis</u>

The specification sets forth two definitions for "digital work." First, the specification states: "Herein the terms 'digital work,' 'work' and 'content' refer to any work that has been reduced to a digital representation." '859 Patent at 5:64-66.

Second, the "Glossary" section of the specification defines "digital work" and "composite digital work" as requiring that usage rights are "attached":

> Digital Work (Work):
>
> Any encapsulated digital information. Such digital information may represent music, a magazine or book, or a multimedia composition. *Usage rights and fees are attached to the digital work.*

*Id.* at 50:11-12.

> Composite Digital Work:
>
> A digital work comprised of distinguishable parts. Each of the distinguishable parts is itself a digital work *which have usage rights attached*.

*Id.* at 49:49-51 (emphasis added). Also of note, the specification discloses that a "ticket" can be used for "one-time usage rights," and "[t]ickets are digital works." '859 Patent at 22:20; '160 Patent at 21:42.

But although the specifications present these definitions, the term "digital work" appears in the claims of only the '160 Patent. The meaning of "digital work" is addressed by the claim language itself (emphasis added):

> 1. A computer readable medium having embedded thereon a digital work adapted to be distributed within a system for controlling use of digital works, *said digital work comprising*:
>
>  a digital content portion that is renderable by a rendering device;

36

a usage rights portion associated with said digital content portion and comprising one or more computer readable instructions configured to permit or prohibit said rendering device to render said digital content portion, said usage rights portion being expressed as statements from a usage rights language having a grammar defining a valid sequence of symbols, and specifying a manner of use relating to one or more purposes for which the digital work can be used by an authorized party; and

a description structure comprising a plurality of description blocks, each of said description blocks comprising address information for at least one part of said digital work, and a usage rights part for associating one or more usage rights portions.

The Court therefore hereby expressly rejects the parties' proposed constructions. No further construction is necessary. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction.").

The Court accordingly hereby construes **"digital work"** to have its **plain meaning**.

## I. "digital document" and "document"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "any work that has been reduced to a digital representation" | "a type of digital work that is written in or viewable as text, for example a book, magazine article, or a message" |

(Dkt. No. 304, at 10; Dkt. No. 331, at 15.) The parties submit that this disputed term appears in Claims 1, 8, 10, and 16 of the '072 Patent. (Dkt. No. 292-1, at 1; Dkt. No. 331, at 15.)

<u>(1)  The Parties' Positions</u>

Plaintiff argues claim differentiation as to Claims 3, 11, and 19 of the '072 Patent.  (Dkt.

No. 304, at 10.)  Plaintiff also notes that the specification refers to "documents" as including

"movies" as well as content that can be "execut[ed]."  (*Id.*)

Defendants respond: "the specification defines the terms 'digital work' and 'digital

content' broadly, to encompass not only documents (such as magazines and books), but also

video, audio and other material.  In using the term 'digital document,' the patentees intended to

refer not to any form of digital content or digital work, but only to documents."  (Dkt. No. 331,

at 16.)

Plaintiff replies that "Defendants fail to rebut [Plaintiff's] showing that the Stefik patents

contemplated using a document repository for movies, software, and other forms of content, not

just written works."  (Dkt. No. 345, at 7.)

<u>(2)  Analysis</u>

Claims 1 and 3 of the '072 Patent are representative and recite (emphasis added):

1.  A method for securely rendering *digital documents*, comprising:
   retrieving, by a document platform, a *digital document* and at least one
usage right associated with the *digital document* from a document repository, the
at least one usage right specifying a manner of use indicating the manner in which
the *digital document* can be rendered;
   storing the *digital document* and the at least one usage right in separate
files in the document platform;
   determining, by the document platform, whether the *digital document* may
be rendered based on the at least one usage right; and
   if the at least one usage right allows the *digital document* to be rendered
on the document platform, rendering the *digital document* by the document
platform.

* * *

3.  The method as recited in claim 1, wherein at least a portion of the *digital
document* is a software program.

Because dependent Claim 3 limits the "digital document" to being "a software program," which presumably is much broader than "text," Claim 3 weighs against Defendants' proposal that the term "digital document" is limited to text. *See Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("[W]here the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest."); *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("Claim differentiation, while often argued to be controlling when it does not apply, is clearly applicable when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, and that limitation is the only meaningful difference between the two claims.").

Turning to the specification, on one hand the specification discloses that a "Document-Descr[iption]" can be a "string containing various identifying information about a document," "such as a publisher name, author name, ISBN number, and so on." '859 Patent at 10:17-20.

On the other hand, the specification uses the term "document" in contexts other than text. *See* '072 Patent at 14:43-54 (referring to security levels of "document repositories" shortly after noting the importance of security for "some digital works such as a digital copy of a first run movie") & 26:25-27 ("document playback platform (e.g., for executing or viewing)").

On balance, nothing in the intrinsic evidence warrants reading the seemingly generic term "document" as being limited to text. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012) ("The patentee is free to choose a broad term and expect to obtain

the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope.").

Defendants' proposed construction is therefore hereby expressly rejected. In particular, Defendants have failed to demonstrate that the disputed terms cannot encompass content beyond merely text, such as audio, video, or software.

No further construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207.

The Court accordingly hereby construes **"digital document"** and **"document"** to have their **plain meaning**.

**J. "requester mode of operation" and "server mode of operation"**

| **"requester mode of operation"** | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary in view of language already in the claims | "a mode of a repository where it is requesting access to a digital work" |

| **"server mode of operation"** | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary in view of language already in the claims | "a mode of a repository where it is processing an incoming request to access the digital work" |

(Dkt. No. 304, at 11; Dkt. No. 331, at 14.) The parties submit that these disputed terms appear in Claims 1 and 58 of the '859 Patent. (Dkt. No. 292-1, at 9; Dkt. No. 331, at 14.)

<u>(1) The Parties' Positions</u>

Plaintiff argues that Defendants "wish to insert their construction for 'digital work' into claims not already reciting that term." (Dkt. No. 304, at 11.) Further, Plaintiff submits, "[t]he

asserted claims of the '859 patent already recite the features of both the 'server mode of operation' and the 'requester mode of operation' with greater detail than is supplied by Defendants' proposed constructions."  (*Id.*)

Defendants respond that Plaintiff "offers no legitimate reason to reject or modify the decisions of the patentees in creating these glossary definitions."  (Dkt. No. 331, at 14.)

Plaintiff replies: "The claims already positively recite that the requester and server modes of operation apply to 'digital content.'  Thus, Defendants' proposed construction would add confusion by having the same claim use two different terms, 'digital content' and 'digital work,' to reference the same thing."  (Dkt. No. 345, at 7.)

At the February 6, 2015 hearing, the parties did not address these disputed terms.

<u>(2)  Analysis</u>

The "Glossary" section of the specification states:

Requester Mode:

A mode of repository where it is requesting access to a digital work.

* * *

Server Mode:

A mode of a repository where it is processing an incoming request to access a digital work.

'859 Patent at 50:53-62.

Claims 1 and 58 of the '859 Patent recite:

1.  A rendering system adapted for use in a distributed system for managing use of content, said rendering system being operative to rendering [*sic*] content in accordance with usage rights associated with the content, said rendering system comprising:
    a rendering device configured to render the content; and
    a distributed repository coupled to said rendering device and including a *requester mode of operation* and *server mode of operation*,

41

wherein the *server mode of operation* is operative to enforce usage rights associated with the content and permit the rendering device to render the content in accordance with a manner of use specified by the usage rights,

the *requester mode of operation* is operative to request access to content from another distributed repository, and

said distributed repository is operative to receive a request to render the content and permit the content to be rendered only if a manner of use specified in the request corresponds to a manner of use specified in the usage rights.

\* \* \*

58. A computer readable medium including one or more computer readable instructions embedded therein for use in a distributed system for managing use of content, and operative to render content in accordance with usage rights associated with the content, said computer readable instructions configured to cause one or more computer processors to perform the steps of:

configuring a rendering device to render the content;

configuring a distributed repository coupled to said rendering device to include a *requester mode of operation* and *server mode of operation*;

enforcing usage rights associated with the content and permitting the rendering device to render the content in accordance with a manner of use specified by the usage rights, when in the *server mode of operation*;

requesting access to content from another distributed repository, when in the *requester mode of operation*; and

receiving by said distributed repository a request to render the content and permitting the content to be rendered only if a manner of use specified in the request corresponds to a manner of use specified in the usage rights.

On balance, the surrounding claim language addresses the meaning of the disputed terms such that no construction is necessary. *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362. Although the specification contains a "Glossary" section that defines "requester mode" and "server mode," the explicit claim language overrides the specification in this regard. *See Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977 (Fed. Cir. 2014) ("In claim construction, this court gives primacy to the language of the claims, followed by the specification.").

The Court accordingly hereby construes **"requester mode of operation"** and **"server mode of operation"** to have their **plain meaning**.

### K. "manner of use"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a way in which [a digital work / digital content / content / a digital document] may be used" | "a defined way of using or distributing a digital work (for example, PLAY, COPY, or PRINT), as distinct from conditions which must be satisfied before that way of using or distributing the digital work is allowed" |

(Dkt. No. 304, at 12 (square brackets Plaintiff's); Dkt. No. 331, at 16.)  The parties submit that this disputed term appears in Claims 1, 19, 20, 58, 75, and 76 of the '859 Patent, Claims 1 and 3 of the '160 Patent, and Claims 1 and 10 of the '072 Patent.  (Dkt. No. 292-1, at 3; Dkt. No. 331, at 16.)

 (1)  The Parties' Positions

 Plaintiff argues that "[t]he specification teaches that conditions can be included in a 'manner of use'—not that they are distinct."  (Dkt. No. 304, at 12.)  "Further," Plaintiff argues, "Defendants' construction is improper because it seeks to import Defendants' construction of the term 'digital work' into claims that do not include this term."  (*Id.*)

 Defendants argue that "Defendants' proposed construction preserves th[e] distinction between the two categories of information that can be conveyed by usage rights," namely "(1) the manner in which a digital work may be used or distributed and (2) the conditions, if any, on which use or distribution is premised."  (Dkt. No. 331, at 16.)

 Plaintiff replies that Defendants' proposal "is made out of whole cloth" and is inconsistent with disclosures showing that "if and when they are defined, conditions are a part of the 'manner of use.'"  (Dkt. No. 345, at 8.)

 In sur-reply, Defendants reiterate that "[t]he patents describe 'manner of use' (e.g., play, copy, or print) as separate and distinct from conditions that must be satisfied prior to use (e.g.,

copy count, fees, or time), not as one common category as [Plaintiff] argues." (Dkt. No. 353, at 5 (discussing Figures 14 and 15 of the Stefik Patents).) Finally, Defendants cite Claim 23 of the '859 Patent. (Dkt. No. 353, at 5.)

At the February 6, 2015 hearing, Plaintiff argued that the line between manners of use and conditions of use is blurry, so to speak, because the patents-in-suit do not clearly distinguish them from one another. Defendants responded that the distinction is clear and should be set forth in the Court's construction because Plaintiff may later attempt to argue that a manner of use can be expressed as merely a condition.

(2) Analysis

Claim 23 of the '859 Patent recites:

> 23. A rendering system as recited in claim 1, wherein the usage rights include at least one *condition* that must be satisfied to exercise the *manner of use*, and wherein the system further comprises means for communicating with an authorization repository for authorizing a condition.

This distinct, separate recital of a "condition" and a "manner of use" weighs against Plaintiff's argument that a "manner of use" can include a condition. *See Phillips*, 415 F.3d at 1314 ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.").

The specification also discloses that a "grammar element" can provide a condition. *Id.* at 20:15-16 ("Grammar element 1510 . . . provides a condition . . . ."), 20:34-36 ("Grammar element 1511 . . . provides a condition . . . .") & 20:47-50 ("Grammar element 1512 . . . provides for specification of time conditions . . . ."). Such disclosures do not demonstrate, however, that a condition is part of a manner of use.

Finally, Defendants have also cited the prosecution of related United States Patent No. 6,708,157, which claims priority to the same application as the Stefik Patents here in suit.

*See Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314-15 (Fed. Cir. 2007) (prosecution history of parent application having specification with "the same content" found to be "relevant in construing the claims" of related patents); *see also Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.") (citation and internal quotation marks omitted).  The applicability of this prosecution history is disputed.  (*See* Dkt. No. 345, at 8).  Even if considered, this prosecution has no impact on the Court's analysis.

On balance, the intrinsic evidence, especially above-quoted Claim 23 of the '859 Patent, is consistent with Defendants' proposal that a "manner of use" is distinct from a "condition."

The Court accordingly hereby construes **"manner of use"** to mean **"a way in which [a digital work / digital content / content / a digital document] may be used, as contrasted with a condition that must be satisfied before such use is allowed."**

## L.  "render" and "rendering"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "converting into an ephemeral, transitory, or non[-]digital form, such as for playing digital movies, playing digital music, playing a video game, running a computer program, or displaying a document on a display" | "play, print, display, or execute [a digital work] [digital content / content] [a digital document]" |

(Dkt. No. 304, at 12; Dkt. No. 331, at 17 (square brackets Defendants').)  The parties submit that these disputed terms appear in Claims 1, 13, 19, 20, 21, 24, 58, 69, and 71 of the '859 Patent, Claim 1 of the '160 Patent, Claims 1 and 18 of the '576 Patent, Claims 1 and 10 of the '072 Patent, Claims 1, 7, and 13 of the '956 Patent, and Claims 1, 3, 6, 8, 11, and 13 of the '007 Patent.  (Dkt. No. 292-1, at 7; Dkt. No. 331, at 17.)

Plaintiff submits that its proposal "is taken from the description of rendering in the patents" and "provides examples to guide the jury in understanding that rendering includes, for example, conversion for playing digital movies and displaying a document on a display."  (Dkt. No. 304, at 12-13.)  Plaintiff argues that "Defendants' construction is unduly narrow because it only accounts for specific forms of conversion (i.e. 'play, print, display, or execute'), while the specification allows for conversion into any ephemeral, transitory, or non-digital form."  (*Id.*, at 13.)

Defendants respond that "[a]lthough the specifications do not explicitly define 'render,' their description of types of rendering systems supports Defendants' construction."  (Dkt. No. 331, at 18.)  Further, Defendants argue, "[t]he specification never compares rendering to 'converting.'  In fact, the words 'convert' and 'converting' never appear in the patents."  (*Id.*) Defendants conclude: "[Plaintiff's] construction contains terms that may be difficult for a jury to apply and it is so open-ended that it risks being read to encompass almost any transformation of data, including acts like decryption that persons of skill in the art would not consider to be 'rendering.'"  (*Id.*)

Plaintiff replies that "while the specification defines 'render' as any conversion into any 'ephemeral, transitory, or non-digital' form, Defendants propose a narrow construction that accounts only for specific types of conversion, i.e., 'play, print, display, or execute.'"  (Dkt. No. 345, at 9.)

(2)  Analysis

The "Glossary" section of the specification states:

Rendering System:

> The combination of a rendering repository and a rendering device. Examples of rendering systems include printing systems, displaying systems, general purpose computer systems, video systems or audio systems.

*Id.* at 50:42-46. Other portions of the specification, however, address the meaning of "rendering" in greater detail:

> *Rendering* Systems
>
> A *rendering* system is generally defined as a system comprising a repository and a *rendering* device which can *render* a digital work into its desired form. Examples of a *rendering* system may be a computer system, a digital audio system, or a printer.
>
> * * *
>
> Grammar element 1504 "*Render*-Code:=[Play:{Player: Player-ID} | Print:{Printer:Printer-ID}]" lists a category of rights all involving *the making of ephemeral, transitory, or non-digital copies of the digital work*. After use the copies are erased.
>
> Play[:] A process of *rendering* or performing a digital work on some processor. This includes such things as playing digital movies, playing digital music, playing a video game, running a computer program, or displaying a document on a display.
>
> Print[:] To *render* the work in a medium that is not further protected by usage rights, such as printing on paper.

'859 Patent at 7:50-54 & 18:44-53 (emphasis added). "Printing," which is disclosed as an example of a type of rendering, is further disclosed as "mak[ing] a copy of the digital work":

> The Print Transaction
>
> A Print transaction is a request to obtain the contents of a work for the purpose of *rendering* them on a "printer." We use the term "printer" to include the common case of writing with ink on paper. However, the key aspect of "printing" in our use of the term is that it *makes a copy of the digital work* in a place outside of the protection of usage rights.

*Id.* at 35:64-36:3.

Plaintiff's proposal of "ephemeral, transitory, or non[-]digital form" is rejected as vague and as tending to confuse rather than clarify the scope of the claims.

Defendants' proposal, however, is too narrow because it limits the disputed term to four specific types of operation.

Based on the above-quoted disclosures, particularly the disclosure of "rendering or performing," construction of this disputed term as "presenting," together with the above-quoted examples set forth in the specification, will be more accurate and of greater help to the finder of fact than either Plaintiff's or Defendants' proposal.

The Court accordingly hereby construes **"render"** and **"rendering"** to mean **"present[ing] a digital work, such as by playing a digital movie, playing digital music, playing a video game, running a computer program, displaying a document on a display, or printing on paper."**

## M. "authorization object"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "digital information that must be possessed to gain access to digital content" | "a digital work that can be moved between repositories and, when specified by a usage right attached to another digital work, must be obtained to exercise the usage right" |

(Dkt. No. 304, at 13; Dkt. No. 331, at 18.)  The parties submit that this disputed term appears in Claims 1 and 18 of the '576 Patent, Claims 4, 10, and 16 of the '956 Patent, and Claims 3, 8, and 13 of the '007 Patent.  (Dkt. No. 292-1, at 9; Dkt. No. 331, at 18.)

(1) The Parties' Positions

Plaintiff argues that its proposed construction "clarifies the role of the 'authorization object' set forth in the claims in that it must be possessed to gain access to digital content."  (Dkt. No. 304, at 13.)  Plaintiff further argues that Defendants' proposal "could apply to any 'digital

48

work' that can be moved between repositories" and "imports the term 'digital work' into claims that do not use this term."  (*Id.*, at 14.)

Defendants respond that "[t]he specification explains with clarity that an authorization object is a type of 'digital work,'" and "[b]y stating that authorization objects are only required 'when specified by a usage right attached to another digital work,' [Defendants'] construction explains when authorization objects are necessary and that they are separate from the digital content."  (Dkt. No. 331, at 18-19.)

Plaintiff replies, in full: "Defendants' construction is improper because it attempts to import Defendants' construction for the term 'digital work' into claims that do not use this term. Defendants' construction is also confusing because it defines the 'authorization object' as a 'digital work,' even though Defendants concede that 'authorization objects' are 'separate from the digital content.'"  (Dkt. No. 345, at 7 (citing Dkt. No. 331, at 19).)

At the February 6, 2015 hearing, the parties did not address this disputed term.

(2)  Analysis

Claim 4 of the '956 Patent, for example, discloses:

4.  The method of claim 1, wherein the receiving the digital content comprises:
   requesting an *authorization object* for the at least one recipient computing device to make the digital content available for use, the *authorization object* being required to receive the digital content and to use the digital content; and
   receiving the *authorization object* if it is determined that the request for the *authorization object* should be granted.

The specification discloses:

Communication with an authorization repository 202 may occur when a digital work being accessed has a condition requiring an authorization.  Conceptually, *an authorization is a digital certificate such that possession of the certificate is required to gain access to the digital work.  An authorization is itself a digital work* that can be moved between repositories and subjected to fees and usage rights conditions.  An authorization may be required by both repositories involved in an access to a digital work.

'859 Patent at 7:18-26 (emphasis added).

> In a transaction involving a repository and a document server, *some usage rights may require that the repository have a particular authorization*, that the server have some authorization, or that both repositories have (possibly different) authorizations. *Authorizations themselves are digital works* (hereinafter referred to as an authorization object) that can be moved between repositories in the same manner as other digital works. Their copying and transferring is subject to the same rights and fees as other digital works. A repository is said to have an authorization if that authorization object is contained within the repository.

*Id.* at 21:57-67 (emphasis added); *id.* at 40:50-51 ("an authorization object (a digital work in a file of a standard format)").

These consistent, explicit disclosures of authorization objects as being digital works should be given effect in the Court's construction. *See Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005) (construing term "board" to mean "wood cut from a log" in light of the patentee's consistent usage of the term; noting that patentee "is not entitled to a claim construction divorced from the context of the written description and prosecution history"); *see also Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1333 (Fed. Cir. 2011) ("[T]he consistent reference throughout the specification to the 'eccentric weight portion' as structure extending from the face of the gear makes it apparent that it relates to the invention as a whole, not just the preferred embodiment."). Further, the above-quoted reference to authorization for usage rights demonstrates that an authorization object may be required for usage rights other than merely accessing.

Nonetheless, Defendants have failed to adequately justify their proposal that an authorization object is necessarily separate from the digital work for which authorization is required. Indeed, the "Glossary" section of the specification states that a digital work can itself include other digital works:

Composite Digital Work:

A digital work comprised of distinguishable parts. Each of the distinguishable parts is itself a digital work *which have usage rights attached*.

*Id.* at 49:49-51 (emphasis added).

The Court accordingly hereby construes **"authorization object"** to mean **"a digital work that can be moved between repositories and that must be possessed in order to exercise a usage right."**

**N. "identification certificate" and "digital certificate"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a signed digital message that attests to the identity of the possessor" | "a signed digital message that attests to the identity of the possessor. Digital certificates are encrypted in the private key of a well-known master repository." |

(Dkt. No. 304, at 14 (Plaintiff addressed only "identification certificate"); Dkt. No. 331, at 14-15.) Defendants submit that "identification certificate" appears in Claims 24 and 81 of the '859 Patent, Claims 5, 11, and 17 of the '956 Patent, and Claims 4, 5, 9, 10, 14, and 15 of the '007 Patent. (Dkt. No. 331, at 14.) Defendants submit that "digital certificate" appears in Claims 1, 15, 21, 24, 58, 71, and 81 of the '859 Patent, Claims 1 and 18 of the '576 Patent, Claims 1 and 10 of the '072 Patent, Claims 1, 7, and 13 of the '956 Patent, and Claims 1, 6, and 11 of the '007 Patent. (Dkt. No. 331, at 14-15.)

(1) The Parties' Positions

The parties agree that "identification certificate" and "digital certificate" are used synonymously in the Stefik Patents. (*See* Dkt. No. 331, at 5 n.4.)

Plaintiff submits that this term is defined in the specification's glossary and that

Defendants "seek to import an additional requirement from the second sentence of the glossary

by removing the word 'typically.'" (Dkt. No. 304, at 14.)

Defendants respond that the specification, as well as the testimony of Plaintiff's expert,

Dr. Goodrich, in IPR proceedings, emphasize "the 'extremely important' requirement of tamper

resistance, which is provided by encrypting the digital certificate in the private key of a master

repository." (Dkt. No. 331, at 15.)

Plaintiff replies that by ignoring the word "typically," Defendants improperly limit the

construction to a preferred embodiment. (Dkt. No. 345, at 9.) Plaintiff also submits that in an

IPR proceeding, Defendant Apple Inc. has proposed a construction of "identification certificate"

that *omits* the second sentence from the "Glossary" definition. (*Id.*, Ex. AE, 12/22/2014 Petition

for *Inter Partes* Review of U.S. Patent No. 8,370,956 (IPR2015-00446), at 14.)

(2) Analysis

The "Glossary" section of the specification states:

Identification (Digital) Certificate:

A signed digital message that attests to the identity of the possessor. *Typically*,
digital certificates are encrypted in the private key of a well-known master
repository.

'859 Patent at 50:16-19 (emphasis added).

Defendants submit that the specification "make[s] clear that identification certificates

(also referred to as 'digital certificates') are generated by a 'master repository' and that

'[c]ommunication with a master repository . . . occurs in connection with obtaining an

identification certificate.'" (Dkt. No. 331, at 15 (citing '859 Patent at 7:32-33 & 12:34-50).)

Defendants have also cited disclosure regarding an "install transaction" that ends with an error if a master repository is not recognized. *See id.* at 41:28-42:6.

On balance, the portions of the specification cited by Defendants do not override the patentee's use of the word "typically" in the above-quoted "Glossary" definition. *See Abbott Labs.*, 334 F.3d at 1354 ("patentee's lexicography must, of course, appear with reasonable clarity, deliberateness, and precision") (citation and internal quotation marks omitted); *cf. MasterObjects, Inc. v. Yahoo!, Inc.*, No. C 11-02539-JSW, 2013 WL 6185475, at *7 (N.D. Cal. Nov. 26, 2013) ("The patentee uses the glossary to describe one particular embodiment . . . . Yahoo! seeks to import a specific limitation from a glossary which is expressly limited to a preferred embodiment. This is not permitted.").

The Court accordingly hereby construes **"identification certificate"** and **"digital certificate"** to mean **"a signed digital message that attests to the identity of the possessor."**

## O. "nonce" and "random registration identifier"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "random or variable information generated to establish a cryptographic connection"[5] | "nonce":<br>    "random and variable information used only once to establish a cryptographic connection"<br><br>"random registration identifier":<br>    Same as "nonce"; Alternatively, indefinite. |

(Dkt. No. 304, at 15; Dkt. No. 331, at 20.) The parties submit that "nonce" appears in Claims 6, 12, and 18 of the '956 Patent and Claims 5, 10, and 15 of the '007 Patent. (Dkt. No. 292-1,

---

[5] Plaintiff previously proposed: "nonce" means "Random or variable information for determining whether a system can correctly perform a cryptographic operation"; and "random registration identifier" means "Random or variable information for identifying a communication session." (Dkt. No. 292-1, at 3-4.)

at 3-4; Dkt. No. 331, at 20.)  The parties submit that "random registration identifier" appears in

Claims 5, 11, and 17 of the '956 Patent and Claims 4, 9, and 14 of the '007 Patent.  (Dkt.

No. 292-1, at 4; Dkt. No. 331, at 20.)

(1)  The Parties' Positions

Plaintiff argues that the specification describes a "nonce" as being random *or* variable.

(Dkt. No. 304, at 15.)  Also, Plaintiff argues, "[b]oth the 'random registration identifier' and the

'nonce' are used several times in different ways during the registration procedure for repositories

. . . ."  (*Id.*; *see id.* at 15-16 (citing '956 Patent at Figure 16).)  Plaintiff further argues:

> Any random number of finite length used as part of such a procedure would with
> some probability repeat a previously generated random number.  That is why the
> specification does not rely on the random registration identifier alone to secure the
> message: the repository using the registration identifier also uses the time and the
> names of the repositories to verify the session.

(*Id.*, at 16 (citing '956 Patent at 27:37-45 & 27:52-57).)

Defendants respond that "[i]f they [(nonces and random registration identifiers)] were

used more than once, a counterparty could fool a repository into creating a connection by using

an unencrypted nonce or identifier from an earlier session."  (Dkt. No. 331, at 20.)  Defendants

also submit that "[b]oth parties to a transaction do use them, but that is a single use of the

nonce."  (*Id.*)  Finally, Defendants urge that "although it is theoretically possible that a number

could be randomly generated more than once, that remote possibility is unlikely to confuse a

jury."  (*Id.*)

Plaintiff replies that "Defendants thus admit that their 'only once' limitation is

scientifically incorrect" (Dkt. No. 345, at 9 (citing Dkt. No. 331, at 20)), and Defendants'

proposal of "random *and* variable" "would exclude the two examples provided in the

specification (time and temperature), both of which are 'variable only' nonces." (Dkt. No. 345, at 9-10 (citing Dkt. No. 304 at 15).)

(2)  Analysis

The specification discloses a "random registration identifier" as being unique to a "session":

> A registration message is comprised of an identifier of a master repository, the identification certificate for the repository-1 and an encrypted *random registration identifier*. * * * The registration identifier is a number generated by the repository for this registration. The registration identifier is *unique to the session* and is encrypted in repository-1's private key. The registration identifier is used to improve security of authentication by detecting certain kinds of communications[-]based attacks.

'859 Patent at 26:51-66 (emphasis added). The specification also discloses a "nonce" as follows:

> When a sending repository transmits a message to a receiving repository, the sending repository encrypts all of its data using the public writing key of the receiving repository. The sending repository includes its name, the name of the receiving repository, a *session identifier* such as a *nonce* (described below), and a message counter in each message. In this way, the communication can only be read (to a high probability) by the receiving repository, which holds the private checking key for decryption. The auxiliary data is used to guard against various replay attacks to security. If messages ever arrive with the wrong counter or an old *nonce*, the repositories can assume that someone is interfering with communication and the transaction [is] terminated.
>
> * * *
>
> *A nonce is a generated message based on some random and variable information* (e.g., the time or the temperature.) The nonce is used to check whether repository-1 can actually exhibit correct encrypting of a message using the private keys it claims to have, on a message that it has never seen before.

'859 Patent at 26:14-26 & 27:45-50 (emphasis added).

This explicit definition of a "nonce" as being based on random *and* variable information should be given effect in the Court's construction. *See Intellicall*, 952 F.2d at 1388; *see also C.R. Bard*, 388 F.3d at 862; *Abbott Labs.*, 334 F.3d at 1354. Also, the above-quoted disclosures

explain that a "nonce" or "random registration identifier" is "unique" to a particular "session." '859 Patent at 26:62-63.

Such a construction is also consistent with the extrinsic dictionary submitted by Defendants, which defines "nonce" as meaning "occurring, used, or made only once or for a special occasion." (Dkt. No. 331, Ex. 12, *The Merriam-Webster Dictionary* 355 (1998).)

The Court accordingly hereby construes **"nonce"** and **"random registration identifier"** to mean **"random and variable information unique to a cryptographic session."**

**P. "distributed repository"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary apart from construction of the term "repository"<br><br>Alternatively:<br>    "a repository adapted for use in a distributed system" | Indefinite |

(Dkt. No. 304, at 16; Dkt. No. 331, at 23.) The parties submit that this disputed term appears in Claims 1 and 58 of the '859 Patent. (Dkt. No. 292-1, at 3; Dkt. No. 331, at 23.)

(1) The Parties' Positions

"In view of the lack of uncertainty regarding 'distributed' before the PTAB, [Plaintiff] submits that 'distributed repository' cannot be indefinite." (Dkt. No. 304, at 16.) Plaintiff also argues that "[t]he repositories described in the specification are connected as a part of a distributed network or system such as the internet." (*Id.* at 16-17 (citing '859 Patent at Fig. 2).)

Defendants argue that because the intrinsic evidence contains no basis for determining what it means for a repository to be "distributed," "[Plaintiff] . . . urges the Court to rewrite the claim so that 'distributed' modifies the system as a whole, rather than the repository." (Dkt. No. 331, at 23.) Defendants urge that such rewriting would be improper because "(1) courts

cannot rewrite claims and (2) it is inconsistent with the claim language, which recites both a 'distributed repository' and a 'distributed system.'" (*Id.*)

Plaintiff replies that its proposal is supported by the claims and that the prosecution history contains no disclaimer. (Dkt. No. 345, at 12.)

At the February 6, 2015 hearing, Defendants argued that because the preambles of the claims at issue use the phrase "adapted for use in a distributed system," the patentee knew how to set forth such a description but did not do so as to the term "distributed repository." Defendants concluded that the term "distributed repository" must refer to the repository itself being "distributed" rather than merely being adapted for use in a distributed system.

(2) Analysis

The PTAB did not construe "distributed repository" apart from its construction of "repository." (*See* Dkt. No. 304, Ex. Q, 7/1/2014 Final Written Decision ('859 Patent), at 22-23.)

Claims 1 and 58 of the '859 Patent recite (emphasis added):

1. A rendering system adapted for use in a distributed system for managing use of content, said rendering system being operative to rendering [*sic*] content in accordance with usage rights associated with the content, said rendering system comprising:
    a rendering device configured to render the content; and
    a *distributed repository* coupled to said rendering device and including a requester mode of operation and server mode of operation,
    wherein the server mode of operation is operative to enforce usage rights associated with the content and permit the rendering device to render the content in accordance with a manner of use specified by the usage rights,
    the requester mode of operation is operative to request access to content from another *distributed repository*, and
    said *distributed repository* is operative to receive a request to render the content and permit the content to be rendered only if a manner of use specified in the request corresponds to a manner of use specified in the usage rights.

* * *

58.  A computer readable medium including one or more computer readable instructions embedded therein for use in a distributed system for managing use of content, and operative to render content in accordance with usage rights associated with the content, said computer readable instructions configured to cause one or more computer processors to perform the steps of:

> configuring a rendering device to render the content;

> configuring a *distributed repository* coupled to said rendering device to include a requester mode of operation and server mode of operation;

> enforcing usage rights associated with the content and permitting the rendering device to render the content in accordance with a manner of use specified by the usage rights, when in the server mode of operation;

> requesting access to content from another *distributed repository*, when in the requester mode of operation; and

> receiving by said *distributed repository* a request to render the content and permitting the content to be rendered only if a manner of use specified in the request corresponds to a manner of use specified in the usage rights.

Figure 2 of the '859 Patent, cited by Plaintiff, is reproduced here:



During prosecution of the '859 Patent, Defendants argue, the patentee distinguished

United States Patent No. 5,260,999 ("Wyman") as disclosing a "centralized" system rather than a

"distributed repository" as claimed by the patentee:

> Wyman discloses a *centralized* license management system used to account for software product usage, wherein each licensed product upon start-up makes a call to a license server to check on whether usage is permitted (Abstract).  However, "the purpose of the license management facility" of Wyman "is not that of

enforcement, nor that of 'copy protection', but instead is merely that of license management" (col. 14, lines 9-11). Moreover, the license management system of Wyman is *centralized* (see, e.g., Wyman Fig. 1). Accordingly, Wyman fails to disclose, teach or suggest rights that are enforced by a *distributed* repository, as recited in the independent claims.

(Dkt. No. 331, Ex. 16, 3/8/2005 Response, at 13-14 (emphasis modified).)

Defendants argue that Plaintiff's proposed construction must fail because the patentee "distinguish[ed] [Wyman] by arguing that a license server connected with other devices in a distributed network is *not* a distributed repository." (Dkt. No. 331, at 23.)

Plaintiff replies that "whether Wyman discloses a repository, let alone one that is distributed, was never discussed during prosecution." (Dkt. No. 345, at 12.) Plaintiff submits that in the Office Action to which the above-quoted Response was directed, the Examiner cited a different reference, Risberg, that allegedly taught a repository. (*Id.*, Ex. AH, 9/8/2004 Office Action, at 4.) Also, at the February 6, 2015 hearing, Plaintiff emphasized that the Wyman reference was not concerned with enforcement of rights.

On balance, the prosecution history submitted by Defendants is not sufficiently clear to warrant finding any disclaimer. *See Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1332 (Fed. Cir. 2004) ("Because the statements in the prosecution history are subject to multiple reasonable interpretations, they do not constitute a clear and unmistakable departure from the ordinary meaning of the term 'rotating.'"); *see also Omega Eng'g*, 334 F.3d at 1324 ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on *definitive* statements made during prosecution.") (emphasis added); *id.* at 1325-26 ("[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both *clear and unmistakable*") (emphasis added); *id.* at 1330 ("[T]here is more than one

reasonable basis for the amendment, rendering the intent underlying the amendment ambiguous and thus negating the possibility of the disclaimer being unmistakable.").

As to extrinsic evidence, Plaintiff's expert, Dr. Goodrich, opines that "[a] person of ordinary skill in the art at the time of the patent would understand a distributed repository to be capable of communicating with other repositories over a network, such as the Internet." (Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at ¶ 55.)

Defendants' expert, Dr. Grimes, responds that although "[i]n computer science, the term 'distributed' is used to refer to systems that include a number of separate devices working in a cooperative manner, as opposed to a single device at a single location," "[t]here is no description in the specification of any repository that is distributed over different nodes of the network." (Dkt. No. 331, 12/22/2004 Grimes Decl., at ¶¶ 59-60.)

Finally, Plaintiff submits that in a recent IPR petition, Defendant Apple Inc. described a "distributed repository" as "a type of repository that must be able to interact with other repositories over a network, *i.e.*, in a distributed system." (Dkt. No. 345, Ex. AG, 12/22/2014 Petition for *Inter Partes* Review ('859 Patent), at 19-20.)

On balance, the Court finds no prosecution disclaimer (as set forth above), and the Court finds the opinions of Plaintiff's expert more credible as to this disputed term. In particular, the Court finds more credible Plaintiff's expert's opinion that a person of ordinary skill in the art would be able to understand the constituent term "distributed" in the context of a repository. The Court therefore hereby expressly rejects Defendants' indefiniteness argument.

As for the proper construction, the claim language and the above-quoted prosecution history are consistent with reading "distributed" as referring to the relative location of a repository on a network rather than the nature of the repository itself.

The Court accordingly hereby construes **"distributed repository"** to mean **"a repository adapted for use in a distributed system."**

## Q. "document platform"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "any computing system that holds a digital document, such as software"[6] | Indefinite.<br><br>Alternatively:<br>    "a repository for rendering a digital document" |

(Dkt. No. 304, at 17; Dkt. No. 331, at 21.)  Defendants submit that this disputed term appears in Claims 1, 8, 10, and 16 of the '072 Patent.  (Dkt. No. 331, at 21.)

(1)  The Parties' Positions

Plaintiff argues that "[a]s the PTAB found, the specification provides sufficient context for this term."  (Dkt. No. 304, at 17.)

"First and foremost," Defendants respond, "[Plaintiff's] proposed construction would inject an inconsistency into the claims by failing to require the document platform to be a repository even though it communicates with a 'document repository.'"  (Dkt. No. 331, at 22.)  "Second," Defendants argue, "[Plaintiff's] proposed construction conflates 'document repository' and 'document platform.'"  (*Id.*)  "Third," Defendants argue that "[Plaintiff's] proposed construction incorrectly uses 'software' as an example of a 'digital document,' as explained more fully above [as to the term "digital document]."  (*Id.*, at 23.)  Defendants conclude: "While a 'document platform' must at least be a repository, [Plaintiff] chose to claim its alleged invention using a term that is otherwise without meaning.  Given the lack of any

---

[6] Plaintiff previously proposed: "a repository for rendering a digital document."  (Dkt. No. 292-1, Pl.'s P.R. 4-3 Disclosures, at 1.)

definition in the specification, [Plaintiff's] own difficulty discerning its meaning, and the problems with [Plaintiff's] latest construction, the term 'document platform'" is indefinite." (*Id.*)

Plaintiff replies, "[f]irst, the fact that [Plaintiff]s construction of 'document platform' does not include the limitation 'repository' is irrelevant given that the surrounding claim language already requires the claimed document platform to include a repository." (Dkt. No. 345, at 11.) "Second, Defendants' argument that a document platform cannot also be used to render the digital documents it holds is nonsensical given that Defendants accept that the claimed document platform must include a repository that renders content." (*Id.*) Third, Plaintiff argues claim differentiation as to Claim 3 of the '072 Patent. (*Id.*) Finally, as to the change in Plaintiff's proposed construction, Plaintiff replies that "[Plaintiff] should not be penalized for attempting to work with Defendants to arrive at an agreed construction for this term." (*Id.*, at 11-12 n.13.)

At the February 6, 2015 hearing, Defendants urged that a "document platform" must be a repository, as Plaintiff itself previously proposed (as footnoted above), because use of a repository is fundamental to the Stefik Patents. Plaintiff responded that it does not dispute that a "document platform" must include a repository. Plaintiff submitted that the change in its proposed construction (so as to propose the PTAB construction) was an effort to reach a compromise, but Plaintiff expressed that the construction Plaintiff previously proposed would be acceptable.

(2) Analysis

Claim 1 of the '072 Patent is representative and recites:

1. A method for securely rendering digital documents, comprising:
retrieving, by a *document platform*, a digital document and at least one usage right associated with the digital document from a document repository, the

at least one usage right specifying a manner of use indicating the manner in which the digital document can be rendered;

storing the digital document and the at least one usage right in separate files in the *document platform*;

determining, by the *document platform*, whether the digital document may be rendered based on the at least one usage right; and

if the at least one usage right allows the digital document to be rendered on the *document platform*, rendering the digital document by the *document platform*.

As discussed regarding the terms "digital document" and "document," above, Claim 3 of the '072 Patent weighs against limiting the term "document" to text.

As to whether a "document platform" should be construed as being a repository, the specification discloses:

Transactions occur between two repositories (one acting as a server), *between a repository and a document playback platform* (e.g. for executing or viewing), between a repository and a credit server or between a repository and an authorization server.

'859 Patent at 25:48-52 (emphasis added).

The PTAB, in its Decision instituting an IPR of the '072 Patent, cited this above-quoted passage and found:

In our view, the discussion of "a document playback platform" set forth above provides sufficient context for construing the claim term "document platform."

Accordingly, applying the broadest reasonable interpretation consistent with the specification, we construe the claim term "document platform" as "any computing system that holds a digital document, such as software." For example, a "document platform" may be a computing system that executes or views software.

(Dkt. No. 304, Ex. R, 7/1/2013 Decision ('072 Patent), at 17.)

The specification also states that "repositories will only communicate with other devices that are able to present proof that they are certified repositories." '859 Patent at 12:25-27. Because a "document platform" is disclosed as communicating with repositories, this passage

63

suggests that a document platform must itself be a repository.  Plaintiff, however, does not

appear to contend that a document platform need not at least include a repository.

Further, the specification discloses that a repository can be used for rendering content:

Rendering Repository:

A special type of repository which is typically coupled to a rendering system.
The rendering repository will be typically be [*sic*] embodied within the secure
boundaries of a rendering system.

'859 Patent at 50:37-41.

As for the prosecution history, the patentee stated:

Applicants respectfully submit that newly amended independent claims 1, 14
and 26 recite various steps being performed by "a document platform".  The
document platform is the client[-]side engagement that controls the document.

(Dkt. No. 331, Ex. 14, 10/15/2008 Response to Office Action, at 12.)

Finally, Plaintiff's expert, Dr. Goodrich, has opined:

The claims of the '072 patent require the recited document platform to also be a
rendering repository, as it receives access to content from a repository, receives
usage rights from a repository, interprets and enforces usage rights, and renders
content when permitted by the usage rights.

(Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at ¶ 56.)

On balance, the intrinsic evidence, as well as the opinions of Plaintiff's expert, are

persuasive that "document platform" would be readily understandable to a person of ordinary

skill in the art.  The Court hereby expressly rejects Defendants' indefiniteness argument.

In light of Plaintiff's statement at the February 6, 2015 hearing that Plaintiff's prior

proposed construction (which is the same as Defendants' alternative proposed construction)

would be acceptable to Plaintiff, the Court adopts that agreed-upon construction.

The Court therefore hereby expressly rejects Defendants' indefiniteness argument and hereby construes **"document platform"** to mean **"a repository for rendering a digital document."**

**R. "validating"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| The phrase "The method of claim 1, wherein the validating comprises:" should be corrected to read: "The method of claim 4, wherein the validating comprises:" | Indefinite |

(Dkt. No. 304, at 17; Dkt. No. 331, at 25.)  The parties submit that this disputed term appears in Claim 5 of the '007 Patent.  (Dkt. No. 292-1, at 9-10; Dkt. No. 331, at 25.)

(1)  The Parties' Positions

Plaintiff argues that "[t]his obvious error should be corrected so that claims 4-5 parallel their mirror image claims 9-10 and 14-15" in the '007 Patent.  (Dkt. No. 304, at 18.)  Plaintiff also submits that "Defendants have not offered an alternative plausible construction, and the prosecution history does not suggest an alternate interpretation of the claims."  (*Id.*)

Defendants respond that because the requested correction is "subject to reasonable debate," judicial correction would be inappropriate.  (Dkt. No. 331, at 25.)

Plaintiff replies "Defendants' proposed alternative correction (replacing the term 'validating' with 'determining' to correct the misstated claim dependency, instead of changing claim 5 to depend from claim 4, as [Plaintiff] proposes) is not reasonable."  (Dkt. No. 345, at 13.)  Further, Plaintiff argues, "Defendants also misinterpret the prosecution history—the dependency of claim 5 was originally to application claim 10, an apparatus claim similar to claim 5.  Claim 5 is a method that adds steps to claim 4, which in turn depends on claim 1.  This is consistent with the patentee's remarks."  (*Id.*, at 13 n.14.)

At the February 6, 2015 hearing, the parties did not address this disputed term.

(2)  Analysis

Judicial correction of an error in a patent may be available "if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Novo Indus. v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir. 2003); *see LG Elecs., Inc. v. Quanta Computer Inc.*, 566 F. Supp. 2d 910, 913 (W.D. Wis. 2008) (noting the "nearly impossible standard for judicial correction of a patent" and citing *Novo*, 350 F.3d 1348, which "refus[ed] to correct 'a' to 'and' because other possibilities for correction existed").

Claims 1, 4, and 5 of the '007 Patent recite (emphasis added):

1.  A computer-implemented method of distributing digital content to at least one recipient computing device to be rendered by the at least one recipient computing device in accordance with usage rights information, the method comprising:

determining, by at least one sending computing device, if the at least one recipient computing device is trusted to receive the digital content from the at least one sending computing device;

sending the digital content, by the at least one sending computing device, to the at least one recipient computing device only if the at least one recipient computing device has been determined to be trusted to receive the digital content from the at least one sending computing device; and

sending usage rights information indicating how the digital content may be rendered by the at least one recipient computing device, the usage rights information being enforceable by the at least on [*sic*, one] recipient computing device.

4.  The method of claim 1, wherein the determination of trust comprises:

receiving a registration message from the at least one recipient device, the registration message including an identification certificate of the recipient computing device and a random registration identifier, the identification certificate being certified by a master device;

*validating* the authenticity of the at least one recipient device;

exchanging messages including at least one session key with the at least one recipient device, the session key to be used in communications; and

conducting a secure transaction using the session key, wherein the secure transaction includes sending the digital content to the at least one recipient device.

5. *The method of claim 1*, wherein the *validating* comprises:
  verifying the identification certificate of the at least one recipient device;
  generating a message to test the authenticity of the at least one recipient device, the generated message including a nonce;
  sending the generated message to the at least one recipient device; and
  verifying if the at least one recipient device correctly processed the generated message.

Defendants suggest that the error could be corrected by replacing "validating" with "determining," and Defendants cite Claims 6 and 8-10 of the '007 Patent.

Plaintiff replies that Defendants' proposed alternative correction "would break the parallel structure of the three claim families of the '007 patent and would generate additional antecedent basis problems. For example, the term 'the identification certificate' in claim 5 lacks antecedent basis in claim 1, but has antecedent basis in claim 4." (Dkt. No. 345, at 13.)

Nonetheless, during prosecution, the patentee amended claim 5 of the '007 Patent and expressly explained:

> Claim 5 stands objected to as incorrectly stating a dependency on claim 10 rather than claim 1. Claim 5 is amended herein to correctly depend on claim 1. Thus, this objection should be withdrawn.

(Dkt. No. 331, Ex. 17, 11/5/2012 Response to Office Action, at 7.)

On balance, the correction sought by Plaintiff is "subject to reasonable debate." *Novo*, 350 F.3d at 1354. Plaintiff's request for judicial correction is therefore denied. *Novo*, 350 F.3d at 1354; *see LG*, 566 F. Supp. 2d at 913; *see also Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002) ("It is not our function to rewrite claims to preserve their validity . . . .").

Thus, based on the lack of antecedent basis, the Court hereby finds that "validating" in Claim 5 of the '007 Patent is **indefinite**.

**S. "determining, by the document platform"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "determining by the document platform" should be corrected to: "determining, by the document repository" | Indefinite |

(Dkt. No. 304, at 18; Dkt. No. 331, at 24.)  The parties submit that this disputed term appears in

Claim 10 of the '072 Patent.  (Dkt. No. 292-1, at 1; Dkt. No. 331, at 24.)

(1)  The Parties' Positions

Plaintiff argues that "[t]he claim itself makes both the error and its correction apparent,

and the prosecution history suggests no alternate interpretation."  (Dkt. No. 304, at 18.)  Plaintiff

explains that "[t]he error was introduced when other determining steps involving client-side

activity were clarified to indicate that those determinations were being performed on the client."

(Dkt. No. 304, at 19 (citing *id.*, Ex. N, 10/15/2008 Response to Office Action at 2 & 9-10).)

Defendants respond that "[Plaintiff] cannot establish that the requested correction is 'not

subject to reasonable debate.'"  (Dkt. No. 331, at 24.)

Plaintiff replies that "Defendants argue that the patentee intentionally wrote and

prosecuted an indefinite claim.  That is nonsense . . . ."  (Dkt. No. 345, at 13.)  Plaintiff further

explains:

> Defendants admit that the asserted claims of the '072 patent recite a document
> repository (the server-side engagement) and a document platform (the client-side
> engagement).  Dkt. 331 at 23.  With this understanding, the error of having the
> client device (the "document platform") decide whether to grant its own request is
> clear, and thus susceptible to correction.  Dkt. 304 at 18-19; Goodrich Reply Decl.
> ¶¶ 39-42.  It is equally clear from the claim language that the server-side device
> (the document repository) must perform the step of determining if the client is
> authorized to receive the content.

(Dkt. No. 345, at 13.)

At the February 6, 2015 hearing, the parties did not address this disputed term.

<u>(2)  Analysis</u>

Judicial correction of an error in a patent may be available "if (1) the correction is not

subject to reasonable debate based on consideration of the claim language and the specification

and (2) the prosecution history does not suggest a different interpretation of the claims."  *Novo*,

350 F.3d at 1354; *see LG*, 566 F. Supp. 2d at 913 (noting the "nearly impossible standard for

judicial correction of a patent" and citing *Novo*, 350 F.3d 1348, which "refus[ed] to correct 'a' to

'and' because other possibilities for correction existed").

Claim 10 of the '072 Patent recites (emphasis added):

10.  A method for securely rendering digital documents, comprising:
 storing a digital document and at least one usage right in separate files in a document repository, wherein the at least one usage right is associated with the digital document;
 receiving a request from a document platform for access to the digital document;
 *determining, by the document platform*, whether the request may be granted based on the at least one usage right, the determining step including authenticating the document platform and determining whether the at least one usage right includes a manner of use that allows transfer of the digital document to the document platform;
 if the at least one usage right allows the transfer of the digital document to the document platform, transferring the digital document and the at least one usage right associated with the digital document to the document platform;
 storing the digital document and the at least one usage right in the document platform, wherein the at least one usage right is stored in a separate file from the digital document; and
 rendering the digital document by the document platform.

Plaintiff's expert, Dr. Goodrich, opines:

A person of ordinary skill in the art would recognize an error in claim 10 of the '072 patent where the document platform of the claim is required to determine whether a request the document platform made in the previous step should be granted.  When the determining step is performed, the request subject to the determining step has just been received from the document platform.  The determining step requires the determining entity (document platform or document repository) to determine whether a usage right includes a manner of use that allows a digital document to be transferred to the document platform.  The document platform does not possess the subject usage right until, later in the

claim, only after the determining step has been resolved in favor of granting the request; the usage right is transferred to the document platform with the digital document. Prior to the "receiving" step, claim 10 introduces the digital document and the usage right as being stored by the document repository. Accordingly, one having ordinary skill in the art would understand that the determining step should be performed by the document repository (which is storing the right used to perform the determining step) and not the document platform (which cannot store the usage right until after the determining step).

(Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at ¶ 57.)

On balance, the correction sought by Plaintiff is "subject to reasonable debate." *Novo*, 350 F.3d at 1354. For example, as argued by Defendants, Claim 10 of the '072 Patent could be corrected by deleting the entire phrase "by the document platform" or by moving the phrase "by the document platform" to after the word "request."

Moreover, during prosecution the patentee relied upon the phrase "determining, by the document platform" when distinguishing a prior art reference:

> . . . *Perritt* fails to disclose, teach or suggest the steps of determining, *by the document platform*, whether the request may be granted based on the at least one usage right, and storing the digital document and the at least one usage right in the document platform, wherein the at least one usage right is stored in a separate file from the digital document, as recited in independent claim 14.

(Dkt. No. 331, Ex. 14, 10/15/2008 Response to Office Action, at 10 (emphasis in original).)

Plaintiff replies that "[n]owhere in their response to the Office Action do applicants attempt to explain how the 'document platform' makes a determination about whether it is authorized to receive the requested content." (Dkt. No. 345, at 13.) Nonetheless, this prosecution history weighs against finding that the claim contains an error for which the proper correction is not "subject to reasonable debate." *Novo*, 350 F.3d at 1354.

Plaintiff's request for judicial correction is therefore denied. *Novo*, 350 F.3d at 1354; *see LG*, 566 F. Supp. 2d at 913. This finding also comports with the principle that "[c]ourts do not rewrite claims; instead, we give effect to the terms chosen by the patentee." *K-2 Corp. v.*

*Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999); *see Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("courts may not redraft claims, whether to make them operable or to sustain their validity"); *see also Allen Eng'g*, 299 F.3d at 1349 ("It is not our function to rewrite claims to preserve their validity . . . .").

The remaining issue is whether the disputed term renders the uncorrected claim invalid as indefinite.

Defendants have failed to demonstrate any inconsistency that would preclude a person of ordinary skill in the art from understanding the meaning of the disputed term.  Instead, the parties simply seem to submit that the claim, as written, does not reflect what the patentee intended to claim.  Defendants have not established that this is an appropriate basis for finding indefiniteness.

Defendants' indefiniteness argument is therefore hereby expressly rejected.  No further construction is required.  *See PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("[A]fter the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact."); *see also U.S. Surgical*, 103 F.3d at 1568; *O2 Micro*, 521 F.3d at 1362.

The Court accordingly hereby construes **"determining, by the document platform"** to have its **plain meaning**.

## T. "grammar"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a manner of defining a valid sequence of symbols for a language" | "a manner of defining a valid sequence of symbols consisting of brackets, bars and braces used to describe the language of usage rights sentences, parentheses used to group items together in lists, keywords followed by colons used to indicate a single value, typically an identifier or list of identifiers, and the suffix 'ID'" |
| | Alternatively, indefinite. |

(Dkt. No. 304, at 19; Dkt. No. 331, at 19.)  The parties submit that this disputed term appears in Claim 1 of the '160 Patent.  (Dkt. No. 292-1, at 4; Dkt. No. 331, at 19.)

<u>(1)  The Parties' Positions</u>

Plaintiff argues that "Defendants seek to shoehorn additional limitations into the term 'grammar' from a subsequent portion of the specification that discusses a particular 'notation' that can be used '[i]n describing the grammar' of the preferred embodiment."  (Dkt. No. 304, at 19.)

Defendants respond that "[t]he patentees did not use 'grammar' in the '160 patent as a generic term but rather a specifically disclosed sequence of symbols used to create the 'usage rights language.'"  (Dkt. No. 331, at 19.)  Defendants further explain: "There are many ways to use and arrange the grammar elements, but the grammar used to describe 'usage rights' must be the particular grammar described by the specification.  If not, then grammar does not give any meaning to the claims in which it is used, and it would be indefinite."  (*Id.*, at 19-20.)

Plaintiff replies that "[t]he claim . . . is directed to the statements generated in accordance with a grammar to express usage rights ('statements from a usage rights language'), not a notation used to express a grammar."  (Dkt. No. 345, at 10.)

<u>(2)  Analysis</u>

Claim 1 of the '160 Patent recites (emphasis added):

1.  A computer readable medium having embedded thereon a digital work adapted to be distributed within a system for controlling use of digital works, said digital work comprising:

       a digital content portion that is renderable by a rendering device;

       a usage rights portion associated with said digital content portion and comprising one or more computer readable instructions configured to permit or prohibit said rendering device to render said digital content portion, said usage rights portion being expressed as statements from a usage rights language having a *grammar* defining a valid sequence of symbols, and specifying a manner of use relating to one or more purposes for which the digital work can be used by an authorized party; and

       a description structure comprising a plurality of description blocks, each of said description blocks comprising address information for at least one part of said digital work, and a usage rights part for associating one or more usage rights portions.

The specification discloses:

The usage rights language is based on the *grammar* described below.  A *grammar* is a convenient means for defining valid sequence [*sic*] of symbols for a language. In describing the *grammar* the notation "[a|b|c]" is used to indicate distinct choices among alternatives.  In this example, a sentence can have either an "a", "b" or "c".  It must include exactly one of them.  The braces { } are used to indicate optional items.  Note that brackets, bars and braces are used to describe the language of usage rights sentences but do not appear in actual sentences in the language.

'859 Patent at 17:41-50 (emphasis added; square brackets in "[a|b|c]" as in original); *see id.* at 17:57-60 (regarding "keywords") & 28:4-8 (regarding how to specify "things" that "need to be identified").

As to extrinsic evidence, Plaintiff has cited the following definitions: "grammar" in the context of "computing" means "a set of rules governing what strings are valid or allowable in a language or text" (Dkt. No. 304, Ex. S, "Google.com Dictionary"); "grammar" means "[a] normative or prescriptive set of rules setting forth a standard of usage" (*id.*, Ex. T, *American Heritage College Dictionary* 602 (2002)); and "language" in the context of computer science

means "[a] system of symbols and rules used for communication with or between computers"

(*id.*, Ex. U, "thefreedictionary.com").

Plaintiff also submits the opinion of is expert, Dr. Goodrich, that:

> The term "grammar" in computer science has been well understood for decades to comprise a set of rules for a language that govern what constitutes valid or permissible strings or sequences of symbols in that language. * * * [T]o a person of ordinary skill in the art, the claim element requiring that statements be expressed from a "language having a grammar" would be well understood to require that statements in that language be generated and interpreted according to a set of rules making up the grammar, which as noted above could be represented using a variety of notational techniques, and would not include the limitation of a particular notation "consisting of brackets, bars and braces," or the like.

(Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at ¶¶ 65 & 67.)

Defendants' expert, Dr. Grimes, responds that "[t]he term ['grammar'] is deprived of any real meaning until it is applied to a particular computer language," and the specification "defines the term 'grammar' by distinguishing it from any computer language" as set forth above. (Dkt. No. 331, Ex. 11, 12/22/2014 Grimes Decl. at ¶¶ 56-57.)

On balance, the surrounding claim language, the specification, the extrinsic dictionary definitions, and Plaintiff's expert's opinion, together, are persuasive evidence that grammar is a generic term that should not be limited to the specific features proposed by Defendants. Defendants' proposal imports limitations from preferred embodiments and is therefore rejected. *See Electro Med.*, 34 F.3d at 1054.

The Court accordingly hereby construes **"grammar"** to mean **"a manner of defining a valid sequence of symbols for a language."**

**U. "description structure"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a structure which describes the location of content and the usage rights for a digital work that is comprised of description blocks, each of which corresponds to a digital work or to an interest in a digital work" | "any acyclic structure that represents the relationship between the components of a digital work" |

(Dkt. No. 304, at 20; Dkt. No. 292-2, at 15-16.) Plaintiff submits that this term appears in Claim 1 of the '160 Patent. (Dkt. No. 292-1, at 4; Dkt. No. 292-2, at 15-16.)

Plaintiff argues that "Defendants ignore the glossary and rely on a portion of the detailed description of a preferred embodiment . . . ." (Dkt. No. 304, at 20.)

Defendants' response brief does not address this disputed term. (*See* Dkt. No. 331.)

Plaintiff replies that "Defendants have dropped their proposal (which improperly includes an 'acyclic' limitation) and agreed to a modified version of [Plaintiff's] construction," namely: "A structure which describes the location of content and the usage rights and usage fees, if any such usage fees are required, for a digital work that is comprised of description blocks, each of which corresponds to a digital work or to an interest in a digital work." (Dkt. No. 345, at 10 & n.10). The parties' January 23, 2015 Joint Claim Construction Chart confirms that the parties have reached agreement as to this term (Dkt. No. 366, Ex. B, at 16), and the parties did not address this disputed term otherwise at the February 6, 2015 hearing.

The Court accordingly hereby construes **"description structure"** to mean **"a structure which describes the location of content and the usage rights and usage fees, if any such usage fees are required, for a digital work that is comprised of description blocks, each of which corresponds to a digital work or to an interest in a digital work."**

## V. "means for communicating with a master repository for obtaining an identification certificate for the repository"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "Corresponding Structure:<br>    an external interface that provides for a signal connection with another device described at 13:52-59"[7] | Indefinite |

(Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at p. 16; Dkt. No. 331, at 25; Dkt. No. 366, Ex. B, at 6.)  The parties submit that this disputed term appears in Claim 24 of the '859 Patent. (Dkt. No. 292-1, at 5; Dkt. No. 331, at 25.)

(1)  The Parties' Positions

Plaintiff's expert submits that the cited structure "is identical to those [*sic*] given by the PTAB for these means in the '859 patent."  (Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at ¶ 35 (citation omitted).)

Defendants argue that "[t]he recited function is indefinite because 'the repository' could refer to the 'distributed repository,' the 'another distributed repository,' or the 'master repository.'"  (Dkt. No. 331, at 25.)

Plaintiff replies that because "[m]aster repositories issue identification certificates to other 'distributed repositories,'" "the reference to communicating with a master repository to

---

[7] Plaintiff previously proposed: "Corresponding Structure: algorithm/structure necessary for performing the recited function set forth in the '859 Spec., including from the following portions: 7:16-17; 13:52-59, Fig. 2, Fig. 12, and equivalents thereof."  (Dkt. No. 292-1, at 5.)

obtain a certificate can only be attributed to the previously recited 'distributed repository.'"

(Dkt. No. 345, at 14.)

At the February 6, 2015 hearing, the parties did not address this disputed term.

(2)  Analysis

In a Decision instituting an IPR of the '859 Patent, the PTAB found:

Claim 23 recites "means for communicating with an authorization repository for authorizing a condition."  Claim 24 recites "means for communication with a master repository for obtaining an identification certificate."

For corresponding structure, [Petitioner] ZTE contends the following:

Claim 23 requires means for communicating with an authorization repository for authorizing a condition, and claim 24 requires means for communication with a master repository for obtaining an identification certificate.  The corresponding structure for performing the claimed function of means for communicating is external interface 1206 (Fig. 12; 13:52-59: "The external interface means 1206 provides for the signal connection to other repositories.").

(Pet. 7)  We agree.  Each of the "means for communicating . . ." covers an external interface that provides for a signal connection with another device and equivalents thereof.

(Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl., Ex. 2, 7/1/2013 Decision (IPR2013-00137)

at 16 (p. 102 of 204 of Ex. K) (citation omitted).)

The parties' present dispute boils down to whether a reasonably clear antecedent basis

exists for "the repository" in Claim 24 of the '859 Patent.  Claims 1 and 24 of the '859 Patent

recite (emphasis added):

1.  A rendering system adapted for use in a distributed system for managing use of content, said rendering system being operative to rendering [*sic*] content in accordance with usage rights associated with the content, said rendering system comprising:
    a rendering device configured to render the content; and
    *a distributed repository* coupled to said rendering device and including a requester mode of operation and server mode of operation,

wherein the server mode of operation is operative to enforce usage rights associated with the content and permit the rendering device to render the content in accordance with a manner of use specified by the usage rights,

the requester mode of operation is operative to request access to content from *another distributed repository*, and

*said distributed repository* is operative to receive a request to render the content and permit the content to be rendered only if a manner of use specified in the request corresponds to a manner of use specified in the usage rights.

\* \* \*

24. A rendering system as recited in claim 1, further comprising means for communicating with a master repository for obtaining an identification certificate for *the repository*.

The specification discloses:

> As a prerequisite to operation, a repository will require possession of an identification certificate. Identification certificates are encrypted to prevent forgery and are issued by a Master repository. A master repository plays the role of an authorization agent to enable repositories to receive digital works. Identification certificates must be updated on a periodic basis. Identification certificates are described in greater detail below with respect to the registration transaction.

'859 Patent at 13:1-9.

> Communications integrity refers to the integrity of the communications channels between repositories. Roughly speaking, communications integrity means that repositories cannot be easily fooled by "telling them lies." Integrity in this case refers to the property that repositories will only communicate with other devices that are able to present proof that they are certified repositories, and furthermore, that the repositories monitor the communications to detect "impostors" and malicious or accidental interference.

*Id.* at 12:21-29; *see id.* at 26:43-57 (disclosing a "registration transaction between two

repositories").

> Plaintiff also submits that in a recent IPR petition, Defendant Apple Inc. stated:

> Claim 24 specifies the rendering system of claim 1 comprises "means for communicating with a master repository for obtaining an identification certificate for the repository." In IPR2013-00137, the Board construed this means "to be the external interface 1206, which provides a signal connection with another device."

> . . . This conclusion is supported by the '859 disclosure. *See* Ex. 1001 [('859 Patent)] at 13:20-22, 13:52-59.

(Dkt. No. 345, Ex. AG, 12/22/2014 Petition for *Inter Partes* Review ('859 Patent), at 22.)

Finally, Plaintiff's expert, Dr. Goodrich, opines that a person of ordinary skill in the art would understand from the intrinsic evidence that "a master repository is the issuer of an identification certificate, not the recipient . . . . That is, the line of communication for obtaining an identification certificate always goes from a master repository to a recipient repository." (Dkt. No. 345, Ex. AA, 1/9/2015 Goodrich Decl., at ¶ 23.) Plaintiff's expert concludes that "it is clear from [the specification and the claims] that to someone with ordinary skill in the art 'the repository' referenced in claim 24 must be the 'distributed repository' referenced in claim 1." (*Id.*)

On balance, the Court finds credible Plaintiff's expert's assessment of how a person of ordinary skill in the art would understand Claim 24 in light of the intrinsic evidence.

The Court therefore hereby finds that the antecedent basis for "the repository" in Claim 24 of the '859 Patent is "a distributed repository" in Claim 1 of the '859 Patent. Defendants' indefiniteness argument is accordingly hereby expressly rejected.

The parties do not appear to otherwise dispute the claimed function, and Defendants have not proposed any alternative corresponding structure. Further, the Court affords "reasoned deference" to the above-quoted finding of the PTAB. *Maurice Mitchell*, 2006 WL 1751779, at *4; *see TQP*, 2014 WL 2810016, at *6; *see also Teva*, 135 S. Ct. at 839-40.

The Court accordingly hereby finds that for the **"means for communicating with a master repository for obtaining an identification certificate for the repository,"** the function is **"communicating with a master repository for obtaining an identification certificate for**

the repository," and the corresponding structure is **"the external interface means 1206**

**described in the '859 Patent at 13:52-59; and equivalents thereof."**

W. **"means for processing a request from the means for requesting"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Corresponding Structure:<br>    "One or more processors that implement the following algorithm: Processing begins when a requester repository has sent a message to initiate a request.  (36:35-40, 37:9-13.)"[8] | "Processing begins when a requester repository has sent a message to initiate a request.  First, the server repository checks the compatibility of the requester repository and the validity of the requester's identification.  Second, the requester and server repositories perform the common opening transaction steps of determining whether authorization is needed, and whether the requested transaction is permitted given the usage rights.  Third, requester and server repositories perform a transmission protocol to read and write blocks of data, and then the requester repository renders the digital work.  Fourth, the contents are removed from the rendering device and the requester repository.  Finally, the requester and server repositories perform the common closing transaction steps of updating the usage rights and billing information."[9] |

---

[8] Plaintiff previously proposed: "Corresponding Structure: algorithm/structure necessary for performing the recited function set forth in the '576 Spec., including from the following portions: 30:25-30, 30:59-31:49, 32:20-31, 36:35-54, 37:9-26, and equivalents thereof; see also, e.g., '576 PTAB Decision at 21-22."  (Dkt. No. 292-1, at 6.)  Plaintiff also previously proposed: "processing begins when a requester repository has sent a message to initiate a request (36:35-40, 37:9-13.)"  (Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at p. 7.)

[9] Defendants previously proposed: "A computer processor and processor memory containing software that, sequentially, instructs the server repository to check the compatibility of the requester repository and the validity of the requester's identification, instructs the requester and server repositories to perform the common opening transaction steps of determining whether authorization is needed and whether the requested transaction is permitted given the usage rights, instructs the requester and sever [*sic*, server] repositories to perform a transmission protocol to read and write blocks of data and then instructs the requester repository to render the digital work, instructs the rendering device and the requester repositories to remove the contents, and instructs the requester and server repositories to perform closing transaction steps of updating the usage rights and billing information.  Alternatively, indefinite."  (Dkt. No. 292-2, at 27-28.)

(Dkt. No. 366, Ex. B, at 21; Dkt. No. 331, at 26; Dkt. No. 366, Ex. B, at 21.)  The parties submit that this disputed term appears in Claim 1 of the '576 Patent.  (Dkt. No. 292-1, at 6; Dkt. No. 331, at 26.)

### (1)  The Parties' Positions

Plaintiff's expert opines: "A person of ordinary skill in the art would identify the algorithm described by the PTAB as 'processing begins when a requester repository has sent a message to initiate a request' as being clearly linked or associated to the recited function.  This algorithm is described in the specification at 36:35-40 and 37:9-13, which includes the contents of the requesting message, as cited by the PTAB on page 21. . . . The remaining portions of the algorithm included in the Defendants' proposed construction are not necessary to perform the recited function."  (Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at ¶¶ 18-19.)

Defendants argue that Plaintiff's proposal "only describes prerequisites for the processing to 'begin[]' and not how it is carried out," which is set forth by the five-step algorithm that appears in the PTAB's construction.  (Dkt. No. 331, at 26.)  Defendants also argue that the passages cited by Plaintiff "at most restate the function without explaining the steps conducted to implement it."  (*Id.*, at 27 (citing *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1335 (Fed. Cir. 2008) (rejecting an alleged "algorithm" that was "at best, a description of the claimed function of the means-plus-function claim")).)  Finally, Defendants argue that rather than merely citing passages from the specification, "that text should actually be reproduced in the construction, to avoid burdening jurors with the need to look up each citation in the patent or confusing them as to whether the cited text is required structure."  (Dkt. No. 331, at 27.)

Plaintiff replies that Defendants have proposed "numerous steps that are not necessary to perform the recited function," and "[b]ecause the 'means for processing' requires no more than

81

merely processing, a general-purpose computer processor is sufficient structure." (Dkt. No. 345, at 14.)

At the February 6, 2015 hearing, the parties did not address this disputed term.

(2)  Analysis

Claim 1 of the '576 Patent recites (emphasis added):

1.  An apparatus for rendering digital content in accordance with rights that are enforced by the apparatus, said apparatus comprising:
> a rendering engine configured to render digital content;
> a storage for storing the digital content;
> means for requesting use of the digital content stored in the storage; and
> a repository coupled to the rendering engine,
> wherein the repository includes:
> *means for processing a request from the means for requesting*,
> means for checking whether the request is for a permitted rendering of the digital content in accordance with rights specified in the apparatus,
> means for processing the request to make the digital content available to the rendering engine for rendering when the request is for a permitted rendering of the digital [*sic*]; and
> means for authorizing the repository for making the digital content available for rendering, wherein the digital content can be made available for rendering only by an authorized repository, the repository comprising:
> means for making a re[q]uest for an authorization ob[j]ect required to be included within the repository for the apparatus to render the digital content; and
> means for receiving the authorization ob[j]ect when it is determined that the request should be granted.

In instituting an IPR of the '576 Patent, the PTAB found as to this disputed term:

> Processing begins when a requester repository has sent a message to initiate a request.  (Ex. 1001 [('576 Patent)], 36:35-40, 37:9-13.)  First, the server repository checks the compatibility of the requester repository and the validity of the requester's identification.  (Ex. 1001, 36:41-44, 37:14-17.)  Second, the requester and server repositories perform the common opening transaction steps of determining whether authorization is needed, and whether the requested transaction is permitted given the usage rights.  (Ex. 1001, 36:45-46, 37:18-19, 30:59-31:49.)  Third, requester and server repositories perform a transmission protocol to read and write blocks of data, and then the requester repository renders the digital work.  (Ex. 1001, 36:47-50, 37:20-22.)  Fourth, the contents are removed from the rendering device and the requester repository.  (Ex. 1001, 36:51-52, 37:23-24.)  Finally, the requester and server repositories perform the

common closing transaction steps of updating the usage rights and billing information.  (Ex. 1001, 36:53-54, 37:25-26, 32:20-31.)

The above-noted description constitutes a sufficiently disclosed algorithm, expressed in prose, which, in combination with processor 1200, constitutes a corresponding structure for the claimed "means for processing a request from the means for requesting."

(Dkt. No. 331, Ex. 18, 7/9/2013 Decision ('576 Patent), at 21-22.)

On one hand, the PTAB Decision is entitled to some deference.  *See Maurice Mitchell*, 2006 WL 1751779, at *4; s*ee also TQP*, 2014 WL 2810016, at *6; *Teva*, 135 S. Ct. at 839-40.

On the other hand, this Court conducts an independent review of claim construction disputes.  *See, e.g., Texas Instruments*, 182 F. Supp. 2d at 589-90; *Burns, Morris*, 401 F. Supp. at 697; *Negotiated Data Solutions*, 2012 WL 6494240, at *5.

"[A] means-plus-function claim element for which the only disclosed structure is a general purpose computer is invalid if the specification fails to disclose an algorithm for performing the claimed function."  *Net MoneyIN Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008); *see WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999) ("In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm."); *see also Noah Sys. v. Intuit Inc.*, 675 F.3d 1302, 1319 (Fed. Cir. 2012) ("Computer-implemented means-plus-function claims are indefinite unless the specification discloses an algorithm to perform the function associated with the limitation.").

There is, however, an exception to the general rule requiring an algorithm.  Specifically, when the corresponding structure is a general purpose computer, an algorithm is required *unless* the recited function can be achieved by any general purpose computer without special

programming. *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) ("Absent a possible narrower construction of the terms 'processing,' 'receiving,' and 'storing,' . . . those functions can be achieved by any general purpose computer without special programming. As such, it was not necessary to disclose more structure than the general purpose processor that performs those functions."); *accord Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012) ("In *In re Katz*, we held that '[a]bsent a possible narrower construction' of the terms 'processing,' 'receiving,' and 'storing,' the disclosure of a general-purpose computer was sufficient. . . . In other words, a general-purpose computer is sufficient structure if the function of a term such as 'means for processing' requires no more than merely 'processing,' which any general-purpose computer may do without any special programming.") (citations omitted); *but see id.* ("It is only in the rare circumstances where any general-purpose computer without any special programming can perform the function that an algorithm need not be disclosed.").

The claimed function of "processing a request from the means for requesting" does not include anything beyond merely generic "processing." As found in *Katz*, this function "can be achieved by any general purpose computer without special programming." *In re Katz*, 639 F.3d at 1316.

The Court accordingly hereby finds that for the **"means for processing a request from the means for requesting,"** the function is **"processing a request from the means for requesting,"** and the corresponding structure is "**a general-purpose computer; and equivalents thereof.**"

**X. "means for checking whether the request is for a permitted rendering of the digital content in accordance with rights specified in the apparatus"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "Corresponding Structure:<br><br>One or more processors that implement the following algorithm: 'the server repository determines whether the right is granted and whether any specified time, security, and access based conditions are satisfied (31:13-33.)'"[10] | "First, the requester repository determines whether an authorization certificate or a digital ticket is needed. Second, the server repository generates a transaction identifier. Third, the server repository determines whether the right is granted and whether time, security, and access based conditions are satisfied. Finally, the server repository determines whether there are sufficient copies of the work to distribute"[11] |

(Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at p. 10; Dkt. No. 331, at 27; Dkt. No. 366, Ex. B, at 22.) The parties submit that this disputed term appears in Claim 1 of the '576 Patent. (Dkt. No. 292-1, at 5; Dkt. No. 331, at 27.)

(1) The Parties' Positions

Plaintiff's expert opines: "A person of ordinary skill in the art would identify the algorithm described by the PTAB as 'the server repository determines whether the right is granted and whether time, security, and access based conditions are satisfied' as being clearly linked or associated to the recited function. This algorithm is described in the '576 patent at

---

[10] Plaintiff previously proposed: "Corresponding Structure: algorithm/structure necessary for performing the recited function set forth in the '576 Spec., including from the following portions: 30:59-31:49, 31:3-49, 36:45-46, 37:18-19, and equivalents thereof; see also, e.g., '576 PTAB Decision at 22-23." (Dkt. No. 292-1, at 5.)

[11] Defendants previously proposed: "A computer processor and processor memory containing software that, sequentially, instructs the requester repository to determine whether an authorization certificate or a digital ticket is needed, instructs the server repository to generate a transaction identifier, instructs the server repository to determine whether the right is granted and whether time, security, and access based conditions are satisfied, and instructs the server repository to determine whether there are sufficient copies of the work to distribute. Alternatively, indefinite." (Dkt. No. 292-2, at 28.)

31:13-33, which describes in prose the functions shown in the flowchart of Figure 18 boxes 1804 through 1807, inclusive." (Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at ¶ 26 (citation omitted).)

Defendants argue that Plaintiff's proposal "does little more than restate the function" and "wrongly dismisses the PTAB's other corresponding steps." (Dkt. No. 331, at 28.)

Plaintiff replies that "[o]nly the second step [proposed by Defendants] is necessary to check whether the request is for a permitted rendering of the digital content." (Dkt. No. 345, at 14.)

At the February 6, 2015 hearing, the parties did not address this disputed term.

(2) Analysis

Claim 1 of the '576 Patent recites (emphasis added):

1. An apparatus for rendering digital content in accordance with rights that are enforced by the apparatus, said apparatus comprising:
   a rendering engine configured to render digital content;
   a storage for storing the digital content;
   means for requesting use of the digital content stored in the storage; and
   a repository coupled to the rendering engine,
   wherein the repository includes:
   means for processing a request from the means for requesting,
   *means for checking whether the request is for a permitted rendering of the digital content in accordance with rights specified in the apparatus,*
   means for processing the request to make the digital content available to the rendering engine for rendering when the request is for a permitted rendering of the digital [*sic*]; and
   means for authorizing the repository for making the digital content available for rendering, wherein the digital content can be made available for rendering only by an authorized repository, the repository comprising:
   means for making a re[q]uest for an authorization ob[j]ect required to be included within the repository for the apparatus to render the digital content; and
   means for receiving the authorization ob[j]ect when it is determined that the request should be granted.

In instituting an IPR of the '576 Patent, the PTAB found as to this disputed term:

First, the requester repository determines whether an authorization certificate or a digital ticket is needed. (Ex. 1001 [('576 Patent)], 31:3-9.) Second, the server repository generates a transaction identifier. (Ex. 1001, 31:10-13.) Third, the server repository determines whether the right is granted and whether time, security, and access based conditions are satisfied. (Ex. 1001, 31:13-33.) Finally, the server repository determines whether there are sufficient copies of the work to distribute. (Ex. 1001, 31:34-49.) The above-noted description constitutes a sufficiently disclosed algorithm, expressed in prose, which, in combination with processor 1200, constitutes a corresponding structure for the claimed "means for checking whether the request is for a permitted rendering of the digital content in accordance with rights specified in the apparatus."

(Dkt. No. 331, Ex. 18, 7/9/2013 Decision ('576 Patent), at 22-23.)

The parties' experts dispute whether the steps of the PTAB's construction are necessary to perform the claimed function. (Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at ¶¶ 27-29; Dkt. No. 331, Ex. 11, Grimes Decl. at ¶¶ 16-24.) On balance, the Court finds Defendants' expert more persuasive. In particular, Plaintiff's expert has failed to persuasively demonstrate that the additional steps identified by the PTAB are not part of the algorithm disclosed for performing the claimed function. *See* '859 Patent at 30:16-62. Finally, the Court affords "reasoned deference" to the PTAB Decision. *Maurice Mitchell*, 2006 WL 1751779, at *4; *see TQP*, 2014 WL 2810016, at *6; *see also Teva*, 135 S. Ct. at 839-40.

The Court accordingly hereby finds that for the **"means for checking whether the request is for a permitted rendering of the digital content in accordance with rights specified in the apparatus,"** the function is **"checking whether the request is for a permitted rendering of the digital content in accordance with rights specified in the apparatus,"** and the corresponding structure is **"a processor configured to perform the following algorithm and equivalents thereof: first, the requester repository determines whether an authorization certificate or a digital ticket is needed; second, the server repository generates a transaction identifier; third, the server repository determines whether the right**

is granted and whether time, security, and access based conditions are satisfied; and finally, the server repository determines whether there are sufficient copies of the work to distribute; and equivalents thereof."

**Y.  "means for receiving the authorization ob[j]ect when it is determined that the request should be granted"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "Corresponding Structure:<br><br>One or more processors that implement the following algorithm: The remote repository transmits a block of data to the server repository and waits for an acknowledgement, which the server provides when the block of data has been completely received.  (33:9-15.) Unless a communications failure terminates the transaction, that process repeats until there are no more blocks to transmit.  (33:16-38, 33:46-49.)  Finally, the server repository sends a completion acknowledgement to the remote repository.  (33:39-45.)"[12] | "[T]he server repository transmits a block of data to the requester repository and waits for an acknowledgement, which the requester provides when the block of data has been completely received.  Unless a communications failure terminates the transaction, that process repeats until there are no more blocks to transmit.  Finally, the requester repository sends a completion acknowledgement to the server repository.<br><br>In that regard, the specification states: "The key property is that both the server and the requester cancel a transaction if it is interrupted before all of the data blocks are delivered, and commits to it if all of the data blocks have been delivered."[13] |

---

[12] Plaintiff previously proposed: "Corresponding Structure: algorithm/structure necessary for performing the recited function set forth in the '576 Spec., including from the following portions: 32:33, 33:9-49, 36:47-50, 41:50-65, and equivalents thereof; see also, e.g., '576 PTAB Decision at 26."  (Dkt. No. 292-1, at 6.)

[13] Defendants previously proposed: "A computer processor and processor memory containing software that, sequentially, instructs the server repository to transmit a block of data to the requester repository and to wait for an acknowledgment from the requester that the block of data has been completely received, instructs the server repository to repeat that transmission and waiting for acknowledgment until there are no more blocks to transmit, instructs the requester repository to send a completion acknowledgment to the server repository, and instructs both the server and the requester to cancel a transaction if it is interrupted before all the data blocks are delivered, and instructs both the server and the requester to commit to the transaction if all the data blocks have been delivered.  Alternatively, indefinite."  (Dkt. No. 292-2, at 30-31.)

(Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at p. 14; Dkt. No. 331, at 28; Dkt. No. 366, Ex. B, at 26.)  The parties submit that this disputed term appears in Claim 1 of the '576 Patent. (Dkt. No. 292-1, at 6; Dkt. No. 331, at 28.)

(1)  The Parties' Positions

Plaintiff's expert opines:

The PTAB construction incorrectly referred to the "server repository" and "requester repository."  However, the PTAB construction[] . . . for the "means for authorizing the repository for making the digital content available for rendering" makes clear that the "authorization object" is transmitted from the "remote repository" to the "server repository."  In fact, the PTAB stated that "It is described in the specification that the authorization process invokes a 'play' transaction to acquire an authorization object from a remote repository." Accordingly, I have corrected this apparent clerical error in the PTAB construction.

(Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at ¶ 33 (citation omitted).)

Defendants argue that the PTAB's construction should be adopted because "[t]he PTAB's terminology . . . comes straight from the cited passages of the patent."  (Dkt. No. 331, at 28 (citing '576 Patent at 33:9-10).)

Plaintiff replies that "Defendants' construction fails to account for the 'remote repository.'"  (Dkt. No. 345, at 15; *see id.*, Ex. AA, 1/9/2015 Goodrich Decl., at ¶ 17.)

At the February 6, 2015 hearing, the parties did not address this disputed term.

(2)  Analysis

Claim 1 of the '576 Patent recites (emphasis added):

1.  An apparatus for rendering digital content in accordance with rights that are enforced by the apparatus, said apparatus comprising:
a rendering engine configured to render digital content;
a storage for storing the digital content;
means for requesting use of the digital content stored in the storage; and
a repository coupled to the rendering engine,
wherein the repository includes:

means for processing a request from the means for requesting,

means for checking whether the request is for a permitted rendering of the digital content in accordance with rights specified in the apparatus,

means for processing the request to make the digital content available to the rendering engine for rendering when the request is for a permitted rendering of the digital [*sic*]; and

means for authorizing the repository for making the digital content available for rendering, wherein the digital content can be made available for rendering only by an authorized repository, the repository comprising:

means for making a re[q]uest for an authorization ob[j]ect required to be included within the repository for the apparatus to render the digital content; and

*means for receiving the authorization ob[j]ect when it is determined that the request should be granted.*

In instituting an IPR of the '576 Patent, the PTAB found as to this disputed term:

[T]he server repository transmits a block of data to the requester repository and waits for an acknowledgement, which the requester provides when the block of data has been completely received. (Ex. 1001, 33:9-15.) Unless a communications failure terminates the transaction, that process repeats until there are no more blocks to transmit. (Ex. 1001, 33:16-38, 33:46-49.) Finally, the requester repository sends a completion acknowledgement to the server repository. (Ex. 1001, 33:39-45.) In that regard, the specification states (Ex. 1001, 33:45-48): "The key property is that both the server and the requester cancel a transaction if it is interrupted before all of the data blocks are delivered, and commits to it if all of the data blocks have been delivered." The above-noted description constitutes a sufficiently disclosed algorithm, expressed in prose, which, in combination with processor 1200, constitutes a corresponding structure for the claimed "means for receiving the authorization object when it is determined that the request should be granted."

(Dkt. No. 331, Ex. 18, 7/9/2013 Decision ('576 Patent), at 26.)

The PTAB's construction is consistent with the context of the claim because the "means for receiving" is part of the rendering apparatus that is recited as requesting access to the content. The Court therefore affords "reasoned deference" to the PTAB Decision. *Maurice Mitchell*, 2006 WL 1751779, at *4; *see TQP*, 2014 WL 2810016, at *6; *see also Teva*, 135 S. Ct. at 839-40.

The Court accordingly hereby finds that for the **"means for receiving the authorization ob[j]ect when it is determined that the request should be granted,"** the function is **"receiving**

**the authorization object when it is determined that the request should be granted,"** and the corresponding structure is **"a processor configured to perform the following algorithm and equivalents thereof: the server repository transmits a block of data to the requester repository and waits for an acknowledgement, which the requester provides when the block of data has been completely received; unless a communications failure terminates the transaction, that process repeats until there are no more blocks to transmit; finally, the requester repository sends a completion acknowledgement to the server repository; both the server and the requester cancel a transaction if it is interrupted before all of the data blocks are delivered, and commits to it if all of the data blocks have been delivered; and equivalents thereof."**

**Z.  "means for requesting a transfer of the digital content from an external memory to the storage"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "Corresponding Structure: <br>    user interface 1305 described at <br> 16:35-44"[14] | Indefinite |

(Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at p. 15; Dkt. No. 331, at 29.)  The parties submit that this disputed term appears in Claim 4 of the '576 Patent.  (Dkt. No. 292-1, at 6-7; Dkt. No. 331, at 29.)  "The PTAB did not construe this claim term."  (Dkt. No. 331, at 29.)

    (1)  The Parties' Positions

      Plaintiff's expert opines: "A person of ordinary skill in the art would understand that a user interface is necessary for a user to request a transfer of the digital content from an external

---

[14] Plaintiff previously proposed: "Corresponding Structure: algorithm/structure necessary for performing the recited function set forth in the '576 Spec., including from the following portions: 30:25-30, 30:59-31:49, 32:20-31, 36:35-54, 37:9-26, and equivalents thereof; see also, e.g., '576 PTAB Decision at 20-22."  (Dkt. No. 292-1, at 6-7.)

memory to the storage and clearly linked to that function."  (Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at ¶ 34.)

Defendants argue that "[Plaintiff] fails to include an algorithm because there is none, thus the term is indefinite."  (Dkt. No. 331, at 29.)

Plaintiff replies that "[n]o algorithm is required because the specification discloses the precise structure (i.e., a user interface) used for performing the function."  (Dkt. No. 345, at 15.)

At the February 6, 2015 hearing, the parties did not address this disputed term.

(2)  Analysis

"[A] means-plus-function claim element for which the only disclosed structure is a general purpose computer is invalid if the specification fails to disclose an algorithm for performing the claimed function."  *Net MoneyIN*, 545 F.3d at 1367; *see WMS Gaming*, 184 F.3d at 1349; *see also Noah*, 675 F.3d at 1319.

If an algorithm is required, that algorithm may be disclosed in any understandable form. *See Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1386 (Fed. Cir. 2011) ("Indeed, the mathematical algorithm of the programmer is not included in the specification.  However, as precedent establishes, it suffices if the specification recites in prose the algorithm to be implemented by the programmer."); *see also Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (noting that "a patentee [may] express th[e] algorithm in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure") (citation omitted); *TecSec, Inc. v. Int'l Bus. Machs.*, 731 F.3d 1336, 1348 (Fed. Cir. 2013) (quoting *Finisar*).

Nonetheless, the purported algorithm cannot "merely provide[] functional language" and must provide a "step-by-step procedure" for accomplishing the claimed function.  *Ergo*

*Licensing*, 673 F.3d at 1365. Further, "[i]t is well settled that simply disclosing software, however, without providing some detail about the means to accomplish the function, is not enough.'" Finally, when citing sections of the specification, a patentee should demonstrate "how these sections explain to one of ordinary skill in the art the manner in which the claimed functions are implemented." *Personalized Media Commc'n, LLC v. Motorola, Inc.*, No. 2:08-CV-70-CE, 2011 WL 4591898, at *38 (E.D. Tex. Sept. 30, 2011); *see Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013).

Claim 4 of the '576 Patent recites: "4. The apparatus as recited in claim 1, further comprising means for requesting a transfer of the digital content from an external memory to the storage."

The specification discloses:

Repository User Interface

A user interface is broadly defined as the mechanism by which a user interacts with a repository in order to invoke transactions to gain access to a digital work, or exercise usage rights. As described above, a repository may be embodied in various forms. The user interface for a repository will differ depending on the particular embodiment. The user interface may be a graphical user interface having icons representing the digital works and the various transactions that may be performed. The user interface may be a generated dialog in which a user is prompted for information.

The user interface itself need not be part of the repository. As a repository may be embedded in some other device, the user interface may merely be a part of the device in which the repository is embedded. For example, the repository could be embedded in a "card" that is inserted into an available slot in a computer system. The user interface may be combination of a display, keyboard, cursor control device and software executing on the computer system.

At a minimum, the user interface must permit a user to input information such as access requests and alpha numeric data and provide feedback as to transaction status. The user interface will then cause the repository to initiate the suitable transactions to service the request. Other facets of a particular user interface will depend on the functionality that a repository will provide.

'859 Patent at 15:44-16:2.

Defendants' expert, Dr. Grimes, opines that "[t]he 'user interface 1305, shown in Figure 13' consists of a rectangle containing the text 'User Interface 1305.' This is not an algorithm or even a block diagram, only a block." (Dkt. No. 331, Ex. 11, 12/22/2014 Grimes Decl. at ¶ 31.) Further, Dr. Grimes opines that the specification disclosure cited by Plaintiff, which is quoted above, "is not a description of an algorithm for the claimed function." (*Id.*, at ¶ 32.)

On balance, the disclosure set forth in the above-quoted "Repository User Interface" section of the specification is sufficient for performing the claimed function. The Court finds Plaintiff's expert's opinion credible in that regard. (Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at ¶ 34.)

The Court accordingly hereby finds that for the **"means for requesting a transfer of the digital content from an external memory to the storage,"** the function is **"requesting a transfer of the digital content from an external memory to the storage,"** and the corresponding structure is **"user interface 1305, as described in the '576 Patent at 16:20-46; and equivalents thereof."**

**AA. "means for processing the request to make the digital content available to the rendering engine for rendering when the request is for a permitted rendering of the digital [content]," "means for authorizing the repository for making the digital content available for rendering, wherein the digital content can be made available for rendering only by an authorized repository," and "means for making a request for an authorization object required to be included within the repository for the apparatus to render the digital content"**

| "means for processing the request to make the digital content available to the rendering engine for rendering when the request is for a permitted rendering of the digital [content]" | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "Corresponding Structure: One or more processors that implement the following algorithm: First, transaction information is provided to the server repository by the requester repository. (33:3-8.) Second, the server repository transmits a block of data to the requester repository and waits for an acknowledgement provided by the requester when the block of data has been received. (33:9-15.) Unless a communications failure terminates the transaction, that process repeats until there are no more blocks to transmit. (33:16-38, 33:46-49.) Finally, the requester repository commits the transaction and sends an acknowledgement to the server repository. (33:39-45.)" | "One or more processors that implement the following algorithm: First, transaction information is provided to the server repository by the requester repository. Second, the server repository transmits a block of data to the requester repository and waits for an acknowledgement provided by the requester when the block of data has been received. Unless a communications failure terminates the transaction, that process repeats until there are no more blocks to transmit. Finally, the requester repository commits the transaction and sends an acknowledgement to the server repository." |

| **"means for authorizing the repository for making the digital content available for rendering, wherein the digital content can be made available for rendering only by an authorized repository"** ||
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "Corresponding Structure: One or more processors that implement the following algorithm: First, a communication channel is set up between the server and the remote repository. (41:52-54.) Second, the server repository performs a registration process with the remote repository. (41:55-57.) Third, the server repository invokes a "play" transaction to acquire the authorization object. (41:58-64.) Finally, the server repository performs tests on the authorization object or executes a script before signaling that authorization has been granted for rendering content. (41:65-42:16.)" | "One or more processors that implement the following algorithm: First, a communication channel is set up between the server and the remote repository. Second, the server repository performs a registration process with the remote repository. Third, the server repository invokes a "play" transaction to acquire the authorization object. Finally, the server repository performs tests on the authorization object or executes a script before signaling that authorization has been granted for rendering content." |

| **"means for making a re[q]uest for an authorization ob[j]ect required to be included within the repository for the apparatus to render the digital content"** ||
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| "Corresponding Structure: One or more processors that implement the following algorithm: First, a communications channel is set up between the server repository and the remote repository. (41:52-54.) Second, the server repository performs a registration process with the remote repository. (41:55-57.) Third, the server repository invokes a "play" transaction to request the authorization object. (41:58-64.)" | "One or more processors that implement the following algorithm: First, a communications channel is set up between the server repository and the remote repository. Second, the server repository performs a registration process with the remote repository. Third, the server repository invokes a "play" transaction to request the authorization object." |

(Dkt. No. 366, Ex. B, at 23-25.) These disputed terms appear in Claim 1 of the '576 Patent.

Defendants submit:

[T]o avoid jury confusion, the Court should decline [Plaintiff's] invitation to include parenthetical citations in its constructions of "means for processing the

request to make the digital content available to the rendering engine for rendering when the request is for a permitted rendering of the digital [content]"; "means for authorizing the repository for making the digital content available for rendering"; and "means for making a request for an authorization object required to be included within the repository for the apparatus to render the digital content." Outside of the parenthetical citations, the parties now agree on the substance of these three terms.

(Dkt. No. 331, at 27 n.15 (square brackets Defendants').)  At the February 6, 2015 hearing, the

parties did not address these terms.

On balance, the Court agrees with Defendants that including the parentheticals proposed

by Plaintiff is unnecessary in light of the parties having otherwise reached agreement as to the

proper corresponding structure for these means-plus-function terms.

The Court accordingly hereby construes these disputed terms as set forth in the following

chart:

| Term | Corresponding Structure |
|---|---|
| "means for processing the request to make the digital content available to the rendering engine for rendering when the request is for a permitted rendering of the digital [content]" | "One or more processors that implement the following algorithm and equivalents thereof: First, transaction information is provided to the server repository by the requester repository. Second, the server repository transmits a block of data to the requester repository and waits for an acknowledgement provided by the requester when the block of data has been received. Unless a communications failure terminates the transaction, that process repeats until there are no more blocks to transmit.  Finally, the requester repository commits the transaction and sends an acknowledgement to the server repository." |
| "means for authorizing the repository for making the digital content available for rendering, wherein the digital content can be made available for rendering only by an authorized repository" | "One or more processors that implement the following algorithm and equivalents thereof: First, a communication channel is set up between the server and the remote repository. Second, the server repository performs a registration process with the remote repository. Third, the server repository invokes a "play" |

| | transaction to acquire the authorization object. Finally, the server repository performs tests on the authorization object or executes a script before signaling that authorization has been granted for rendering content." |
|---|---|
| "means for making a re[q]uest for an authorization ob[j]ect required to be included within the repository for the apparatus to render the digital content" | "One or more processors that implement the following algorithm and equivalents thereof: First, a communications channel is set up between the server repository and the remote repository. Second, the server repository performs a registration process with the remote repository. Third, the server repository invokes a "play" transaction to request the authorization object." |

## V. CONSTRUCTION OF DISPUTED TERMS IN THE NGUYEN PATENTS

The '280 Patent is titled "System and Method for Managing Transfer of Rights Using Shared State Variables." The '280 Patent issued on August 10, 2010, and bears a priority date of June 7, 2001. The Abstract states:

> A method, system and device for transferring rights adapted to be associated with items from a rights supplier to a rights consumer, including obtaining a set of rights associated with an item, the set of rights including meta-rights specifying derivable rights that can be derived from the meta- [*sic*, meta-right]; determining whether the rights consumer is entitled to the derivable rights specified by the meta-rights; and deriving at least one right from the derivable rights, if the rights consumer is entitled to the derivable rights specified by the meta-rights, wherein the derived right includes at least one state variable based on the set of rights and used for determining a state of the derived right.

The '053 Patent claims priority to a provisional application to which the '280 Patent also claims priority.

## A. "repository"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "Same as in Stefik Patents, i.e.: a trusted system in that it maintains physical, communications, and behavioral integrity in the support of usage rights" | "a trusted system, which maintains physical, communications and behavioral integrity, and supports usage rights" |

(Dkt. No. 292-1, at 12; Dkt. No. 331, at 29; Dkt. No. 366, Ex. B, at 46.)  The parties submit that this disputed term appears in Claims 1 and 12 of the '280 Patent and Claims 1 and 15 of the '053 Patent.  (Dkt. No. 292-1, at 12; Dkt. No. 331, at 29.)

"[Plaintiff] and Defendants agree that 'repository' should be construed the same way in the Stefik and Nguyen patents."  (Dkt. No. 331, at 30.)

For the same reasons set forth above as to the Stefik Patents, the Court hereby construes **"repository"** to mean **"a trusted system in that it maintains physical, communications, and behavioral integrity in the support of usage rights."**

## B. "license"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "data embodying a grant of usage rights and/or meta-rights" | "a data structure containing both a usage right and meta-right" |

(Dkt. No. 304, at 21; Dkt. No. 334, at 34.)  The parties submit that this disputed term appears in Claims 11 and 22 of the '280 Patent and Claims 1, 3, 4, 5, 15, and 23 of the '053 Patent.  (Dkt. No. 292-1, at 11; Dkt. No. 331, at 34.)[15]

---

[15] Defendants submit in their response brief, evidently erroneously, that this disputed term appears also in Claim 12 of the '280 Patent.  (Dkt. No. 331, at 34.)

Plaintiff submits that "the specification repeatedly uses 'and/or' language to make clear that a 'license' can embody usage rights, meta-rights, or both."  (Dkt. No. 304, at 21.)  Plaintiff also argues that Defendants' proposal of a "data structure" is based on a portion of the specification but, "[a]mong other issues, . . . is incomplete."  (*Id.*, at 21-22.)

Defendants respond that the Nguyen Patents "describe licenses not as mere permissions or authorizations, but as particular data constructs . . . ."  (Dkt. No. 331, at 34-35 (citing '280 Patent at 4:7-14; citing '053 Patent at 4:40-47).)

Plaintiff replies that "the patent specification repeatedly uses 'and/or' language to teach that a license can embody usage rights, meta-rights, or both . . . ."  (Dkt. No. 345, at 15.) Further, Plaintiff submits, "Defendants also fail to explain why the Court should limit the term license to a 'data structure' when the patent teaches that rights can also be expressed in 'symbols, elements, or sets of rules.'"  (*Id.*, at 15 n.17.)

At the February 6, 2015 hearing, the parties did not address this disputed term.

(2)  Analysis

The specification discloses:

> License 52 includes the appropriate rights, such as usage rights *and/or* meta-rights, and can be downloaded from license server 50 or an associated device.

'280 Patent at 5:13-16 (emphasis added).

> As shown in FIG. 10, license 52 includes license 52a, grant 52b, and digital signature 52c.  Grant 52b includes granted usage rights *and/or* meta-rights selected from label.  The structure of the grant also includes one or more principals, to whom the specified usage rights and/or meta-rights are granted, a list of conditions, and state variables required to enforce the license.  Like usage rights, access and exercise of the granted meta-rights are controlled by the condition list and state variables as described below.

'053 Patent at 4:59-64 (emphasis omitted); *see id.* at 10:15-16 ("[G]rant 52b of license 52 can include usage rights *and/or* meta-rights.") (emphasis added); *see also id.* at 6:66-7:2 ("An 'offer of rights' or 'rights offer' expresses how a consumer (e.g. a content distributor or user) can acquire a particular instance of content together with its associated usage rights *and/or* meta-rights.") (emphasis added).

The specification also discloses "licenses" both with and without reference to a meta-right:

> These licenses embody the actual granting of usage rights to an end user. For example, rights label 40 may include usage rights permitting a recipient to view content for a fee of five dollars and view and print content for a fee of ten dollars. License 52 can be issued for the view right when the five dollar fee has been paid, for example. Client component 60 interprets and enforces the rights that have been specified in license 52.

'280 Patent at 4:7-14.

> FIG. 4 is an example of license 52 encoded in XrML™. The provider grants the distributor a meta right to issue a usage right (i.e., play) to the content (i.e., a book) to any end user. With this meta right, the distributor may issue the right to play the book within the U.S. region and subject to some additional conditions that the distributor may impose upon the user, as long as the distributor pays $1 to the provider each time the distributor issues a license for an end user.

*Id.* at 8:17-24.

> *Licenses 52 embody the actual granting of rights, including usage rights and meta-rights, to an end user.* For example, rights offer 40 may permit a user to view content for a fee of five dollars and print content for a fee of ten dollars, or it may permit a user to offer rights to another user, for example, by utilizing the concept of meta-rights described below. License 52 can be issued for the view right when the five dollar fee has been paid. Client component 60 interprets and enforces the rights, including usage rights and meta-rights, that have been specified in the license.

'053 Patent at 4:40-50 (emphasis added).

Plaintiff argues that "[t]he plain import of this sentence [("Licenses 52 embody the actual granting of rights, including usage rights and meta-rights, to an end user.")] is that the scope of

the word 'rights' in licenses generally can encompass both usage rights and meta-rights.  It does not follow, however, that every license specifically must contain both types of rights."  (Dkt. No. 345, at 15.)

On balance, the above-quoted disclosures demonstrate that Defendants' proposal of "usage right *and* meta-right" should be rejected.

As to whether a "license" must be a data structure, as Defendants have proposed, the specification discloses:

> Meta-rights can be expressed by use of a grammar or rights language including data structures, symbols, elements, or sets of rules.

'280 Patent at 7:40-42; *see id.* at 4:7-14; *see also id.* at 4:40-48.  Plaintiff urges that because Defendants' proposed construction "ignores the reference to 'symbols,' 'elements' and 'sets of rules, . . . [Plaintiff's] construction of 'data embodying a grant' is more appropriate.  (Dkt. No. 304, at 22.)

On balance, Defendants' proposal of "data structure" lacks sufficient support in the intrinsic evidence and would tend to confuse rather than clarify the scope of the claims.

The Court accordingly hereby construes **"license"** to mean **"data embodying a grant of usage rights and/or meta-rights."**

**C.  "meta-right"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a right that when exercised creates or disposes of usage rights or other meta[-]rights but is not itself a usage right, i.e., actions to content do not result from exercising meta-rights"[16] | "a data structure that is used by a repository to create or dispose of 'usage rights' or other meta-rights relating to an item of content and is distinct from a usage right associated with the item of content" |

---

[16] Plaintiff previously proposed: "a right that when exercised creates or disposes of usage rights or other meta-rights but is not itself a usage right."  (Dkt. No. 304, at 22.)

(Dkt. No. 304, at 22; Dkt. No. 331, at 31; Dkt. No. 366, Ex. B, at 45.)  The parties submit that these disputed terms appear in Claims 1, 11, 12, and 22 of the '280 Patent and Claims 1, 3, 4, and 15 of the '053 Patent.  (Dkt. No. 292-1, at 11; Dkt. No. 331, at 31.)

(1)  The Parties' Positions

Plaintiff argues that whereas its proposed construction is "based on an express definition in the specification," Defendants "seek to graft additional language onto this definition that is nowhere found in the specification and which obscures rather than clarifies the distinction between meta-rights and usage rights."  (Dkt. No. 304, at 22.)  Plaintiff explains that "in contrast to usage rights which control access to content, meta-rights control and manage usage rights (or other meta-rights)."  (*Id.*, at 23 (citing '280 Patent at 7:23-31).)  Finally, Plaintiff argues that "it is unclear whether Defendants' construction means: (a) that a meta-right is not itself a usage right (in which case [Plaintiff's] construction is a clearer way of saying that); (b) that a meta-right *can* be a usage right so long as it is distinct from at least one other usage right associated with the same content (which would be at odds with the distinctions recited in the specification); or (c) something else entirely."  (Dkt. No. 304, at 24.)

Defendants respond that "'[m]eta-rights' in the Nguyen patents are the rights to grant 'usage rights' (or additional meta-rights) to others."  (Dkt. No. 331, at 31.)  Defendants submit that their proposed construction "avoids reciting pure legal concepts and captures the three distinguishing characteristics of 'meta-rights' in the Nguyen patents: 'meta-rights' are (1) formed as a data construct associated with a particular digital work; (2) used by a repository to create or dispose of usage rights or other meta-rights; and (3) distinct from a usage right."  (*Id.*, at 31-32.)  Defendants emphasize that "[e]very . . . example in the specifications . . . presents meta-rights as data."  (*Id.*, at 32.)

Plaintiff replies that including Defendants' "data structure" and "repository" limitations would "create[] nonsensical redundancy." (Dkt. No. 345, at 16.) Plaintiff also argues that its proposed construction makes clear that "a meta-right can be exercised independent of an action to content." (*Id.*)

At the February 6, 2015 hearing, Defendants argued that Plaintiff's proposed "i.e." phrase is confusing and should be omitted.

(2) Analysis

Claim 1 of the '280 Patent, for example, recites (emphasis added):

1. A computer-implemented method for transferring rights adapted to be associated with items from a rights supplier to a rights consumer, the method comprising:
    obtaining a set of rights associated with an item, the set of rights including *a meta-right specifying a right that can be created when the meta-right is exercised, wherein the meta-right is provided in digital form and is enforceable by a repository*;
    determining, by a repository, whether the rights consumer is entitled to the right specified by the *meta-right*; and
    exercising the *meta-right* to create the right specified by the *meta-right* if the rights consumer is entitled to the right specified by the *meta-right*, wherein the created right includes at least one state variable based on the set of rights and used for determining a state of the created right.

The specification discloses:

Meta-rights are the rights that one has to generate, manipulate, modify, dispose of or otherwise derive other rights. Meta-rights can be thought of as usage rights to usage rights (or other meta-rights). * * * Meta-rights can be hierarchical and can be structured as objects within objects.

'280 Patent at 5:47-50 & 5:60-62; *see* '053 Patent at 5:22-23 (similar).

At a high level the process of enforcing and exercising meta-rights are [*sic*, is] the same as for usage rights. However, the difference between usage rights and meta-rights are [*sic*, is] the result from exercising the rights. *When exercising usage rights, actions to content result.* For example usage rights can be for viewing, printing, or copying digital content. *When meta-rights are exercised, new rights are created from the meta-rights or existing rights are disposed as the result of exercising the meta-rights.* The recipient of the new rights may be the same

principal (same person, entity, or machine, etc), who exercises the meta-rights. Alternatively, the recipient of meta-rights can be a new principal. The principals who receive the derived rights may be authenticated and authorized before receiving/storing the derived rights. Thus, the mechanism for exercising and enforcing a meta-right can be the same as that for a usage right. . . .

Meta-rights can be expressed by use of a grammar or rights language including data structures, symbols, elements, or sets of rules. For example, the XrML™ rights language can be used. As illustrated in FIG. 3, the structure of license 52 can consist of one or more grants 300 and one or more digital signatures 310.

'280 Patent at 7:23-45 (emphasis added).

In FIG. 9, rights 902 and 903 derived from an offer 901 are exclusive to each respective consumer. The offer 901 is a type of *meta-right* of which the recipients have the rights to obtain specific derivative rights when the conditions for obtaining such rights are satisfied.

'280 Patent at 11:54-58 (emphasis added); *see* '280 Patent at Figs. 9-16; *see also* '053 Patent at Figs. 13-20 (same).

Plaintiff also submits that in an appeal during prosecution of United States Patent No. 7,774,279, which claims priority to one of the same applications to which the Nguyen Patents claim priority, the Board of Patent Appeals and Interferences found that "the Specification provides an express definition of 'meta-rights.' . . . The definition for 'meta-rights' given in the Specification governs the construction to be given that term in the claims." (Dkt. No. 304, Ex. V, 12/16/2009 Decision on Appeal, at 6.)

Plaintiff also submits that in a recent Petition for Covered Business Method Patent Review at the PTO, Defendant Google Inc. argued that "the broadest reasonable construction of a 'meta-right' is 'a right about a right.'" (Dkt. No. 345, Ex. AJ, at 27.)

On balance, Defendants' proposal of "data structure" lacks sufficient support in the intrinsic evidence and would tend to confuse rather than clarify the scope of the claims. The parties are otherwise essentially in substantive agreement, and the above-discussed evidence

demonstrates that a "meta-right" is a right governing another right rather than governing any action to content.

The Court accordingly hereby construes **"meta-right"** to mean **"a right that, when exercised, creates or disposes of usage rights (or other meta-rights) but that is not itself a usage right because exercising a meta-right does not result in action to content."**

**D. "usage rights"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Same as in Stefik patents, i.e., "an indication of the manner in which a [digital work / digital content / content / a digital document] may be used or distributed as well as any conditions on which use or distribution is premised" | "statements in a language for defining the manner in which a digital work may be used or distributed, as well as any conditions on which use or distribution is premised.  Usage rights must be permanently attached to the digital work"[17] |

(Dkt. No. 304, at 23; Dkt. No. 331 at 33; Dkt. No. 366, Ex. B, at 50.)  The parties submit that this disputed term appears in Claims 1, 3, 4, and 15 of the '053 Patent.  (Dkt. No. 292-1, at 12; Dkt. No. 331, at 33.)[18]

(1)  The Parties' Positions

Plaintiff argues: "Defendants' scattershot approach will result in jury confusion and does not reflect how a person of skill in the art would understand these patents.  From beginning to end, the specification confirms that 'usage rights' should be construed the same in both the meta-rights patents and the Stefik patents."  (Dkt. No. 304, at 24.)

---

[17] Defendants previously proposed: "A data structure that persists with digital content and that defines the manner in which the content may be used or distributed, as well as any conditions on which use or distribution is premised."  (Dkt. No. 292-2, at 21.)

[18] Plaintiff submitted in its P.R. 4-3 statement, evidently erroneously, that this disputed term appears also in Claims 5 and 23 of the '053 Patent.  (Dkt. No. 292-1, at 12.)

Defendants respond "[t]he parties agree that the Court should construe 'usage rights' in the Nguyen '053 patent in the same way the Court construes that term for the majority of the Stefik patents because the '053 patent incorporates four Stefik patents by reference. . . . The parties disagree about which Stefik patents to base this construction on." (Dkt. No. 331, at 33.) Defendants emphasize that whereas the '053 Patent incorporates-by-reference several Stefik Patents, the Stefik '160 Patent relied upon by Plaintiff is not incorporated by the '053 Patent. (*Id.*)

Plaintiff replies that having a different construction for the Nguyen Patents "would result in unnecessary jury confusion." (Dkt. No. 345, at 17.)

(2) Analysis

The specification discloses:

> A predetermined set of usage transaction steps define a protocol used by the repositories for enforcing usage rights associated with a document. *Usage rights persist with the document content.* The usage rights can permit various manners of use such as, viewing only, use once, distribution, and the like. Usage rights can be contingent on payment or other conditions.
>
> * * *
>
> The interpretation and enforcement of usage rights are well known generally.

'053 Patent at 2:39-45 & 6:23-25 (emphasis added); *see id.* at 15:25-27 ("Access to the various documents, and elements thereof, can be controlled using known techniques.")

For substantially the same reasons discussed above as to the Stefik Patents, the Court reaches the same construction for the Nguyen Patents as for the Stefik Patents.

The Court accordingly hereby construes **"usage rights"** to mean **"indications that are attached, or treated as attached, to [a digital work / digital content / content / a digital document] and that indicate the manner in which the [digital work / digital content /**

**content / digital document] may be used or distributed as well as any conditions on which use or distribution is premised."**

**E.  "manner of use"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Same as in Stefik patents, i.e., "a way in which [a digital work / digital content / content / a digital document] may be used" | "a defined way of using or distributing a digital work (for example, PLAY, COPY, or PRINT), as distinct from conditions which must be satisfied before that way of using or distributing the digital work is allowed"<br><br>[Same as in Stefik Patents] |

(Dkt. No. 304, at 23; Dkt. No. 331 at 31; Dkt. No. 366, Ex. B, at 50.)  The parties submit that this disputed term appears in Claims 1 and 15 of the '053 Patent.  (Dkt. No. 292-1, at 12; Dkt. No. 331, at 31.)

"Both sides propose their respective constructions of 'manner(s) of use' for both the Stefik and Nguyen patents."  (Dkt. No. 331, at 31.)

Defendants argue that "[j]ust like the Stefik patents, the '053 patent differentiates manners of use from conditions on use or distribution."  (Dkt. No. 331, at 31 (citing '053 Patent at 1:58-64 & 2:42-44).)  "Essentially," Defendants submit, "authorization determines whether a user is allowed to access digital content, while usage rights define particular manners in which the authorized content can be used."  (*Id.*)

Plaintiff's reply brief does not specifically address this disputed term.  (*See* Dkt. No. 345, at 16-17.)

The specification discloses:

The usage rights can permit various manners of use such as, viewing only, use once, distribution, and the like.  Usage rights can be contingent on payment or other conditions.

'280 Patent at 2:16-19.

Because the parties appear to agree that this disputed term should be given the same construction in the Nguyen Patents as in the Stefik Patents, the Court hereby construes **"manner of use"** to mean **"a way in which [a digital work / digital content / content / a digital document] may be used, as contrasted with a condition associated with such use."**

## F. "state variable"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a variable having a value, or identifying a location at which a value is stored, that represents status of an item, rights, license, or other potentially dynamic conditions" | "a variable having a value that represents the status of usage rights, license, or other dynamic conditions" |

(Dkt. No. 304, at 25; Dkt. No. 331, at 34.)  The parties submit that this disputed term appears in Claims 1, 5, and 12 of the '280 Patent and Claims 1, 4, 5, 15, and 23 of the '053 Patent.  (Dkt. No. 292-1, at 13; Dkt. No. 331, at 34.)

(1)  The Parties' Positions

Plaintiff argues that the specification and the prosecution history explain that a "state variable" can identify location information.  (Dkt. No. 304, at 25-26.)

Defendants respond that the Nguyen Patents expressly define "state variables" in the manner Defendants have proposed.  (Dkt. No. 331, at 34.)  Defendants also argue that "[Plaintiff] does not cite any part of the patents to support its construction" and, "[a]s for [Plaintiff's] prosecution history argument, new subject matter added to the '053 patent by amendment cannot be used to expand the scope of this term."  (*Id.*)  Finally, Defendants urge that "[c]onditions are either dynamic or not.  [Plaintiff's proposal of] '[p]otentially' turns the claim inside out by

allowing it to encompass conditions that are not dynamic and might never become dynamic." (*Id.*)

Plaintiff replies that based on Figure 15 and accompanying description, "there can be no dispute that the specification amply discloses the use of a state variable to identify a location on a remote server." (Dkt. No. 345, at 17.) Plaintiff also emphasizes disclosure of "track[ing] *potentially* dynamic states [*sic*] conditions." (*Id.*, at 18 (quoting '053 Patent at 5:42-44) (emphasis Plaintiff's).)

At the February 6, 2015 hearing, Defendants argued that Plaintiff's proposal of referring to a location cannot be correct because a state variable is something that holds a value, not a location where a value might be found. Defendants also argued that the illustrations of a "state variable id" (in the Figures of the Nguyen Patents) are references to the *names* of state variables, not the *values* of those variables. Defendants concluded that the illustration of "state variable id = www.foou.edu" does *not* demonstrate that a state variable can identify a location.

(2)  Analysis

Claim 1 of the '053 Patent recites (emphasis added):

1.  A method for sharing rights adapted to be associated with an item, the method comprising:
    specifying, in a first license, using a processor, at least one usage right and at least one meta-right for the item, wherein the usage right and the meta-right include at least one right that is shared among one or more users or devices;
    defining, via the at least one usage right, using a processor, a manner of use selected from a plurality of permitted manners of use for the item;
    defining, via the at least one meta-right, using a processor, a manner of rights creation for the item, wherein said at least one meta-right is enforceable by a repository and allows said one or more users or devices to create new rights;
    associating, using a processor, at least one state variable with the at least one right in the first license, *wherein the at least one state variable identifies a location where a state of rights is tracked*;
    generating, in a second license, using a processor, one or more rights based on the meta-right in the first license, wherein the one or more rights in the

second license includes at least one right that is shared among one or more users or devices; and

      associating at least one state variable with the at least one right that is shared in the second license, wherein the at least one state variable that is associated with the second license is based on the at least one state variable that is associated with the first license.

This claim itself thus contemplates that a "state variable" can identify a location at which a value is stored.

The specification discloses:

> State variables track *potentially dynamic* states [*sic*] conditions. *State variables are variables having values that represent status of an item, usage rights, license or other dynamic conditions*. State variables can be tracked, by clearinghouse 90 license or server 30 another device [*sic*], based on identification mechanisms in license 52. Further, the value of state variables can be used in a condition. For example, a usage right can be the right to print content 42 three times. Each time the usage right is exercised, the value of the state variable "number of prints" is incremented. In this example, when the value of the state variable is three, the condition is no[] longer satisfied and content 42 cannot be printed. Another example of a state variable is time. A condition of license 52 may require that content 42 is printed within thirty days. A state variable can be used to track the expiration of thirty days. Further, the state of a right can be tracked as a collection of state variables. The collection of the change is [*sic*, in] the state of a usage right represents the usage history of that right.

'053 Patent at 5:42-59 (emphasis added); *see* '280 Patent at 7:66-8:12 (similar).

In light of this disclosure of "potentially" dynamic conditions, Plaintiff's proposal of "potentially" is appropriate.

As to Plaintiff's proposal of "identifying a location at which a value is stored," the specification discloses:

> There are multiple ways to specify the scope of state variables, each of which can affect whether the derivative state variables can be shared, how the derivative state variables can be shared, and the like. For example, a state variable can be local, and solely confined to a recipient or can be global, and shared by a predetermined group of recipients. A *global state variable can be shared by a group of recipients* not determined when derived rights are issued, but to be specified later, perhaps based on certain rules defined in the license or based on other means. A global state variable can be shared between one or more rights

suppliers, predetermined recipients, un-specified recipients, and the like. Advantageously, depending on the sharing employed with a given a [*sic*] business model and the rights granted in the meta-rights, state variables can be created at different stages of the value chain.

'053 Patent at 17:4-18 (emphasis added); *see* '280 Patent at 11:29-43 (same); *see also id.* at 11:25-28 & 12:19-21. Also of note, Figure 17 of the '280 Patent discloses "state variable id = www.foou.edu," which a person of ordinary skill in the art would understand as an Internet location. (Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at ¶ 68; Dkt. No. 345, Ex. AA, 1/9/2015 Goodrich Decl., at ¶ 43.)

Plaintiff also submits that during prosecution of the '053 Patent, the patentee stated that "*a state variable referring to a location on a server* can be used to infer that the right is shared among multiple devices." (Dkt. No. 397, Ex. W, Amendment After Non-Final Rejection at 13 (emphasis added); *see id.* at 13-14 ("a state variable is not 'the number of copies' or 'rental terms,' as asserted by the present Office Action, but rather references, for example, a counter or variable where 'the number of copies' or 'rental terms' is maintained, and wherein such a counter or variable can be located on a local device or a remote server. The ability to choose the location of a state keeper instead of a specific number, advantageously, provides a mechanism for the rights owner to control rights sharing.").)[19]

---

[19] At the February 6, 2015 hearing, the Court requested that Plaintiff file a more complete version of the excerpted Exhibit W attached to Plaintiff's opening brief. Plaintiff did so. (Dkt. No. 397.) Defendants have responded by submitted a subsequent office action. (*See* Dkt. No. 399, Ex. A, 5/21/2007 Office Action.) Defendants explain that submission of this subsequent office action is necessary for "completeness." (Dkt. No. 399 at 1.) Defendants have not argued that they were not aware of the content or significance of Plaintiff's Exhibit W. Indeed, at the February 6, 2015 hearing, Defendants' counsel offered immediately to hand up paper copies of a complete version of the document that Plaintiff had submitted in excerpted form as Exhibit W. Defendants had an opportunity to respond to Exhibit W and submit additional exhibits at the time Defendants filed their responsive claim construction brief. Thus, Defendants' submission (Dkt. No. 399) is untimely, and the Court does not consider it.

Finally, Plaintiff's expert, Dr. Goodrich, has opined:

> To someone of ordinary skill in the art the concept that a variable can store a location where something is tracked is well understood.  For example, the computer language C includes the concept of a variable storing the address for another variable and this address can be used to read or write the value of the other variable.  Likewise, at the time of the '053 patent it was well understood that objects on the Internet could be referenced by a Uniform Resource Identifier (URI), such as a Uniform Resource Locator (URL) which is standard format for specifying addresses of objects on the Internet, or a Uniform Resource Name (URN), which identifies a resource on a network using a unique name. * * * It would be well known to someone with ordinary skill in the art . . . that variables can be of many different types and the same is true of state variables as taught in the patent.

(Dkt. No. 345, Ex. AA, 1/9/2015 Goodrich Decl., at ¶ 43.)

Defendants' expert, Dr. Grimes, responds that "[i]n the context of claims and the intrinsic evidence, a person of ordinary skill in the art would not understand whether the state variable stores 1) an address or file in which a value is stored, 2) the identity of a group/organization for which a state variable is tracked, or 3) the right itself."  (Dkt. No. 331, Ex. 11, 12/22/2014 Grimes Decl., at ¶ 73.)  Further, as to the above-mentioned disclosure of a web address, Dr. Grimes responds that "the specification never discloses what, if anything, is maintained at that location."  (*Id.*)

On balance, in light of the above-discussed intrinsic evidence, the opinions of Plaintiff's expert are more credible as to how a person of ordinary skill in the art would understand a "state variable" with regard to a location.  Defendants' expert's opinions regarding purported ambiguity are unpersuasive, particularly given the above-quoted prosecution history and the above-quoted disclosure that state variables can be shared.  *See* '280 Patent at 11:29-43; *see also id.* at 11:25-28 ("[A] shared state variable can include a data variable that is updated in response to actions by a plurality of users and which is globally applied to each of the users.") & 12:19-21 ("[A] shared state can be managed by an entity that is accessible by all sharing principals.").

The Court accordingly hereby construes **"state variable"** to mean **"a variable having a value, or identifying a location at which a value is stored, that represents status of an item, rights, license, or other potentially dynamic conditions."**

## G. "the at least one state variable identifies a location where a state of rights is tracked"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Ordinary and customary meaning | Indefinite |

(Dkt. No. 304, at 25; Dkt. No. 331, at 36). The parties submit that this disputed term appears in Claims 1 and 15 of the '053 Patent. (Dkt. No. 292-1, at 14; Dkt. No. 331, at 36.)

### (1) The Parties' Positions

Plaintiff's opening brief does not address this term separately from the term "state variable," which is addressed above. (*See* Dkt. No. 304, at 25-26.)

Defendants respond that "One of ordinary skill in the art cannot determine with reasonable certainty whether the 'state variable' is and/or stores (1) an address or file in which another value is stored; (2) the identity of a group/organization for which a state variable is tracked; or (3) the 'state of rights' itself." (Dkt. No. 331, at 36.)

Plaintiff's reply brief does not address this term separately from the term "state variable," which is addressed above. (*See* Dkt. No. 345, at 17-18.)

At the February 6, 2015 hearing, the parties did not address this disputed term.

### (2) Analysis

Defendants submit that the specification refers to "state variables," a "state variable identification," and a "state variable id" interchangeably. *See, e.g.,* '053 Patent at 4:64, 20:2 & Fig. 17. The specification illustrates the state variable "id" as being a number (Fig. 17 ("40")), a right (Fig. 13 ("AlicePlayEbook")), a priority (Fig. 18 ("priority_1")), or an organization (Fig. 16

("um.foo.club")).  Defendants submit that "[t]he specification never explains if these values or elements are themselves 'state variables' or merely 'identification[s]' of the state variables." (Dkt. No. 331, at 36 (square brackets Defendants').)

Further, Defendants argue, "though the specification alludes to a state variable storing a location (such as a Web site address), the specification never discloses what is maintained at that location."  (*Id.* (citing '053 Patent at 18:14-21 & Fig. 15).)  Finally, Defendants submit that the prosecution history of the '053 Patent fails to clarify the meaning by stating that "a state variable referring to a location on a server can be used to infer that the right is shared among multiple devices . . . ."  (Dkt. No. 331, Ex. 23, 12/31/2008 Reply Brief, at 6.)

For substantially the same reasons set forth above as to the term "state variable," in particular as to disclosures regarding sharing of state variables, Defendants' arguments are unpersuasive.

The Court therefore hereby expressly rejects Defendants' indefiniteness argument.  No further construction is necessary.  *See U.S. Surgical*, 103 F.3d at 1568; *see also O2 Micro*, 521 F.3d at 1362; *Finjan*, 626 F.3d at 1207.

The Court accordingly hereby construes **"the at least one state variable identifies a location where a state of rights is tracked"** to have its **plain meaning** apart from the construction of the term "state variable," above.

**H. "specifying, in a first license, . . . at least one usage right and at least one meta-right for the item, wherein the usage right and the meta-right include at least one right that is shared among one or more users or devices"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "specifying in a first license, at least one usage right and at least one meta-right for the item, wherein at least one of the meta-right or the usage right is shared among one or more users or devices" | Indefinite |

(Dkt. No. 304, at 27; Dkt. No. 331, at 35.)  Defendants submit that this disputed term appears in Claims 1 and 15 of the '053 Patent.  (Dkt. No. 331, at 35.)

(1)  The Parties' Positions

Plaintiff argues that "the surrounding claim language and the specification make clear exactly what the claim covers.  In particular, the requirement that a license 'include' at last one shared right merely means that at least one right specified in the license be shared with other users or devices."  (Dkt. No. 304, at 27.)

Defendants respond that "given that [Plaintiff] admits that a meta-right 'is not itself a usage right,' it is nonsensical that a meta-right and a usage right could possibly both include a 'shared' right."  (Dkt. No. 331, at 35 (citing Dkt. No. 304, at 23).)  Defendants emphasize that the disputed term itself recites "the usage right *and* the meta-right," *not* "the usage right *or* the meta-right."  (Dkt. No. 331, at 35.)

Plaintiff replies that "[t]he claim language simply requires that the first license specify a set of rights (i.e., at least one usage right and at least one meta-right), where this set includes at least one right that is shared.  This limitation is satisfied so long as at least one member of the set is shared."  (Dkt. No. 345, at 18.)  Plaintiff also highlights Figure 15 and the accompanying written description.  (*Id.*)

At the February 6, 2015 hearing, the parties did not address this disputed term.

<u>(2)  Analysis</u>

The specification discloses:

> When a usage right is to be shared among a predetermined set of recipients, a
> state variable for tracking a corresponding usage right can be specified in a meta-
> right using a same state variable identification for all recipients.  During a process
> of exercising the meta-right, the same state variable identification is included in
> every derived right.
>
> FIG. 15 illustrates the use of state variable in deriving rights that are shared
> among a known set of rights recipients, according to the present invention.

'053 Patent at 18:8-16; *see id.* at 18:17-24.

Defendants' expert, Dr. Grimes, opines that "[t]he specification fails to explain how either the usage right or the meta-right 'includes' a shared right[,] and one of ordinary skill in the art would not understand what this means without further explanation."  (Dkt. No. 331, Ex. 11, 12/22/2014 Grimes Decl., at ¶ 76.)

Plaintiff's expert, Dr. Goodrich, replies that "in light of the specification, it is clear that the claim language does not require that the usage right and the meta-right must each contain another right that is shared, but rather means that the usage right and meta-right comprise a set whereby that set includes at least one right (either the meta-right or the usage right) that is shared."  (Dkt. No. 345, Ex. AA, 1/9/2015 Goodrich Decl., at ¶ 45.)

Claim 1 of the '530 Patent, for example, recites (emphasis added):

> 1. A method for sharing rights adapted to be associated with an item, the method
> comprising:
> > *specifying, in a first license, using a processor, at least one usage right*
> > *and at least one meta-right for the item, wherein the usage right and the meta-*
> > *right include at least one right that is shared among one or more users or devices*;
> > defining, via the at least one usage right, using a processor, a manner of
> > use selected from a plurality of permitted manners of use for the item;
> > defining, via the at least one meta-right, using a processor, a manner of
> > rights creation for the item, wherein said at least one meta-right is enforceable by

a repository and allows said one or more users or devices to create new rights;

       associating, using a processor, at least one state variable with the at least one right in the first license, wherein the at least one state variable identifies a location where a state of rights is tracked;

       generating, in a second license, using a processor, one or more rights based on the meta-right in the first license, wherein the one or more rights in the second license includes at least one right that is shared among one or more users or devices; and

       associating at least one state variable with the at least one right that is shared in the second license, wherein the at least one state variable that is associated with the second license is based on the at least one state variable that is associated with the first license.

Consistent with Plaintiff's proposed construction, the language of the disputed term itself refers to "at least one right" from among "the usage right and the meta-right." Plaintiff's expert's opinion supports such a reading of the plain language of the claims and is persuasive. The Court therefore adopts Plaintiff's proposed construction so as to aid clarity, and the Court hereby expressly rejects Defendants' indefiniteness argument.

The Court accordingly hereby construes **"specifying, in a first license, . . . at least one usage right and at least one meta-right for the item, wherein the usage right and the meta-right include at least one right that is shared among one or more users or devices"** to mean **"specifying in a first license, at least one usage right and at least one meta-right for the item, wherein at least one of the meta-right or the usage right is shared among one or more users or devices."**

## I. "means for obtaining a set of rights associated with an item"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "Corresponding Structure:<br>    a client environment 30 capable of connecting to a web server 80 and storing a license 52 including meta-rights and/or usage rights in a license repository 818, which can be interpreted by a license interpreter 802 (4:67-5:13; 10:44-45)[20,21] | Indefinite |

(Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at p. 35; Dkt. No. 331, at 36; Dkt. No. 366, Ex. B, at 47.)  The parties submit that this disputed term appears in Claim 12 of the '280 Patent. (Dkt. No. 292-1, at 14; Dkt. No. 331, at 36.)

### (1)  The Parties' Positions

Plaintiff's expert opines: "A person of ordinary skill in the art would understand that the ability to connect to a web server and to store and interpret licenses embodying a grant of rights is necessary to obtain a set of rights associated with an item, and clearly linked to that function." (Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at ¶ 69.)

Defendants argue that the specification "does not identify a specific structure [such as an algorithm] that 'obtains a set of rights'" but instead "provides only a conceptual description in which rights, content, or both are sent from a content provider to a recipient."  (Dkt. No. 331, at 37 (citing '280 Patent at 6:27-31).)

Plaintiff's reply brief does not address this term.  (*See* Dkt. No. 345, at 15-18.)

---

[20] This parenthetical does not appear in the parties' January 23, 2015 Joint Claim Construction Chart.  (*See* Dkt. No. 366, Ex. B, at 47.)

[21] Plaintiff previously proposed: "Corresponding Structure: algorithm/structure necessary for performing the recited function set forth in the '280 Spec., including from the following portions: Figs. 1, 5, 8 and 4:66-5:16, 5:18-21, 6:10-17, 8:31-35, 9:54-58, 10:37-45, and equivalents thereof."  (Dkt. No. 292-1, at 14.)

At the February 6, 2015 hearing, the parties did not address this disputed term.

(2)  Analysis

"[A] means-plus-function claim element for which the only disclosed structure is a general purpose computer is invalid if the specification fails to disclose an algorithm for performing the claimed function."  *Net MoneyIN*, 545 F.3d at 1367; *see WMS Gaming*, 184 F.3d at 1349; *see also Noah*, 675 F.3d at 1319.

If an algorithm is required, that algorithm may be disclosed in any understandable form. *See Typhoon Touch*, 659 F.3d at 1386 ("Indeed, the mathematical algorithm of the programmer is not included in the specification.  However, as precedent establishes, it suffices if the specification recites in prose the algorithm to be implemented by the programmer."); *see also Finisar*, 523 F.3d at 1340; *TecSec*, 731 F.3d at 1348.

Nonetheless, the purported algorithm cannot "merely provide[] functional language" and must provide a "step-by-step procedure" for accomplishing the claimed function.  *Ergo Licensing*, 673 F.3d at 1365.  Further, "[i]t is well settled that simply disclosing software, however, without providing some detail about the means to accomplish the function, is not enough."  *Function Media*, 708 F.3d at 1318 (citation and internal quotations and alterations omitted).

Claim 12 of the '280 Patent recites (emphasis added):

12.  A system for transferring rights adapted to be associated with items from a rights supplier to a rights consumer, the system comprising:
    *means for obtaining a set of rights associated with an item*, the set of rights including a meta-right specifying a right that can be created when the meta-right is exercised, wherein the meta-right is provided in digital form and is enforceable by a repository;
    means for determining whether the rights consumer is entitled to the right specified by the meta-right; and
    means for exercising the meta-right to create the right specified by the meta-right if the rights consumer is entitled to the right specified by the meta-

right, wherein the created right includes at least one state variable based on the set of rights and used for determining a state of the created right.

The specification discloses:

> When a recipient wishes to obtain specific content 42, the recipient makes a request for content 42. For example, a user, as a recipient, might browse a Web site running on Web server 80, using a browser installed in client environment 30, and request content 42. During this process, the user may go through a series of steps possibly including a fee transaction (as in the sale of content) or other transactions (such as collection of information). When the appropriate conditions and other prerequisites, such as the collection of a fee and verification that the user has been activated, are satisfied, Web server 80 contacts license server 50 through a secure communications channel, such as a channel using a Secure Sockets Layer (SSL). License server 50 then generates license 52 for content 42 and Web server 80 causes both the content and license 52 to be downloaded. License 52 includes the appropriate rights, such as usage rights and/or meta-rights, and can be downloaded from license server 50 or an associated device. Content 42 can be downloaded from computer 70 associated with a vendor, distributor, or other party.

> Client component 60 in client environment 30 will then proceed to interpret license 52 and allow use of content 42 based on the usage rights and conditions specified in license 52. The interpretation and enforcement of usage rights are well known generally and described in the patents referenced above, for example. The steps described above may take place sequentially or approximately simultaneously or in various orders.

'280 Patent at 4:66-5:25.

On balance, this disclosure amounts to a sufficient algorithm "in prose" for implementing the claimed function. *Typhoon Touch*, 659 F.3d at 1386.

The Court accordingly hereby finds that for the **"means for obtaining a set of rights associated with an item,"** the function is **"obtaining a set of rights associated with an item,"** and the corresponding structure is **"a client environment 30 with a browser capable of connecting to a web server 80 and storing a license 52 that can be interpreted by client component 60, as set forth in the '280 Patent at 4:66-5:21; and equivalents thereof."**

**J. "means for determining whether the rights consumer is entitled to the right specified by the meta-right"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "Corresponding Structure: authorization manager 508 that authenticates the rights consumer 304 and verifies that the conditions 306 of the license 52 have been satisfied (8:66-9:8; 9:15-18; 9:63-10:2)[22],[23] | Indefinite |

(Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at p. 36; Dkt. No. 331, at 37.)  The parties

submit that this disputed term appears in Claim 12 of the '280 Patent.  (Dkt. No. 292-1, at 14;

Dkt. No. 331, at 37.)

(1)  The Parties' Positions

Plaintiff's expert opines: "A person of ordinary skill in the art would understand that

authenticating the rights consumer and verifying that the conditions of the license have been

satisfied is necessary to determine whether the rights consumer is entitled to the right specified

by the meta-right and clearly linked to that function."  (Dkt. No. 304, Ex. K, 11/25/2014

Goodrich Decl. at ¶ 70.)

Defendants argue that "[t]here are no algorithms or other descriptions of software that

show how the consumer's entitlement is determined.  Instead, the '280 patent provides only

conceptual and abstract restatements of the claimed function."  (Dkt. No. 331, at 37 (citations

omitted).)

---

[22] This parenthetical does not appear in the parties' January 23, 2015 Joint Claim Construction Chart.  (*See* Dkt. No. 366, Ex. B, at 48.)

[23] Plaintiff previously proposed: "Corresponding Structure: algorithm/structure necessary for performing the recited function set forth in the '280 Spec., including from the following portions: Figs. 5, 7, 8 and 8:66-9:8, 9:66-10:2, 10:35-45, and equivalents thereof."  (Dkt. No. 292-1, at 14.)

Plaintiff's reply brief does not address this term.  (*See* Dkt. No. 345, at 15-18.)

At the February 6, 2015 hearing, the parties did not address this disputed term.

<u>(2)  Analysis</u>

Claim 12 of the '280 Patent recites (emphasis added):

12.  A system for transferring rights adapted to be associated with items from a rights supplier to a rights consumer, the system comprising:

means for obtaining a set of rights associated with an item, the set of rights including a meta-right specifying a right that can be created when the meta-right is exercised, wherein the meta-right is provided in digital form and is enforceable by a repository;

*means for determining whether the rights consumer is entitled to the right specified by the meta-right*; and

means for exercising the meta-right to create the right specified by the meta-right if the rights consumer is entitled to the right specified by the meta-right, wherein the created right includes at least one state variable based on the set of rights and used for determining a state of the created right.

The specification discloses:

Authorization module 508 instructs license manager 503 to fetch state variable 308 and conditions 306 of license 52.  Authorization manager 508 then determines which state variables are required to enforce to enforce [*sic*] license 52.  State of rights manager 504 then supplies the current value of each required state variable to authorization module 508.  Authorization module 508 then passes conditions 306 and the required state variables to condition validator 506.  If all conditions 306 are satisfied, authorization module 508 returns "authorized" to meta-rights manager module 510.

* * *

Rights manager module 512 uses authorization module 508 to verify that recipient of the newly created rights or derived rights is intended principal 304.

* * *

In step 702 [of Fig. 7], principal 304 of license 52 is *authenticated in a known manner.  In other words, it is determined if the party exercising meta-right 302 has the appropriate license to do so.*  If the principal is not authorized, the procedure terminates in step 704.  If the principal is authorized, the procedures [*sic*] advances to step 706 in which meta right 302 is exercised and transmitted to the consumer in the form of license 52 having derived rights in the manner set forth above.  In step 708 the principal of this new license is *authenticated.  In*

*other words, it is determined if the party exercising the derived rights has the appropriate license to do so.*  If the principal is not authorized, the procedure terminates in step 710.  If the principal is authorized, the procedures [*sic*] advances to step 712 in which the derived right is stored.  The procedure then returns to step 708 for each additional right in the license and terminates in step 714 when all rights have been processed.

'280 Patent at 8:66-9:8, 9:15-18 & 9:58-10:7 (emphasis added).

Defendants' expert, Dr. Grimes, opines:

For instance, "authenticating the rights consumer" is not an algorithm.  Rather, it is a function that similarly requires structural support, which Dr. Goodrich [(Plaintiff's expert)] does not identify.  "Verifying that conditions of the license have been satisfied" is no better.  This language is insufficient to define an algorithm.

(Dkt. No. 331, Ex. 11, 12/22/2014 Grimes Decl., at ¶ 41.)

Plaintiff's expert, Dr. Goodrich, opines that a person of ordinary skill in the art would understand the above-quoted passages as sufficient disclosure of an algorithm in prose form.

(Dkt. No. 345, Ex. AA, 1/9/2015 Goodrich Decl., at ¶ 23.)

The Court finds Plaintiff's expert's opinion more credible in this regard.  For example, Defendants' have not rebutted the above-quoted disclosure in the specification that authentication was "known."  On one hand, "[t]he inquiry is whether one of skill in the art would understand the specification itself to disclose a structure, not simply whether that person would be capable of implementing a structure."  *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 953 (Fed. Cir. 2007).  On the other hand, "the amount of detail that must be included in the specification depends on the subject matter that is described and its role in the invention as a whole, in view of the existing knowledge in the field of the invention."  *Typhoon Touch*, 659 F.3d at 1385.  On balance, the latter is the applicable principle here, and the above-quoted disclosure amounts to a sufficient algorithm in prose form.  *Id.* at 1386.

The Court accordingly hereby finds that for the **"means for determining whether the rights consumer is entitled to the right specified by the meta-right,"** the function is **"determining whether the rights consumer is entitled to the right specified by the meta-right,"** and the corresponding structure is **"authorization manager 508 that authenticates the rights consumer 304 and verifies that the conditions 306 of the license 52 have been satisfied, as described in the '280 Patent at 8:66-9:8, 9:15-18 & 9:63-10:2; and equivalents thereof."**

**K. "means for exercising the meta-right to create the right specified by the meta-right"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "Corresponding Structure: <br>    meta-rights manager module 510 that derives new rights from meta-rights 302 in accordance with a set of rules or other logic and updates the state of rights and the current value of the conditions in a state of rights repository (9:9-13; 9:33-50)[24],[25] | Indefinite |

(Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at p. 37; Dkt. No. 331, at 37.)  The parties submit that this disputed term appears in Claim 12 of the '280 Patent.  (Dkt. No. 292-1, at 15; Dkt. No. 331, at 37.)

(1)  The Parties' Positions

Plaintiff's expert opines: "A person of ordinary skill in the art would understand that deriving new rights from meta-rights and updating the state of rights and the current value of the

---

[24] This parenthetical does not appear in the parties' January 23, 2015 Joint Claim Construction Chart.  (*See* Dkt. No. 366, Ex. B, at 48.)

[25] Plaintiff previously proposed: "Corresponding Structure: algorithm/structure necessary for performing the recited function set forth in the '280 Spec., including from the following portions: Figs. 5, 7, 8 and 8:56-57, 9:9-22, 9:33-6, 10:2-7, 10:35-45, 10:62-66, and equivalents thereof." (Dkt. No. 292-1, at 15.)

conditions in a state of rights repository is necessary in exercising the meta-right to create the right specified by the meta-right, and clearly linked to that function." (Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at ¶ 71.)

Defendants argue that "[t]he '280 patent explains that to 'exercise' a meta-right is to create a usage right (or another meta-right) using the meta-right. The '280 patent, however, provides no description of any algorithm for performing this 'exercising' function." (Dkt. No. 331, at 37.)

Plaintiff's reply brief does not address this term. (*See* Dkt. No. 345, at 15-18.)

At the February 6, 2015 hearing, the parties did not address this disputed term.

(2) Analysis

Claim 12 of the '280 Patent recites (emphasis added):

12. A system for transferring rights adapted to be associated with items from a rights supplier to a rights consumer, the system comprising:
   means for obtaining a set of rights associated with an item, the set of rights including a meta-right specifying a right that can be created when the meta-right is exercised, wherein the meta-right is provided in digital form and is enforceable by a repository;
   means for determining whether the rights consumer is entitled to the right specified by the meta-right; and
   *means for exercising the meta-right to create the right specified by the meta-right* if the rights consumer is entitled to the right specified by the meta-right, wherein the created right includes at least one state variable based on the set of rights and used for determining a state of the created right.

The specification discloses:

Meta-rights manager module 510 verifies license 52 and meta-rights 302 therein, to authorize the request to exercise meta-rights 302, to derive new rights from meta-rights 302, and to update the state of rights and the current value of the conditions.

* * *

Once a request to exercise a meta-rights [*sic*] has been authorized, the meta-right can be exercised. Meta-rights manager module 510 informs state of rights

module 504 that it has started exercising the requested meta-rights. State of rights module 504 then records the usage history and changes its current value of the state variables. Meta-rights manager module 510 exercises the requested meta-rights in a manner similar to known procedures for usage rights. If new rights are derived, then meta-rights manager module 510 invokes license manager module 504 to create new rights as the result of exercising the target meta-rights. Each new right is then sent to the corresponding rights manager module 512 of the consumer and stored in a repository associated with the consumer. Rights manager module 512 of the consumer will authenticate and authorize the consumer before receiving and storing the newly created right. New rights can be derived from meta-rights in accordance with a set of rules or other logic. For example, one rule can dictate that a consumed right to offer a license for use will result in the consumer having the right to offer a usage right and grant a license to that usage right to another consumer.

'280 Patent at 9:9-13 & 9:33-53.

Plaintiff's expert, Dr. Goodrich, opines that a person of ordinary skill in the art would recognize this as disclosure of an algorithm in prose form. (Dkt. No. 345, Ex. AA, 1/9/2015 Goodrich Decl., at ¶ 22; *see* Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at ¶ 71.)

The Court finds Plaintiff's expert's opinion credible in this regard. On one hand, "[t]he inquiry is whether one of skill in the art would understand the specification itself to disclose a structure, not simply whether that person would be capable of implementing a structure." *Biomedino*, 490 F.3d at 953. On the other hand, "the amount of detail that must be included in the specification depends on the subject matter that is described and its role in the invention as a whole, in view of the existing knowledge in the field of the invention." *Typhoon Touch*, 659 F.3d at 1385. On balance, the latter is the applicable principle here, and the above-quoted disclosure amounts to a sufficient algorithm in prose form. *Id.* at 1386.

The Court accordingly hereby finds that for the **"means for exercising the meta-right to create the right specified by the meta-right,"** the function is **"exercising the meta-right to create the right specified by the meta-right,"** and the corresponding structure is **"meta-rights manager module 510 that derives new rights from meta-rights 302 in accordance with a set**

**of rules or other logic and updates the state of rights and the current value of the**

**conditions in a state of rights repository, as described in the '280 Patent at 9:9-13 &**

**9:33-50; and equivalents thereof."**

**L. "means for generating a license including the created right, if the rights consumer is entitled to the right specified by the meta-right"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "Corresponding Structure: License Server 50/License Manager 803 (4:5-14; 5:6-13; 10:35-45; 10:62-11:16)[26,27] | Indefinite |

(Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at p. 37; Dkt. No. 331, at 38; Dkt. No. 366,

Ex. B, at 49.)  Plaintiff submits that this disputed term appears in Claim 22 of the '280 Patent.

(Dkt. No. 292-1, at 15.)

    (1)  The Parties' Positions

    Plaintiff's expert opines: "A person of ordinary skill in the art would understand that a

license server/license manager is necessary to generate a license including the created right and

[is] clearly linked to that function."  (Dkt. No. 304, Ex. K, 11/25/2014 Goodrich Decl. at ¶ 72.)

    Defendants argue that the only relevant passage in the specification "simply restates the

function of generating a license."  (Dkt. No. 331, at 38 (citing '280 Patent at 5:11-13).)

    Plaintiff's reply brief does not address this term.  (*See* Dkt. No. 345, at 15-18.)

    At the February 6, 2015 hearing, the parties did not address this disputed term.

---

[26] This parenthetical does not appear in the parties' January 23, 2015 Joint Claim Construction Chart.  (*See* Dkt. No. 366, Ex. B, at 49.)

[27] Plaintiff previously proposed: "Corresponding Structure: algorithm/structure necessary for performing the recited function set forth in the '280 Spec., including from the following portions: Figs. 1, 3, 4, 5, 7, 8 and 4:2-49, 5:6-13, 8:31-35, 8:56-57, 9:9-22, 9:33-66, 10:2-7, 10:35-45, 10:62-66, and equivalents thereof."  (Dkt. No. 292-1, at 15.)

(2)  Analysis

Claim 22 of the '280 Patent recites: "The system of claim 12, further comprising means for generating a license including the created right, if the rights consumer is entitled to the right specified by the meta-right."

The portions of the specification cited by Plaintiff disclose as follows:

License Server 50 manages the encryption keys and issues licenses for protected content.  These licenses embody the actual granting of usage rights to an end user.  For example, rights label 40 may include usage rights permitting a recipient to view content for a fee of five dollars and view and print content for a fee of ten dollars.  License 52 can be issued for the view right when the five dollar fee has been paid, for example.  Client component 60 interprets and enforces the rights that have been specified in license 52.

* * *

When the appropriate conditions and other prerequisites, such as the collection of a fee and verification that the user has been activated, are satisfied, Web server 80 contacts license server 50 through a secure communications channel, such as a channel using a Secure Sockets Layer (SSL).  *License server 50 then generates license 52 for content 42 and Web server 80 causes both the content and license 52 to be downloaded.*

* * *

FIG. 8 illustrates an exemplary system including a common state-of-rights server, according to the present invention.  In FIG. 8, the exemplary system can include a common state-of-rights server of the system 801, including a state-of-rights manager 809, and one or more state-of-rights repositories 814, and one or more license servers 800, including a meta-rights manager 810, a usage rights manager 812, an authorization component 808, a condition validator 806, a state-of-rights manager 804, one or more state-of-rights repositories 816, a license manager 803, a license interpreter 802, and one or more license repositories 818.

* * *

The *license manager 803 derives new rights* based on an offer, which can include any suitable machine-readable expression, and optionally including meta-rights.  While deriving rights, the license manager 803 can create new state variables to be associated with derived rights.  The creation of state variables and their scopes can be prescribed in the offer or by some other function in the system.  The state variables can be created in one or more instances, for example, prior to rights

derivation, during rights derivation, upon fulfillment of conditions, during a first exercise of rights associated with the state variables, and the like. The state variables can be designated exclusively for a specific rights consumer, can be shared among rights consumers, and can be shared among rights consumers and other entities, such as rights suppliers, and the like. The license manager 803 can interact with the state-of-rights manager 804 to associate new state variables with physical addresses in one or more of the state-of-rights repositories 816. The state-of-rights manager 804 can access the one or more state-of-rights repositories 816 and can interact with the state-of-rights server 801 to access shared state variables from one or more of the state-of-rights repositories 814.

'280 Patent at 4:5-14, 5:6-13, 10:35-45 & 10:62-11:16 (emphasis added).

On balance, these disclosures set forth a "license server 50" and a "license manager 803" that are "clearly linked or associated with the claimed function," *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1219 (Fed. Cir. 2003), and that connote structure as opposed to merely restating the claimed function, especially in light of the surrounding disclosure set forth above.

The Court accordingly hereby finds that for the **"means for generating a license including the created right, if the rights consumer is entitled to the right specified by the meta-right,"** the function is **"generating a license including the created right, if the rights consumer is entitled to the right specified by the meta-right,"** and the corresponding structure is **"license server 50 or license manager 803 as described in the '280 Patent at 4:5-14, 5:6-13, 10:35-45, and 10:62-11:16; and equivalents thereof."**

## VI. CONSTRUCTION OF DISPUTED TERMS IN THE DUNKELD PATENT

The '556 Patent is titled "Method of Providing a Digital Asset for Distribution." The '556 Patent issued on November 12, 2013, and bears a priority date of December 10, 2001. The Abstract states:

Digital assets are provided for distribution within an electronic network. The digital asset includes digital content that is associated with a digital rights holder. A serial number is provided for (embedded within) the asset; this number

130

uniquely identifies a first introduction of digital asset for distribution within the electronic network. The asset is then posted in a number of locations so that it can be distributed to users. A transaction database is updated to reflect occurrences of different instantiations of the asset.

## A. "detect[ing] a transfer"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "to discover or determine the existence, presence, or fact of a transfer" | "to discover the occurrence of a transfer" |

(Dkt. No. 304, at 28; Dkt. No. 331, at 38.) Defendants submit that these disputed terms appear in Claims 1 and 12 of the '556 Patent. (Dkt. No. 331, at 38.)

(1) The Parties' Positions

Plaintiff argues, in full: "Both parties are proposing dictionary definitions. [Plaintiff's] proposal, which relies on the Merriam-Webster dictionary (http://www.merriam-webster.com/dictionary/detect), is slightly broader than Defendants', and as such should be adopted." (Dkt. No. 304, at 28 (citing *Cephalon Inc. v. Mylan Pharms. Inc.*, 962 F. Supp. 2d 688, 699 (D. Del. 2013)).)

Defendants respond that "[t]he specification does not include the broad[] scope urged by [Plaintiff]," and "Defendants' more clear and concise proposal will be easier for a jury to understand." (Dkt. No. 331, at 38.)

Plaintiff replies that "[t]he parties' . . . dispute boils down to whether the Court should pick Defendants' narrow definition . . . or [Plaintiff's] slightly broader definition . . . ." (Dkt. No. 345, at 19.) "Nothing in the specification indicates that the patentee had in mind a narrow definition for 'detecting,'" Plaintiff urges. (*Id.*)

(2) Analysis

The specification discloses:

One key purpose of the present inventions is to allow individual customers to trade digital assets with each other while compensating rights holders for their work. The described system allows each asset to be *identified and tracked* (preferably) at the time the asset is *transferred*.

'556 Patent at 10:13-17 (emphasis added).

At the completion of the transfer, Host Server Network Device initiates step 324 by contacting Serial Number Reconciliation Module 120 to report completion of the transfer or its abandonment and the reasons for such.

\* \* \*

Customer client server module 124 also contacts Serial Number Reconciliation Module 120 in step 328. It reports the transaction as being complete and also indicates whether and where the second instantiation of the digital asset can be found for transfer to other customers in system 100.

*Id.* at 15:20-23 & 15:38-42.

In another variation of the present invention, *detection* of "rogue" assets is performed prior to *transfers*. By this it is meant that a first customer may attempt to download a digital asset from a second customer, and in the process of doing so, System Network Device 106 may *detect* that there is no appropriate tracking record reflecting a prior authorized *transfer* to such second customer.

*Id.* at 16:10-16 (emphasis added).

Nothing in the intrinsic evidence suggests that the patentee gave a special meaning to the term "detect." *Thorner*, 669 F.3d at 1367 ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope."). In other words, the proposals by both sides lack support or justification in the intrinsic evidence and would tend to confuse rather than clarify the scope of the claims.

Further, upon discussion at the February 6, 2015 hearing, both sides agreed that this disputed term could be construed to have its plain meaning.

The Court accordingly hereby construes **"detect[ing] a transfer"** to have its **plain meaning.**

**B. "instance"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "instantiation" | "a file containing the digital asset that is distinct from other files containing the same digital asset" |

(Dkt. No. 304, at 28; Dkt. No. 331, at 40.)  The parties submit that this disputed term appears in Claims 1 and 12 of the '556 Patent.  (Dkt. No. 292-1, at 16; Dkt. No. 331, at 40.)

(1)  The Parties' Positions

Plaintiff argues that whereas the specification and the prosecution history support Plaintiff's proposal, Defendants' proposal "is both unsupported by the evidence and needlessly verbose."  (Dkt. No. 304, at 28; *see id.*, at 28 n.15 (citing *Encap LLC v. Oldcastle Retail, Inc.*, 2012 WL 2339095, at *9 (E.D. Wis. June 19, 2012) ("Claim construction is not intended to allow for needless substitution of more complicated language for terms easily understood by a lay jury."); *Am. Patent Dev. Corp. v. Movielink, LLC*, 604 F. Supp. 2d 704, 716 (D. Del. 2009) (rejecting construction that, "in the Court's view, is merely a verbose paraphrasing of the claim language that otherwise offers little to assist one of skill in the art in understanding the claims")).)

Defendants respond, in full: "Defendants' proposal clearly explains the meaning of 'instance,' while [Plaintiff's] proposal would be more confusing to the jury than 'instance' itself. Moreover, 'instance' was changed from 'instantiation' during prosecution.  The Court should prevent [Plaintiff] from reclaiming scope it surrendered to obtain the claims."  (Dkt. No. 331, at 40 (citation omitted).)

Plaintiff replies that whereas Defendants' proposal lacks support in any intrinsic evidence or any dictionary definition, Plaintiff's proposal is consistent with the intrinsic record. (Dkt. No. 345, at 20.) Plaintiff also argues that "Defendants are incorrect that the patentee effectuated a 'surrender[r]' of claim scope by replacing 'instantiation' in the claims with its synonym 'instance.'" (*Id.*)

At the February 6, 2015 hearing, the parties did not address this disputed term.

(2) Analysis

The specification repeatedly uses the term "instantiation":

A related object [of the invention] is to provide a tracking mechanism and method that relies primarily on creating *separate instantiations of a digital asset to facilitate tracking* of the latter[.]

* * *

This architecture ensures security, compliance, and accountability for each *instantiation* of the asset.

* * *

[T]o assist the tracking of the digital asset, *a separate and new instantiation of the digital asset is created for each transfer* occurring over the network between peer devices.

* * *

*The present invention treats each instantiation of an asset as unique* and as such the terms of acquisition can be flexible with respect to time, parties involved in the transaction, prior purchasing, intended usage, etc.

* * *

As noted earlier, a *first instantiation* of the digital asset is created based on an original offset and serial number embedded within the digital content. To allow for *tracking of the particular transfer*, a *new instantiation* of the digital asset is made. In step 316 Client Server module 124 gets a new serial number and new offset for this transaction from the Serial Number Assignment Module 118. The new serial number and new offset are used to create a *unique instantiation* of the digital asset for the particular transaction. Thus, instead of merely copying the

digital content as part of the transfer, *the present invention creates a separate instantiation to facilitate tracking of each transfer* (or transaction) within system 100.

In some applications where security and accounting is [*sic*, are] not as critical (or can be remedied by other mechanisms consistent with the present teachings) it is possible that actual *separate instantiations* of the digital asset might not be required. Instead, it might be more practical to simply track the point-to-point movement of a digital asset across network between one or more Customer Network devices 112, and/or Host Server Network Device 110.

'556 Patent at 2:32-34, 3:27-28, 3:43-46, 8:23-27 & 14:27-46 (emphasis added); *see id.* at 4:24-38 ("first instantiation" and "second instantiation"); *see also id.* at 5:37-44 (similar) & 6:53-62 (similar).

Plaintiff also submits that during prosecution of the '556 Patent, the patentee submitted: "Instantiation=To create an instance of an object, *Microsoft Computer Dictionary*, 3rd Edition, Microsoft Press, Redmond, WA, 1997[]." (Dkt. No. 304, Ex. X, at 4.) Defendants likewise note that the patentee amended the claims so as to replace "instantiation" with "instance." (Dkt. No. 331, Ex. 20, 10/9/2012 Amendment and Response, at 2-3 & 5-6.)

The intrinsic evidence thus demonstrates that the term "instance" in the claims refers to what is described as an "instantiation" in the specification. Defendants' proposed construction properly conveys the essential feature of an "instance" as set forth in the disclosures above. Specifically, as quoted above, the essence of one "instance" of an item of digital content, as compared to another such instance, is that each instance contains the same digital content but is nonetheless uniquely identifiable. *See* '556 Patent at 8:23-27 & 14:27-38 (describing "the present invention"); *see, e.g., Verizon*, 503 F.3d at 1308.

The Court accordingly hereby construes **"instance"** to mean **"a file that contains a digital asset, and the file is distinguishable from other files containing the same digital asset."**

## C. "other portion"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "an unused part of the digital asset or information prepended or postpended to the digital asset" | "a part of the digital asset wherein embedding information does not affect the user-perceptible portion of content" |

(Dkt. No. 304, at 29; Dkt. No. 331, at 39.)  The parties submit that this disputed term appears in Claims 1 and 12 of the '556 Patent.  (Dkt. No. 292-1, at 16; Dkt. No. 331, at 39.)

(1)  The Parties' Positions

Plaintiff argues that whereas its proposed construction "faithfully tracks the disclosure in the specification," "Defendants' construction reflects language that is expressly tied to a preferred embodiment (*see* '556 Patent at col. 3:35-39) that is nowhere present in the claims." (Dkt. No. 304, at 29.)  Plaintiff submits that although the prosecution history of the '556 Patent reveals that the application claims at one time included a limitation of "without altering user perceptible content of the first digital media asset" (Dkt. No. 304, Ex. Y, 10/9/2012 Amendment and Response, at 3), the issued Claims 1 and 12 do not include such a limitation.

Defendants respond that "[Plaintiff's] proposed construction ignores the specification, which shows that a customer identification can be embedded into many portions of the digital asset."  (Dkt. No. 331, at 39 (citing '556 Patent at 12:43-47 & 19:28-31).)  Defendants also urge that "Defendants' proposed construction takes into account a key part of the invention: that embedding the customer identification does not affect user-perceptible content."  (Dkt. No. 331, at 39 (citing '556 Patent at 1:24-26, 2:8-10, 3:37-39 & 8:8-9).)

Plaintiff replies that its proposal "mirrors verbatim the specification's disclosure concerning the 'portion[s]' of the digital assets that are to contain identifying information." (Dkt. No. 345, at 19 (citing '556 Patent at 19:36-38).)  Plaintiff also argues that "Defendants'

proposed construction (1) describes a preferred embodiment; (2) rests on a portion of the

specification that says nothing about *which part* of the digital asset is to contain identifying

information; and (3) imports into the claims a limitation ('embedding information does not affect

the user-perceptible portion of content') that was removed during prosecution." (*Id.*, at 19-20

(citation omitted).)

At the February 6, 2015 hearing, the parties did not address this disputed term.

<u>(2)  Analysis</u>

Claims 1 and 23 of the '556 Patent recite, in relevant part:

> 1.  A method implemented by one or more computing devices for providing a digital asset for distribution, the method comprising:
>> storing, by at least one of the one or more computing devices, the digital asset, the digital asset including *digital content*; . . .
>> in response to the request for the digital asset, creating, by at least one of the one or more computing devices, a second instance of the digital asset for transfer to the user device, the second instance of the digital asset including *content* and at least one *other portion*, and embedding in the at least one *other portion* of the second instance of the digital asset at least a customer identification associated with the user and the asset identifier, wherein other instances of the digital asset have customer identifications embedded therein and the customer identifications are used to track instances of the digital asset;
>>> . . . .

> * * *

> 23.  The method of claim 1, wherein the at least one *other portion* is an unused portion.

Claim 23, a dependent claim, thus suggests that the "other portion" can be either an

"unused" portion or, presumably, a "used" portion.  *See Phillips*, 415 F.3d at 1315 ("[T]he

presence of a dependent claim that adds a particular limitation gives rise to a presumption that

the limitation in question is not present in the independent claim."); *see also Liebel-Flarsheim*,

358 F.3d at 910 ("[W]here the limitation that is sought to be 'read into' an independent claim

already appears in a dependent claim, the doctrine of claim differentiation is at its strongest.");

*Wenger*, 239 F.3d at 1233 ("Claim differentiation, while often argued to be controlling when it does not apply, is clearly applicable when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, and that limitation is the only meaningful difference between the two claims.").

Nonetheless, "the doctrine of claim differentiation can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998); *see N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed. Cir. 1993) ("While it is true that dependent claims can aid in interpreting the scope of claims from which they depend, they are only an aid to interpretation and are not conclusive. The dependent claim tail cannot wag the independent claim dog.").

At first blush, reading "other portion" to encompass the "content" set forth in Claim 1 would seemingly be at odds with the plain language of Claim 1, which appears to contrast the "other portion" with "content," as quoted above. Nonetheless, Claim 1 recites "content," not a "content portion," so Claim 1 does not on its face recite whether or not the "other portion" can be embedded with the content.

Turning to the other intrinsic evidence, the specification discloses substantially the language that Defendants have proposed:

> In a preferred embodiment the digital asset is modified for each transfer, and this modification is used by the third management server for generating the tracking records. Again, the modification *does not alter user-perceptible content* of the digital asset.
>
> * * *
>
> A preferred approach is to use the Offset to specify a valid frame and word count within the MP3 file to begin the marking. The Serial Number is then encoded one

> bit at a time in the least significant bit of successive data words until the entire
> Serial Number is encoded.

'556 Patent at 3:35-39 & 12:43-47 (emphasis added); *see id.* at 1:24-26 ("intellectual property

assets that can be digitized can now be reproduced and distributed without quality degradation");

*see also id.* at 8:8-9 ("digital media formats are receptive to steganographic techniques without

noticeable quality degradation").

Defendants' proposed reference to what is "user-perceptible" thus has some support in

the specification, as set forth above, but the specification also explains that one of the purposes

of using steganographic techniques is to allow use of existing media formats and rights

management. *See* '556 Patent at 8:8-18; *see also id.* at 8:50-52 & 9:61-64. Thus, user-

perceptible portions of content may be altered, albeit perhaps in a way that a user would not

notice. Defendants' proposal of "user-perceptible" would also introduce a potentially subjective

element that would tend to confuse rather than clarify the scope of the claims. The Court

therefore hereby expressly rejects Defendants' proposed construction.

The specification also discloses that information can be "prepended or postpended," as

Plaintiff has proposed:

> Steganographic Variations
>
> While the preferred embodiment discussed above uses a steganographic technique
> for embedding a serial number in an MP3 file, there are many other approaches
> that could accomplish this same function. Furthermore, it is expected that the
> particular mechanism used to provide and associated serial numbers will be
> different from application to application, because various digital asset formats are
> receptive to different approaches.
>
> In addition, as alluded to earlier, digital asset serial numbers could be *prepended
> or postpended*; alternatively, *unused portions* of the digital asset could be used to
> store the serial numbers. Finally, a modified format for a digital asset could be
> created to accommodate the serial number, such as new variation of an MP3 file,
> MPEG file, etc. For example, one or more standards groups or industry groups

> may utilize a form of digital asset that includes fields intended to accommodate a
> serial number.

*Id.* at 19:27-44 (emphasis added)

Plaintiff's proposal of "prepended or postpended" is thus supported by the specification. Plaintiff's proposal of referring to an "unused part of the digital asset," however, would apparently exclude a "used" portion. Such a reading is disfavored by the doctrine of claim differentiation, as set forth above.

The Court accordingly hereby construes **"other portion"** to mean **"any part of the digital asset, or information prepended or postpended to the digital asset."**

## D. "over said network between user devices"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Error – "over said network" should be deleted from both claims 8 and 19 | Indefinite |

(Dkt. No. 304, at 29; Dkt. No. 331, at 40; Dkt. No. 366, Ex. B, at 57.) The parties submit that this disputed term appears in Claims 8 and 19 of the '556 Patent. (Dkt. No. 292-1, at 16; Dkt. No. 331, at 40.)

### (1) The Parties' Positions

Plaintiff submits that "'[o]ver said network' appears in claims 8 and 19 because it was overlooked in a complicated amendment when similar language was deleted from other claims." (Dkt. No. 304, at 30.)

Defendants respond that "[t]he parties agree that claims 8 and 19 of the '556 patent are indefinite as written," and "[t]he Court should not grant [Plaintiff's] request [for judicial correction] because the claims are subject to multiple potential 'corrections,' e.g., changing

'said' to 'a' or reciting a 'network' in claim 1." (Dkt. No. 331, at 40 (citing *Novo Indus.*, 350 F.3d at 1354).)

> Plaintiff replies:
>
> [F]rom the face of the patent, it is plain that, as they presently stand and unless "over said network" is removed, claims 8 and 19 lack antecedent bases in the claims from which they depend, independent claims 1 and 12. Put differently, [Plaintiff] is not asking the Court to impermissibly remove a limitation from a defect-free, perfectly coherent claim. Rather, [Plaintiff] is asking for a correction of an obvious clerical error to make these claims coherent.

(Dkt. No. 345, at 20.)

> At the February 6, 2015 hearing, the parties did not address this disputed term.

<u>(2) Analysis</u>

> Claims 1 and 8 of the '556 Patent are representative and recite (emphasis added):

> 1. A method implemented by one or more computing devices for providing a digital asset for distribution, the method comprising:
> > storing, by at least one of the one or more computing devices, the digital asset, the digital asset including digital content;
> > associating, by at least one of the one or more computing devices, an asset identifier with the digital asset to thereby generate a first instance of the digital asset, the asset identifier identifying the digital asset;
> > receiving from a user, by at least one of the one or more computing devices, an acceptance of terms of use of digital assets;
> > providing, by at least one of the one or more computing devices, a list of one or more digital assets to the user, the list including the digital asset;
> > receiving from the user, by at least one of the one or more computing devices, a request for the digital asset;
> > in response to the request for the digital asset, creating, by at least one of the one or more computing devices, a second instance of the digital asset for transfer to the user device, the second instance of the digital asset including content and at least one other portion, and embedding in the at least one other portion of the second instance of the digital asset at least a customer identification associated with the user and the asset identifier, wherein other instances of the digital asset have customer identifications embedded therein and the customer identifications are used to track instances of the digital asset;
> > detecting, by at least one of the one or more computing devices, a transfer of the second instance of the digital asset to the user based at least in part on the customer identification;

debiting an account of the user related to the transfer of the second instance of the digital media asset to the user; and

updating, by at least one of the one or more computing devices, a transaction database to reflect a transfer of the second instance of the digital media asset to the user.

\* \* \*

8.  The method of claim 1, wherein distributions of said digital asset *over said network* between user devices are not preconditioned on securing authorization for individual copies of said digital asset.

During prosecution, the patentee added new application claims 40 and 43 (which issued as Claim 1 and Claim 12, respectively), which recited no "network" limitation. (Dkt. No. 304, Ex. Z, 8/14/2014 Amendment, at 6-7.) At the same time, the patentee modified various dependent claims so as to depend from the new application claims 40 and 43, and the patentee removed the "network" from various dependent claims. (*See id.*, at 2-6.) Plaintiff submits that the patentee's failure to remove "over said network" from the claims that issued as Claim 8 and Claim 19 was an "oversight." (Dkt. No. 304, at 30.)

"A district court can correct a patent only if, among other things, the error is evident from the face of the patent." *H-W Tech., LC v. Overstock.com, Inc.*, 758 F.3d 1329, 1333 (Fed. Cir. 2014) (citation and internal quotation marks omitted). Further, "evidence of error in the prosecution history [is] alone insufficient to allow the district court to correct the error." *Id.* at 1334.

Here, Plaintiff argues that because the erroneousness of the claims is self-evident on their face, the Court can look to the prosecution history to determine the nature of the error and the appropriate correction. The above-cited authority, however, appears to require that "*the* error," not merely the presence of some error, must be evident from the face of the patent. *Id.* Because

Plaintiff must resort to the prosecution history to demonstrate the error, the Court hereby expressly rejects Plaintiff's argument.

This finding is also consistent with the principle that "[c]ourts do not rewrite claims; instead, we give effect to the terms chosen by the patentee." *K-2*, 191 F.3d at 1364; *see Chef Am.*, 358 F.3d at 1374 ("courts may not redraft claims, whether to make them operable or to sustain their validity").

The Court accordingly hereby finds that the term **"over said network"** in Claims 8 and 19 of the '556 Patent is **indefinite**.

## VII.  CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit.  The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

Having found that the term "validating" in Claim 5 of the '007 Patent is indefinite, as discussed above, the Court hereby finds that Claim 5 of the '007 Patent is invalid.

Also, having found that the term "over said network" in Claims 8 and 19 of the '556 Patent is indefinite, as discussed above, the Court hereby finds that Claims 8 and 19 of the '556 Patent are invalid.

Within thirty (30) days of the issuance of this Memorandum Opinion and Order, the parties are hereby ORDERED, in good faith, to mediate this case with the mediator agreed upon by the parties.  As a part of such mediation, each party shall appear by counsel and by at least

one corporate officer possessing sufficient authority and control to unilaterally make binding decisions for the corporation adequate to address any good faith offer or counteroffer of settlement that might arise during such mediation.  Failure to do so shall be deemed by the Court as a failure to mediate in good faith and may subject that party to such sanctions as the Court deems appropriate.


    **So ORDERED and SIGNED this 20th day of March, 2015.**


RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE